# 25-0613-cv

## United States Court of Appeals

*for the*

### Second Circuit

AMY MOORE, MIA LYTELL, NATASHA TAGAI, EMMA HOPPER,
BRITTANY HASSEN, BRITTANY REYES,

*Plaintiffs-Appellees,*

STEPHANIE CALDWELL,

*Plaintiff-Counter-Defendant-Third-Party-Defendant,*

– v. –

HOWARD RUBIN,

*Defendant-Counter-Claimant-Appellant,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-COUNTER CLAIMANT-APPELLANT

BENJAMIN E. ROSENBERG
EDWARD A. MCDONALD
MAY CHIANG
DECHERT LLP
*Attorneys for Defendant-Counter-
Claimant-Appellant*
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500

CP COUNSEL PRESS    (800) 4-APPEAL • (381697)

JENNIFER POWERS,

*Defendant-Third-Party-Plaintiff-Counter-Claimant,*

YIFAT SCHNUR, STEPHANIE SHON, BLUE ICARUS, LLC,
DOE COMPANY, JOHN DOE,

*Defendants.*

## TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ..........................................................................1

STATEMENT OF THE CASE...............................................................................1

QUESTIONS PRESENTED...................................................................................2

RELEVANT STATUTORY PROVISIONS..........................................................3

STATEMENT OF FACTS ....................................................................................3

    A.   The Jury Verdict and Rubin's Appeal of the Damages Award......................3

    B.   Plaintiffs' Application for Fees and Costs ....................................................4

    C.   Withdrawal of Balestriere Fariello.................................................................5

    D.   The District Court's Grant of Fees and Costs ...............................................5

STANDARD OF REVIEW ...................................................................................7

SUMMARY OF THE ARGUMENT .....................................................................8

ARGUMENT ........................................................................................................9

I.    THE DISTRICT COURT ABUSED ITS DISCRETION BY AWARDING EXCESSIVE AND UNPRECEDENTED HOURLY RATES TO PLAINTIFFS' COUNSEL .............................................................................................................9

    A.   The District Court Deferred to Plaintiffs' Requested Rates And Inconsistently Reduced Those Rates Without Explanation .................................10

    B.   The District Court Improperly Rejected The Rates Set In Other TVPA Cases .............................................................................................................................14

    C.   No Enhancement To Rates Was Justified Here............................................18

II.    THE DISTRICT COURT ABUSED ITS DISCRETION BY AWARDING FEES ON THIRTY-FOUR TIMEKEEPERS ........................................................29

CONCLUSION...................................................................................................31

CERTIFICATE OF COMPLIANCE...................................................................32

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agudath Israel of America v. Hochul*,
  No. 22-38, 2023 WL 2637344 (2d Cir. Mar. 27, 2023) .................................7, 25

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany
  & Albany Cnty. Bd. of Elections*,
  522 F.3d 182 (2d Cir. 2008), *as amended* (Apr. 10, 2008) .......................... 9-10

*Balestriere PLLC v. CMA Trading, Inc.*,
  No. 11 Civ. 9459 MHD,
  2014 WL 7404068 (S.D.N.Y. Dec. 31, 2014) ...................................................24

*Barfield v. N.Y.C. Health & Hosps. Corp.*,
  537 F.3d 132 (2d Cir. 2008) ....................................................................... 21-22

*Baxter v. Crown Petroleum Partners*,
  No. 3:97–CV–2371–P,
  2000 WL 269747 (N.D. Tex. Mar. 10, 2000)....................................................23

*Beazer v. New York City Transit Auth.*,
  558 F.2d 97 (2d Cir. 1977),
  *rev'd on other grounds*, 440 U.S. 568 (1979) ..................................................14

*Blanchard v. Bergeron*,
  489 U.S. 87 (1989).........................................................................................23

*Cao v. Wedding in Paris LLC*,
  727 F. Supp. 3d 239 (E.D.N.Y. 2024) ................................................... 13-14, 30

*Chrapliwy v. Uniroyal, Inc.*,
  670 F.2d 760 (7th Cir. 1982) ..........................................................................15

*Chaparro v. John Varvatos Enterprises, Inc.*,
  No. 21-446-cv, 2021 WL 5121140 (2d Cir. Nov. 4, 2021)...............9-10, 27-28

*Chrysafis v. Marks*,
  No. 21-CV-2516 (GRB)(AYS),
  2023 WL 6158537 (E.D.N.Y. Sept 21, 2023) ........................................ 13, 24-25

*City of Burlington v. Dague*,
    505 U.S. 557 (1992)...........................................................................27

*Cornelio v. Connecticut*,
    No. 3:19-CV-01240 (JAM),
    2023 WL 10802701 (D. Conn. Nov. 28, 2023)..................................26

*Feltzin v. Union Mall LLC*,
    393 F. Supp. 3d 204 (E.D.N.Y. 2019) ...............................................25

*Fisher v. SD Prot. Inc.*,
    948 F.3d 593 (2d Cir. 2020) ...............................................................8

*H.C. v. New York City Dep't of Edu.*,
    71 F.4th 120 (2d Cir. 2023) ..............................................................10

*Hemant Patel, M.D., P.C. v. Bandikatla*,
    No. 18-cv-10227 (JSR),
    2024 WL 1509238 (S.D.N.Y. Apr. 5, 2024) ............................... 15-18

*Jackson v. United States*,
    No. 3:14-15086, 2016 WL 3826379 (S.D. W. Va. July 13, 2016)....................26

*Johnson v. Ga. Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) ...................................................*passim*

*Lawson v. Rubin*,
    No. 17-CV-6404 (BMC),
    2018 WL 4861380 (E.D.N.Y. Oct. 5, 2018) .....................................23

*Lilly v. City of New York*,
    934 F.3d 222 (2d Cir. 2019) .....................................................*passim*

*Linneman v. Vita-Mix Corp.*,
    970 F.3d 621 (6th Cir. 2020) .....................................................19, 28

*Lochren v. Cnty. of Suffolk*,
    344 F. App'x 706 (2d Cir. 2009) ................................................11, 30

*Marion S. Mishkin L. Off. v. Lopalo*,
    767 F.3d 144 (2d Cir. 2014) .............................................................29

*McCombs v. Festival Fun Parks*,
  No. H–08–1093, 2009 WL 1596763 (S.D. Tex. June 5, 2009) .........................23

*Menard v. Targas*,
  No. 19-00050-BAJ-SDJ,
  2023 WL 5628593 (M.D. La. Aug. 31, 2023) ...................................................26

*Mhany Mgmt. Inc. v. Cnty. of Nassau*,
  CV 05-2301, 2018 WL 11605900 (E.D.N.Y. Dec. 13, 2018) ...........................30

*Millea v. Metro-N. R.R. Co.*,
  658 F.3d 154 (2d Cir. 2011) ...........................................................................8, 14

*Moore v. Rubin*,
  724 F. Supp. 3d 93 (E.D.N.Y. 2024) ...............................................................20

*Paguirigan v. Prompt Nursing Emp. Agency LLC*,
  286 F. Supp. 3d 430 (E.D.N.Y. 2017) ..............................................................17

*Paguirigan v. Prompt Nursing Emp. Agency LLC*,
  No. 1:17-cv-01302-NG-CLP,
  2022 WL 6564755 (E.D.N.Y. Apr. 7, 2022) ............................................... 15-17

*McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA
  Pension Tr. Fund*,
  450 F.3d 91 (2d Cir. 2006) ..................................................................................8

*Reply All Corp. v. Gimlet Media Inc*,
  No. 15-CV-4950 (WFK) (PK),
  2021 WL 1291103 (E.D.N.Y. Apr. 5, 2021) .............................................. 23-24

*Rodriguez v. It's Just Lunch*,
  No. 07-CV-09227,
  2020 WL 1030983 (S.D.N.Y. Mar. 2, 2020) .....................................................21

*Rubin v. HSBC Bank USA*,
  763 F. Supp. 3d 233 (E.D.N.Y. 2025) ......................................................6, 11, 24

*Simmons v. New York City Transit Auth.*,
  575 F.3d 170 (2d Cir. 2009) ...................................................................10, 15, 19

*Solnin v. Sun Life & Health Ins. Co.*,
  776 F. App'x 731 (2d Cir. 2019) ..................................................................7, 22

iv

*White Lilly LLC v. Balestriere*,
    No. 18-cv-12404 (ALC),
    2022 WL 4365615 (S.D.N.Y. Sept. 21, 2022) ....................................................24

*Wong v. Mangone*,
    450 F. App'x 27 (2d Cir. 2011) ..........................................................................22

**Statutes**

18 U.S.C.A. § 1595 ........................................................................................................3

28 U.S.C. § 1291 ...........................................................................................................1

## STATEMENT OF JURISDICTION

This is an appeal from an amended judgment dated February 14, 2025, which awarded attorneys' fees to Plaintiffs' counsel following a civil jury verdict in the federal district court for the Eastern District of New York. Defendant-Appellant filed a timely notice of appeal on March 14, 2025. JA-787. The damages awarded on that verdict are proceeding in a separate appeal before this Court in Case No. 24-2018. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE CASE

Defendant-Appellant Howard Rubin appeals from the Amended Judgment issued by the Honorable Brian M. Cogan, awarding Plaintiffs $4,830,148.15 in attorneys' fees. JA-785-786. These fees were awarded to Plaintiffs as prevailing parties under the Trafficking Victims Protection Act (the "TVPA") after the parties elected to proceed with briefing the fee issue before the District Court while Rubin's appeal of the jury verdict proceeded in this Court.[1]

The District Court abused its discretion in awarding such high fees to Plaintiffs' counsel. In doing so, the District Court disregarded the strong presumption in favor of the rates prevailing in the district as well as rates awarded

---

[1] Should this Court reverse the judgment in Case No. 24-2018, Plaintiffs would no longer be prevailing parties. Rubin reserves the right to move the District Court for relief from the fee award.

1

in similarly complex cases under the TVPA. Instead, it deferred to Plaintiffs'

requested rates for commercial cases, inconsistently applying reductions to those

rates. Although the reductions ranged from nearly 7% to 61%, the District Court

did not explain it reasoning for these reductions. And while the District Court

professed to determine a reasonable rate by applying the well-established *Johnson*

factors, its analysis was replete with errors.

Under the correct analysis, the District Court would have used the forum

rates as its baseline and then considered whether a reduction or enhancement from

those rates was justified. No such enhancement was justified here. The District

Court abused its discretion in awarding such high rates.

## QUESTIONS PRESENTED

1. Did the District Court abuse its discretion in awarding hourly rates to
   Plaintiffs' counsel that significantly exceeded the prevailing rates awarded in
   the Eastern District of New York?

2. Did the District Court abuse its discretion by allowing Plaintiffs to recover
   for thirty-four timekeepers whose qualifications were never presented to the
   District Court and where many contributed minimally to the case?

2

## RELEVANT STATUTORY PROVISIONS

Under the Trafficking Victims Protection Act ("TVPA"), a prevailing party to a civil suit under "may recover damages and reasonable attorneys' fees." 18 U.S.C.A. § 1595.

## STATEMENT OF FACTS

### A.    The Jury Verdict and Rubin's Appeal of the Damages Award

Plaintiff-Appellees Amy Moore, Mia Lytell, Natasha Tagai, Emma Hopper, Brittany Rae Hassen, and Brittany Reyes ("Plaintiffs") participated in commercial sex encounters with Defendant-Appellant Rubin.  In 2017, Plaintiffs brought a civil action against Rubin under the TVPA, alleging that at some point during certain of the encounters Rubin exceeded each Plaintiff's consent, and that liability under the TVPA attached at that moment.  Through trial, Plaintiffs were represented by Balestriere Fariello.

Following a seven-day trial, the jury found Rubin liable to each of the plaintiffs under the TVPA, and awarded each of them compensatory damages of $500,000.  JA-70, ECF 406, Verdict Sheet (April 7, 2022).  The jury then assessed punitive damages of $120,000 each for five of the plaintiffs, and $250,000 in punitive damages to Moore.  *Id*.

Rubin moved pursuant to Rules 50 and 59 for a judgment in his favor or a new trial.  The District Court denied Rubin's motions.  JA-72, ECF 425, Mem.

3

Dec. & Order (March 19, 2024). Rubin appealed, and that appeal remains pending before this Court (the "Trial Appeal"). JA-75, ECF 443, Notice of Appeal dated July 26, 2024; *see* 2d Cir. No. 24-2018.

### B.      Plaintiffs' Application for Fees and Costs

Plaintiffs then moved for attorneys' fees and costs. JA-90-593, Motion for Attorneys' Fees dated May 2, 2024. Despite Plaintiffs receiving a damages award totaling $3,850,000, Plaintiffs' counsel sought a total of $8,793,940.80 in fees and $2,035,386.10 in expenses. At nearly $11 million, Plaintiffs' counsel requested a recovery nearly triple the damages awarded to Plaintiffs. Plaintiffs' counsel fee application sought fees for sixteen attorneys and twenty non-attorney professionals (some of whom were summer law clerks), for a total of thirty-six timekeepers. Of these timekeepers, twenty-one of them billed less than 100 hours over a seven-year period. The vast majority of costs sought by Plaintiffs' counsel consisted of litigation financing charges—charges not recognized as recoverable costs.

Rubin opposed Plaintiffs' fee request, arguing that it constituted a windfall to Plaintiffs' counsel. ECF 442, Rubin Opposition dated July 22, 2024 ("Rubin Opp. Memo"). In addition to pointing out the excessive number of timekeepers, Rubin argued that Plaintiffs' requested hourly rates were unreasonable and far exceeded the prevailing rates in the Eastern District of New York. Rubin urged the District Court to follow the hourly rates awarded in the district in other TVPA cases, and,

relying on the *Johnson* factors, noted numerous issues justifying the reduction of the lodestar. With respect to costs, Rubin demonstrated that counsel's litigation financing charges were not recoverable as a cost. Rubin argued that Plaintiffs should recover $1,057,223 in attorneys' fees and $15,114.90 in expenses.

### C.    Withdrawal of Balestriere Fariello

After Rubin opposed Plaintiffs' motion for attorneys' fees, Balestriere Fariello sought to withdraw as counsel due to its founder John Balestriere's personal bankruptcy, the dissolution of the firm, and a breakdown in the attorney-client relationship. JA-77, ECF 455, Motion to Withdraw as Counsel dated August 21, 2024; JA-78, ECF 459, Motion to Withdraw as Counsel dated October 29, 2024. On November 19, 2024, the District Court granted Balestriere Fariello's motion to withdraw as counsel for Plaintiffs Reyes, Hopper, and Hassen. JA-78-79. On March 12, 2025, the District Court terminated Balestriere Fariello as counsel to Plaintiffs Tagai and Moore. JA-80. Before the District Court, Balestriere Fariello remains as counsel to only Plaintiff Lytell.

### D.    The District Court's Grant of Fees and Costs

On February 14, 2025, the District Court granted Plaintiffs' motion for fees and costs, awarding $4,830,148.15 in fees and $15,114.90 in costs. JA-769, Memorandum Decision and Order dated February 14, 2025. The District Court purported to follow the lead of a decision issued three weeks prior by Judge Block.

5

JA-772 (citing *Rubin v. HSBC Bank USA*, 763 F. Supp. 3d 233, 243 (E.D.N.Y. 2025)). In *Rubin v. HSBC Bank USA*, Judge Block found that the forum rates in the Eastern District had not been updated for twelve years and did not account for inflation. 763 F. Supp. 3d 233, 243 (E.D.N.Y. 2025). Thus, Judge Block established new hourly rate ranges for the Eastern District, setting the ranges at "$450-$650 for partners, $300-$450 for senior associates, $150-$300 for junior associates, and $100-$150 for paralegals." *Rubin*, 763 F. Supp. 3d at 244.

The District Court then "fine tune[d]" the rates for this case, looking instead at "what plaintiffs' attorneys charge their paying clients" and "whether the reasonable hourly rates that Judge Block has established and I have accepted should be enhanced because of extraordinary circumstances." JA-774. The District Court then concluded that this case was "one of the rare cases requiring a rate in excess of the usual rate commanded for litigation brought in this district." JA-775. The District Court enhanced the hourly rates substantially, adopting hourly rates of $1000 for partners, $500-800 for senior attorneys and of counsel, $400 for mid-level attorneys, $350 for junior attorneys, $225 for legal apprentices, and $150 for non-attorney analysts. The District Court applied those rates to all time billed to the case to calculate the lodestar, and then applied a 15% reduction to the lodestar to arrive at the fee award.

6

As for costs, the District Court excluded Plaintiffs' request to recover its litigation financing charges, finding that counsel's financing of its practice was overhead and not something that the non-prevailing party should have to cover. JA-782. Plaintiffs did not object to the issues Rubin raised with respect to many of the expenses, and the District Court thus excluded those expenses as having been waived by Plaintiffs.[2]

Rubin filed a timely notice of appeal on March 14, 2025. JA-787.

## STANDARD OF REVIEW

The Second Circuit generally reviews a district court's award of attorneys' fees for abuse of discretion. *Lilly v. City of New York*, 934 F.3d 222, 227 (2d Cir. 2019); *see also Agudath Israel of America v. Hochul*, No. 22-38, 2023 WL 2637344, at * 1 (2d Cir. Mar. 27, 2023) (Summary Order); *Solnin v. Sun Life & Health Ins. Co*., 776 F. App'x 731 (Mem), 733 (2d Cir. 2019) (Summary Order). "A district court abuses its discretion if it (1) bases its decision on an error of law or uses the wrong legal standard; (2) bases its decision on a clearly erroneous factual finding; or (3) reaches a conclusion that, though not necessarily the product of a legal error or a clearly erroneous factual finding, cannot be located within the

---

[2]     Rubin does not contest the awarded costs in this appeal but reserves the right to seek vacatur of the costs should he prevail on his Trial Appeal.

7

range of permissible decisions." *Lilly*, 934 F.3d at 227 (quoting *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011)).

Though the Court's review is "highly deferential," *McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund*, 450 F.3d 91, 96 (2d Cir. 2006) (per curiam), to the district court due to that court's proximity "to the details of each individual case," *Lilly*, 934 F.3d at 234, the Court has not hesitated to vacate an award of attorneys' fees due to clear error, *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 607 (2d Cir. 2020).

## SUMMARY OF THE ARGUMENT

The District Court abused its discretion by disregarding the well-settled forum rates, instead relying on counsel's own proposed rates as the basis for its decision, adjusting those rates inconsistently and without explanation. The prevailing rates in the forum, as used in comparable TVPA cases, indicated that significantly lower rates should have been charged. Furthermore, the District Court erred in approving fees for the multiple timekeepers for whom no background or qualifying information was provided to the Court.

8

## ARGUMENT

I. **THE DISTRICT COURT ABUSED ITS DISCRETION BY AWARDING EXCESSIVE AND UNPRECEDENTED HOURLY RATES TO PLAINTIFFS' COUNSEL**

The District Court abused its discretion by awarding hourly rates to Plaintiffs' counsel which greatly exceeded the prevailing rates in the Eastern District. While recognizing that both "the Supreme Court and the Second Circuit could not have been clearer that any such enhancement should be a rarity[,]" JA-774, the District Court nonetheless awarded hourly rates that were substantially higher than the prevailing rates in the Eastern District. This was clear error and must be reversed.

When determining an award of fees, courts in the Second Circuit apply the "presumptively reasonable fee" method to determine the award of attorneys' fees. The "presumptively reasonable fee" is the product of the reasonable number of hours worked multiplied by a reasonable hourly rate. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany & Albany Cnty. Bd. of Elections*, 522 F.3d 182, 183–84 (2d Cir. 2008), *as amended* (Apr. 10, 2008); *see also Chaparro v. John Varvatos Enterprises, Inc.*, No. 21-446-cv, 2021 WL 5121140, at *1–2 (2d Cir. Nov. 4, 2021). Courts determine the reasonable hourly rate "by considering all pertinent factors, including the [twelve *Johnson* factors," *Lilly*, 934 F.3d at 230.

9

This Court has repeatedly held that "[t]he reasonable hourly rate is the rate a paying client would be willing to pay . . . bear[ing] in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Arbor Hill*, 522 F.3d at 190; *Lilly*, 934 F.3d at 231; *see also H.C. v. New York City Dep't of Edu.*, 71 F.4th 120, 126 (2d Cir. 2023); *Chaparro*, 2021 WL 5121140, at \*1–2. Indeed, the "touchstone" of the attorneys' fees doctrine is that "that district courts should award fees *just high enough* 'to attract competent counsel.'" *Simmons v. New York City Transit Auth.*, 575 F.3d 170, 176 (2d Cir. 2009). Such cost-consciousness "increase[s] the probability that attorneys will receive no more than the relevant market would normally permit, and encourage[s] litigants to litigate with their own pocketbooks in mind, instead of their opponents." *Id.* at 176.

### A. The District Court Deferred to Plaintiffs' Requested Rates And Inconsistently Reduced Those Rates Without Explanation

In arriving at its hourly rates, the District Court departed from the well-established principles announced in *Arbor Hill*, *Lilly*, and subsequent cases. Setting aside for the moment whether an enhancement of the prevailing rates in the forum was justified (it was not), the District Court did not award rates by applying such an enhancement. Instead, the District Court used the rates claimed by Plaintiffs' counsel as the anchor and then applied a reduction.

10

This was a clear abuse of discretion for several reasons. First, courts in the Second Circuit apply a strong presumption in favor of the forum rule, which calls on courts to award attorneys' fees at the going rate for similarly situated attorneys in similar cases in the district. *See Lochren v. Cnty. of Suffolk*, 344 F. App'x 706, 708 (2d Cir. 2009). Here, while the District Court paid lip service to the presumption in favor of the forum rule, it immediately disregarded that presumption by turning its focus to "what plaintiffs' attorneys charge their paying clients." JA-774.

Second, the District Court's analysis was essentially the reverse of what this Court has prescribed. The District Court recognized that "the question is whether the reasonable hourly rates that Judge Block has established and I have accepted should be enhanced because of extraordinary circumstances." *Id.* But then the District Court *did not apply an enhancement* to the prevailing rates in the forum. If the District Court had done its analysis correctly, Judge Block's rates would have served as the anchor, and then the District Court would have considered whether to adjust those rates. Such a process would have been similar to how Judge Block proceeded: Judge Block adjusted the long prevailing rates in the district by an inflation factor and then rounded the numbers. *Rubin*, 763 F. Supp. 3d at 240-44. But this is not what happened. Instead, the District Court set Plaintiffs' requested rates as the baseline, then adjusted those rates downward.

11

Third, the District Court compounded that error by failing to explain why it was reducing the rates as it did and instead applying reductions at its whim. There is no rhyme or reason as to how the District Court arrived at the reductions. Below is a chart showing Plaintiffs' claimed rate ("Pl. Claimed Rate"), the Court's awarded rate ("Dist. Ct. Allowed Rate"), and the percentage difference. The chart shows that the District Court deviated from the Plaintiff's Claimed Rate by anywhere from 6.98% to 61.04%, without explanation:[3]

| Position | Pl. Claimed Rate | Dist. Ct. Allowed Rate | % Difference |
|---|---|---|---|
| Partners (5) | $1089-1670 | $1000 | -8.17% to -40.12% |
| Of Counsel (1) | $860 | $800 | -6.98% |
| Senior Attorney (1) | $715 | $500 | -30.07% |
| Mid-Level Attorney (7) | $650 | $400 | -38.46% |
| Junior Attorneys (2) | $417-450 | $350 | -16.06% to -22.22% |
| Legal Apprentices (4) | $385 | $225 | -41.56% |
| Non-Attorney Analysts (14) | $385 | $150 | -61.04% |

Comparing the awarded rates to the prevailing rates in the District (assuming Judge Block's recent decision sets the baseline) also shows the arbitrariness of the awarded rates. The awarded rates range from enhancements between 33.33% and 133.33%:

---

[3]     In addition to the roles set forth in the chart, Plaintiff also sought recover for two administrative roles (Chief of Staff and Operations Manager). The District Court denied any recovery for these two roles.

12

| Position | Inflation-Adjusted EDNY Rates | Dist Ct. Allowed Rate | % Difference |
|---|---|---|---|
| Partner | $450-650 | $1000 | 53.85%-122.22% |
| Counsel/Senior Associates | $300-450 | $500-800 | 66.67%-77.78% |
| Associates | $150-300 | $350-400 | 33.33%-133.33% |
| Paralegal/Clerks | $100-150 | $150-225 | 50% |

The District Court's arbitrariness is evident from the fact that it never explains why the junior associates who worked on the cases had their rates enhanced above district rates by 133.33% (at $350/hour awarded) whereas mid-level associates' rates were enhanced above district rates by 33.33% (at $400/hour awarded). There was no evidence in the record before the District Court to justify these increases upward, as Plaintiffs' counsel provided background and experience information for only two associates on the primary case team. *See* JA-92, Balestriere Decl. ¶ 8 (providing background and experience information for only Ms. McNeil and Mr. Grossman); *see also* Rubin Opp. Memo at 4-6; *cf. Chrysafis v. Marks*, No. 21-CV-2516 (GRB)(AYS), 2023 WL 6158537 (E.D.N.Y. Sept 21, 2023) at *3-4 (describing the background and experience of numerous associates for whom the prevailing party was seeking fees). Plaintiffs' failure to provide such information should have resulted in exclusion of the fees, yet here the District Court not only overlooked Plaintiffs' waiver but substantially increased the enhanced the rate for associates above the forum rates. *See Cao v. Wedding in*

13

*Paris LLC*, 727 F. Supp. 3d 239, 299-300 (E.D.N.Y. 2024) (fees excluded where application had no information as to certain timekeepers' backgrounds or credentials). While the District Court noted that "I have considered the qualifications of each professional," this was impossible on the record, because the qualifications for most of the thirty-six timekeepers were never presented to the District Court.

The arbitrary nature of the District Court's awarded rates is a clear abuse of discretion. *See Beazer v. New York City Transit Auth.*, 558 F.2d 97, 100 (2d Cir. 1977), *rev'd on other grounds*, 440 U.S. 568 (1979) (finding district court abused discretion in awarding a $50,710 "premium" above the lodestar); *see also Millea v. Metro-N. R. Co.*, 658 F.3d 154, 169 (2d Cir. 2011) (ruling "the district court abused its discretion when it ignored the lodestar and calculated the attorneys' fees as a proportion of the damages awarded.")

### B. The District Court Improperly Rejected The Rates Set In Other TVPA Cases

Below, Rubin argued for rates that ranged from $400-550 for partners, $300-400 for counsel, $200-275 for associates, and $100 for paralegals and clerks. Rubin Opp. Memo at 10. These rates were consistent with those awarded in TVPA cases in either the Eastern or Southern Districts,[4] and were thus consistent with this

---

[4]     Rubin's requested rates fall within the range of those ordered by Judge Block, who adjusted the Eastern District rates upward for inflation:

Circuit's presumption in favor of the forum rule. *See Simmons*, 575 F.3d at 175 ("'If a high priced, out of town attorney renders services which local attorneys could do as well, and there is no other reason to have them performed by the former, then the judge ... m[ay] allow only an hourly rate which local attorneys would have charged for the same service.'" (quoting *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 (7th Cir. 1982)).

Rubin also pointed the District Court to two TVPA cases decided in the Eastern and Southern District that applied rates within the range awarded by the Eastern District. Rubin Opp. Memo at 6-7 (citing *Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 1:17-cv-01302-NG-CLP, 2022 WL 6564755, at *7–8 (E.D.N.Y. Apr. 7, 2022) (approving hourly rates of $550 and $450 for "uniquely qualified" attorneys in a TVPA case); *Hemant Patel, M.D., P.C. v. Bandikatla*, No. 18-cv-10227 (JSR), 2024 WL 1509238, at *11 (S.D.N.Y. Apr. 5, 2024) (relying in part on *Paguirigan* to approve hourly rates of $450 for a partner, $350 for counsel,

| Position | Rubin Requested Rates | Inflation-Adjusted EDNY Rates | Dist. Ct. Rates Awarded |
|---|---|---|---|
| Partner | $400-550 | $450-650 | $1000 |
| Counsel/Senior Associates | $300-400 | $300-450 | $500-800 |
| Associates | $200-275 | $150-300 | $350-400 |
| Paralegal/Clerks | $100 | $100-150 | $150-225 |

15

$275 for senior associates, $250 for associates, and $100 for paralegals and law clerks in a TVPA case and *reject* hourly rates of $475 for partners, $425 for counsel, $375 for senior associates, and $320 for junior associates as unreasonable).

*Paguirian* and *Patel* were apt comparisons not only because they involved claims under the TVPA, but also because they were filed in 2017 and 2018 (around the same time as Plaintiffs' case) and were vigorously litigated over a number of years. The parties in *Paguirian* litigated over five years, and there the district court was required to determine motions to dismiss, a class certification motion, summary judgment motions, and then the class settlement. *See* Docket for *Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 1:17-cv-01302. Amidst that litigation, the parties also took an interlocutory appeal to the Second Circuit. *Id*. *Patel*, is even more analogous, because it was litigated over seven years and the defendant was found civilly liable following a 7-day jury trial. 2024 WL 1509238, at *1.

Yet the District Court dismissed these cases out of hand. JA-773 ("there are not many more than [these two cases] and it hardly presents an abundance of authority from which to fix a 'reasonable rate' for TVPA cases in this district."). The District Court instead mischaracterized and distorted each case. It reduced *Paguirigan* to the settlement of a class action -- overlooking years of discovery and

16

motion practice, as well as an interlocutory appeal.  The District Court also minimized *Patel* as a case where "some of [the] lawyers had a fee cap[,]" overlooking that the case had proceeded to a seven-day trial and the lower court had explicitly rejected the higher fees sought by one of the firms.  JA-773; *see also Patel*, 2024 WL 1509238, at *12 (rejecting the "higher rates charged by Scarinci & Hollenbeck").

    *Patel* and *Paguirigan* are apt precedents.  Both cases involved complex facts and required significant skill and effort from counsel.  *Paguirigan* involved immigrants from the Philippines facing threats of criminal indictment, civil lawsuits, and steep monetary penalties.  *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 434 (E.D.N.Y. 2017).  When awarding fees, the lower court noted the "novel factual and legal challenges," faced by counsel, the attorneys' skills in complex civil litigation, one of the attorney's experience  in advising Philippine citizens on their "employment and immigration[] rights[,]" in the United States, and the other attorney's 30+ years of handling "complex litigation[,]" and his fluency in the two dialects spoken by class members.  *Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 1:17-cv-01302-NG-CLP, 2022 WL 6564755, at 8 (E.D.N.Y. Apr. 7, 2022).  *Patel* involved an immigrant doctor whose employment and visa status was threatened by her employer, and the TVPA claim arose as a counterclaim to claims against the doctor seeking millions

of dollars in compensatory damages as well as permanent injunctive relief. 2024 WL 1509238, at *2. To put it simply, the stakes were high in both *Patel* and *Paguirigan*, both cases required skilled representation, and both arose under the TVPA.

Even if the District Court deemed Plaintiffs' case to be more complex than *Patel* and *Paguirigan*, the proper procedure would have been to conduct the analysis to seek an enhancement to the rates set forth in those cases—not to reject the rates from those cases entirely. By rejecting and mischaracterizing analogous TVPA cases, the District Court abused its discretion.

## C.   <u>No Enhancement To Rates Was Justified Here</u>

Had the District Court conducted the correct analysis, no enhancement to the forum rates or the TVPA rates would have been justified. The District Court abused its discretion by misapplying the *Johnson* factors and then considering the overall risk profile of the case to award high hourly fees to counsel.

This Court has counseled that in addition to the presumption in favor of the forum rates, the district court should consider, among other things, the twelve factors identified in *Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974), to the extent that they are applicable:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6)

18

> whether the fee is fixed or contingent; (7) the time limitations imposed
> by the client or the circumstances; (8) the amount involved in the case
> and the results obtained; (9) the experience, reputation, and ability of
> the attorneys; (10) the "undesirability" of the case; (11) the nature and
> length of the professional relationship with the client; and (12) awards
> in similar cases.

*Lilly*, 934 F.3d at 228. Enhancements to the standard rates in the forum should be awarded only in the most rare and exceptional circumstances. *Id*.; *see also Linneman v. Vita-Mix Corp*., 970 F.3d 621, 630 (6th Cir. 2020) (finding district court abused its discretion when departing from the rates used in the relevant legal community and instead applying national rates, which were significantly higher).

Here, while the District Court deemed this to be "one of the rare cases requiring a rate in excess of the usual rate commanded" in the Eastern District, its analysis of the *Johnson* factors was replete with flaws. JA-775.

Johnson *Factor 1 (time and labor required)*: The District Court noted that "the time commitment here was enormous . . . and . . . resulted in an extensive time commitment from everyone involved . . . ." *Id.* But the "enormous time commitment" is reflected in the hours claimed by Plaintiffs' counsel and does not justify increasing the hourly rates awarded. Double-counting the time and labor factor to increase the lodestar is inconsistent with this Court's direction from *Simmons* that attorneys should receive "no more than the relevant market would normally permit[.]" *Simmons*, 575 F.3d at 176.

19

*Johnson Factor 2 (novelty and difficulty of the questions)*: The District Court found this case to be complex because "it presented untested legal and factual issues under the TVPA" and "there were so many other pretrial issues that required the exercise of great skill in briefing and arguing." But, while there were issues involving the interpretation of the TVPA (some of those issues are on appeal before the Court), the substance of the case itself was neither novel nor complex. There was no expert testimony, and although the subject matter of the case was salacious, it was not complex. As the District Court itself found, the case ultimately boiled down to a question of consent. *See* Summary Judgment Decision, *Moore v. Rubin*, 724 F. Supp. 3d 93 (E.D.N.Y. 2024); JA-72, ECF 429-1 at 7, Plaintiffs' Memorandum (noting "the 'heart of this case [was] a credibility dispute'"). While consent presents a factually difficult issue, it does not present a novel one. This factor also did not support an enhancement.

*Johnson Factor 3 (level of skill required):* The District Court did not engage in an analysis of this factor, except to note that, apart from the preparation for and conduct of depositions, Plaintiffs' lead counsel had "extensive input" in "virtually every other aspect of the case . . . ." JA-776. However, the District Court commented on just one attorney out of thirty-two timekeepers listed on Plaintiffs' invoices. To justify an enhancement of the rates that applied to all timekeepers, the District Court should have examined the skill required at each level. But Plaintiffs'

20

counsel did not meet its burden to show this, because, as noted above, it failed to provide background and experience information for 32 of the 36 timekeepers.[5]

*Johnson Factor 5 (attorneys' customary rate)*: As explained above, the District Court used Plaintiffs' requested rates (taken from their complex commercial litigation cases) as the baseline rate and applied reductions. This was error, as the District Court should have instead started from the forum rates and considered whether an enhancement commensurate with Plaintiffs' requested rates was justified. Plaintiffs' requested rates applied to complex commercial cases, and the District Court overlooked that counsel had conceded in a prior fee application that his top rate for commercial clients should not apply in non-commercial cases. Rubin Opp. Memo at 7 n.4 (citing Balestriere Decl. ¶ 30, *Rodriguez v. It's Just Lunch*, No. 07-CV-09227, 2020 WL 1030983 (S.D.N.Y. Mar. 2, 2020) (ECF No. 451)).

*Johnson Factor 8 (amount involved and results obtained)*: This Court has counseled that "'the most critical factor' in a district court's determination of what constitutes a reasonable attorney's fee in a given case 'is the degree of success

---

[5]     Further, the District Court appears not to have considered that trial was delayed for two years because of the COVID-19 pandemic, which increased the time commitment because the parties had to prepare for trial twice. This unprecedented event should not justify an increase in counsel's rates over the forum rates because it had nothing to do with counsel's skill. Rubin Opp. Memo. at 8.

obtained' by the plaintiff." *Barfield v. N.Y.C. Health & Hosps. Corp.,* 537 F.3d 132, 152 (2d Cir. 2008). Rates may be adjusted downward where counsel was not successful on all claims. *Wong v. Mangone*, 450 F. App'x 27 (2d Cir. 2011).

Over the course of the litigation, Plaintiffs' RICO claims were dismissed, the number of defendants was notably trimmed down by the District Court, and Plaintiffs did not prevail against the second defendant, Ms. Powers. Furthermore, the District Court's fee award exceeds the plaintiffs' total recovery by nearly $1 million. This windfall to Plaintiffs' counsel was improper. *Solnin,* 776 F. App'x at 732–33.

Balestriere Fariello's engagement agreement with Plaintiffs also shows how disproportionate the District Court's fee award was in comparison to Plaintiffs' recovery. That agreement provided that if the case went to trial, the firm would "receive either the Success Fee . . . or attorney's fees awarded by the Court . . . ." JA-684, Balestriere Fariello Engagement Letter. The agreement did not state a Success Fee if the case was resolved at trial, but it had various success fees depending on where and when the case settled before trial. In particular, the agreement provided that if the case resolved on the eve of trial (following summary judgment motions), Balestriere Fariello would receive 40% of his clients' recovery. *Id*. Here, Plaintiffs were awarded $3,850,000 by the jury. Even if the success fee were 50% or even 60% of Plaintiffs' award, that fee amount would be far less than

22

what the Court awarded in fees, which was 125% of the damages award.  *See generally Blanchard v. Bergeron*, 489 U.S. 87, 93 (1989) (contingency fee agreement is "a factor" in determining appropriate fees under *Johnson*); *McCombs v. Festival Fun Parks*,  No. H–08–1093*, 2009 WL 1596763, at *5 (S.D. Tex. June 5, 2009) (contingency fee arrangement is "a factor" to be considered under *Johnson*, though it is neither dispositive nor greatly authoritative); *Baxter v. Crown Petroleum Partners*, No. 3:97–CV–2371–P, 2000 WL 269747, at *7 (N.D. Tex. Mar. 10, 2000) (finding that a contingency fee agreement is "a factor" to consider, but is not determinative of the reasonableness of the attorneys' fee award).

*Johnson Factor 9 (experience, reputation and ability of the attorneys*): The District Court acknowledged its prior sanctions against Plaintiffs' counsel, as well as sanctions imposed by other courts.  JA-776-777; Rubin Opp. Memo at 9 (citing *Lawson v. Rubin*, No. 17-CV-6404 (BMC), 2018 WL 4861380, at *2 (E.D.N.Y. Oct. 5, 2018) and Order denying ECF 163); Rubin Opp. Memo at 9 n.5 (citing *Reply All Corp. v. Gimlet Media Inc*, No. 15-CV-4950 (WFK) (PK), 2021 WL 1291103, at *2-4 (E.D.N.Y. Apr. 5, 2021)) (requiring Plaintiffs' law firm to pay the legal fees of the defendant, and finding that "[t]he underlying action was frivolous and objectively unreasonable[,]" "plaintiff advanced multiple baseless damages theories in bad faith with the sole aim of extracting a settlement[,]" "[counsel's] increasingly tortured attempts to create a viable damages theory indicate bad faith

23

and extortionary motives," and "[c]ounsel knew of the [] claim's futility yet continued to impose costs on Defendant under increasingly fanciful [] theories"); *White Lilly LLC v. Balestriere*, No. 18-cv-12404 (ALC), 2022 WL 4365615, at *1-2 (S.D.N.Y. Sept. 21, 2022) (affirming an arbitration award and finding that Mr. Balestriere "dipped into escrow funds, retrieving $1.4 million to partially satisfy outstanding fees," and that Mr. Balestriere did not dispute "the Arbitrator's finding that Balestriere's conduct was violative of New York's Disciplinary Rules"); *Balestriere PLLC v. CMA Trading, Inc.*, No. 11 Civ. 9459 MHD, 2014 WL 7404068, at *9-10 (S.D.N.Y. Dec. 31, 2014) (criticizing counsel for defects in its fee application, finding that the firm's "performance left much to be desired," and stating that the court was "generally unimpressed with the quality of legal work from the individuals whom we have seen in this case")).

Had the District Court conducted the correct analysis, it would have found that these repeated sanctions against Plaintiffs' counsel would have weighed against an enhancement of the forum rates (or those in TVPA cases). Upon the record before it, the District Court plainly abused its discretion in awarding a rate to Mr. Balestriere that is 122% above the top rate for partners in the forum (as set by Judge Block's opinion in *Rubin*, *supra*). Courts in this Circuit reserve the highest forum rates for those "'expert trial attorneys with extensive experience before the federal bar, who specialize in the practice of civil rights law and are

24

recognized by their peers as leaders and experts in their fields.'" *Chrysafis*, 2023 WL 6158537, at 5 (quoting *Feltzin v. Union Mall LLC*, 393 F. Supp. 3d 204 (E.D.N.Y. 2019)); *see also Agudath*, 2023 WL 2637344, at *5 (awarding counsel with 25 years' experience and a former Deputy Attorney General of New York a rate of $550/hour). There was no basis in the record to find that Plaintiffs' counsel was so expert, esteemed, or experienced.

*Johnson Factor 10 (undesirability of the case)*: The District Court essentially elevated this factor above all the other factors in the *Johnson* framework. After considering "the relevant *Johnson* factors," the District Court asked itself the "overarching question of what it would take to induce a reasonable, qualified lawyer to take on this case." JA-777-778. The District Court noted that this "was not a case for the faint-hearted" and "[t]here were substantial factual, legal, and practical obstacles that would have reduced the desirability of this case for any timid or risk-averse plaintiff's lawyer." JA-778. Among the factors that the District Court noted was that each plaintiff had signed an agreement to engage in sado-masochistic sex in exchange for money, and that several of the plaintiffs returned for sexual encounters with Rubin even after the allegedly violative encounters. *Id.* In other words, the District Court recognized that this was a potentially weak case.

25

The District Court's reliance on this factor evidenced a misunderstanding of the "undesirability" *Johnson* factor. That factor does not refer to whether a case is difficult to win, or risky, but to whether the case is so controversial that it might bring adverse consequences to the attorney who tried the case. *See, e.g., Cornelio v. Connecticut*, No. 3:19-CV-01240 (JAM), 2023 WL 10802701, at *8 (D. Conn. Nov. 28, 2023) ("The undesirability of the case factor articulated in *Johnson* was meant to be considered in cases in which civil rights attorneys face hardships in their communities because of their desire to ... eradicate discrimination, which is not pleasantly received by the community or counsel's contemporaries' and 'can have an economic impact on counsel's practice.) (internal quotations omitted, citation omitted); *Menard v. Targas*, No. 19-00050-BAJ-SDJ, 2023 WL 5628593, at *22 (M.D. La. Aug. 31, 2023) (litigation "risk simply is not the type of undesirability contemplated by *Johnson*, which aimed the 'undesirability' factor to encourage and compensate civil rights attorneys facing social and economic backlash for their professional efforts to eradicate discrimination") (citations omitted); *Jackson v. United States*, No. 3:14-15086, 2016 WL 3826379, at *9 (S.D. W. Va. July 13, 2016) ("This case is unlike the civil rights cases contemplated in *Johnson*, which because of their unpleasant reception by a misunderstanding community could result in a negative economic impact on the attorney's practice.") (citing *Johnson*, 488 F.2d at 719).

26

This was especially improper where the Supreme Court has counseled that an enhancement of the lodestar due to the risk taken on by an attorney is "not permitted." *See City of Burlington v. Dague*, 505 U.S. 557, 567 (1992) ("enhancement for contingency is not permitted under the fee-shifting statutes"). The District Court effectively found that Plaintiffs' counsel took a significant risk with this case. JA-777-778 (noting the complicated facts and the "substantial risk" posed). Plaintiffs' counsel was fully aware of this risk, as evidenced by its contingency arrangement with Plaintiffs in their engagement letters. By basing its rate determination on the overall riskiness of the litigation, the District Court sought to justify significantly increased rates in comparison to the forum rates. This is inconsistent with the Supreme Court's direction from *Dague.*

The District Court's repeated errors in applying and analyzing the *Johnson* factors resulted in rates that were wildly over the prevailing rates in the forum. Typically, courts that find that the *Johnson* factors warrant an increase in the reasonable rate simply set rates within or at the high end of the prevailing rate in the forum. For example, in *Chaparro*, the Second Circuit affirmed a district court's decision to set rates "that were well within, *or at the high end* of, the prevailing rate for attorneys of like skill and experience in the Southern District" based on findings that the "case involved novel issues of law, that both sides prosecuted the matter zealously, and that the stakes involved were high."

27

*Chaparro*, 2021 WL 5121140, at *2 (internal quotation marks omitted, emphasis added). There, the district court "placed great emphasis on the fact that the performance of the plaintiffs' attorneys in the courtroom and the quality of the papers they filed with the Court was extraordinary." *Id.* Here, however, though the District Court conceded that plaintiffs' attorneys initially sought rates that no court in the district had ever approved, and some of the awarded rates remained within 6-8% of counsel's rates for commercial clients—a *de minimis* reduction that did not reflect the sanctions against Plaintiffs' counsel.

*Linneman v. Vita-Mix* is instructive. 970 F.3d 621 (6th Cir. 2020). There, the Sixth Circuit found that the district court abused its discretion when using higher national rates for the billing rates when calculating the lodestar, instead of the prevailing rates in Cincinnati. *Id.* at 630 ("[T]he relevant inquiry is what billing rates are required to encourage competent lawyers *within the relevant* [*jurisdiction*] to undertake legal representation.") (internal quotations and citations omitted; emphasis in *Linneman). Linneman* arrived at this conclusion despite the parties litigating zealously for more than five years and the case presenting an issue of first impression under the Class Action Fairness Act. *Linneman* is consistent with this Court's emphasis on the forum rates—and the courts' instruction that enhancements to such rates must be extremely rare.

28

Here, the District Court committed clear error by awarding rates that far exceeded the forum rates. No enhancement to the prevailing rates in the Eastern District was justified here.

## II. THE DISTRICT COURT ABUSED ITS DISCRETION BY AWARDING FEES ON THIRTY-FOUR TIMEKEEPERS

The District Court abused its discretion by allowing Plaintiffs' counsel to recover for thirty-four out of thirty-six requested timekeepers. The only timekeepers excluded were the Chief of Staff and the Operations Manager, presumably because such positions are administrative and non-legal.

The record before the District Court, however, was incomplete as Plaintiffs provided background and experience information for only four attorneys: John Balestriere, Matthew Schmidt, Jillian McNeil and Brian Grossman. Rubin Opp. Memo at 4-5. As discussed above, Plaintiffs' failure to provide background information for any of the other timekeepers should have resulted in the exclusion of time from all other timekeepers. Nor is it clear how the Court "considered the qualifications of each professional" when such information was not provided to the Court for thirty-two of them. JA-780. In awarding enhanced fees on an incomplete record, the District Court abused its discretion. *See Marion S. Mishkin L. Off. v. Lopalo*, 767 F.3d 144, 149-50 (2d Cir. 2014) (holding the district court abused its discretion when relying on an incomplete record).

29

Even if Plaintiffs had provided "sufficient information to assess the reasonableness of their hourly rates"[6] the District Court should have reduced the hours claimed due to overstaffing. *Lochren*, 344 F. App'x at 709 (affirming 25% reduction due to plaintiffs overstaffing the case). Plaintiffs' time entries make clear that a majority of the timekeepers did not contribute meaningfully to the case. *See Mhany Mgmt. Inc. v. Cnty. of Nassau*, CV 05-2301, 2018 WL 11605900, at *3–5, 15 (E.D.N.Y. Dec. 13, 2018) (approving the voluntary exclusion of the time of attorneys who recorded fewer than ninety hours of litigation at one law firm, and fewer than fifty hours at two other law firms). Here, twenty-one timekeepers recorded less than 100 hours on this case over the entirety of the litigation. This includes a "mid-level attorney" who billed just twelve minutes to the case (.2 hours), another "mid-level attorney" who billed forty-two minutes (.6 hours), and a partner who billed just thirty minutes.

These timekeepers should have been eliminated before the lodestar was calculated. Nor could the Court's use of a 15% reduction of the lodestar adequately address the excessive number of timekeepers. At the rates awarded by the District Court, the twenty-one timekeepers amounted to approximately $227,417.50 in fees—representing approximately 25% of the District Court's calculated lodestar. The District Court should have excluded these timekeepers or

---

[6]     *Cao*, 727 F. Supp. 3d at 300.

30

applied a greater reduction of the lodestar to account for the excessive number of timekeepers. The record before the District Court did not support their inclusion.

## CONCLUSION

The District Court abused its discretion. Assuming Plaintiffs remain a prevailing party following this Court's determination of the pending Trial Appeal in Case No. 24-2018, the Court should vacate the fee award and remand for a determination consistent with the prevailing rates in the forum.

Date: June 26, 2025
      New York, NY

By: */s/ Benjamin E. Rosenberg*
Benjamin E. Rosenberg
Edward A. McDonald
May K. Chiang
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
Tel.: (212) 698-3500
Fax: (212) 698-3599

*Counsel for*
*Defendant-Appellant Howard*
*Rubin*

31

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 6,960 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Time New Roman.

Dated: June 26, 2025               Respectfully submitted,

                                 */s/ Benjamin E. Rosenberg*
                                 Benjamin E. Rosenberg

# SPECIAL APPENDIX

i

## SPECIAL APPENDIX TABLE OF CONTENTS

**Page**

Memorandum Decision and Order of the Honorable
Brian M. Cogan, Appealed From, dated February
14, 2025 ................................................................. SPA-1

Amended Judgment, Appealed From, dated
February 18, 2025 ................................................ SPA-17

SPA-1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
AMY MOORE, MIA LYTELL, NATASHA        :
TAGAI, EMMA HOPPER, BRITTANY          :
HASSEN and BRITTANY REYES,            :
                                      :
                  Plaintiffs,         :     **MEMORANDUM DECISION AND**
                                      :     **ORDER**
                                      :
        -against-                     :     17-cv-6404 (BMC)
                                      :
HOWARD RUBIN,                         :
                                      :
                  Defendant.          :
-------------------------------------------------------- X

**COGAN**, District Judge.

Presently before the Court is the motion by plaintiffs for an award of attorneys' fees and

costs, the result of plaintiffs having obtained a jury verdict pursuant to the Trafficking Victims

Protection Act, 18 U.S.C. § 1591, in the aggregate amount of $3,850,000. The facts surrounding

this action are discussed at length in the Court's decision denying defendant's motion for

judgment as a matter of law or for a new trial, see Moore v. Rubin, 724 F. Supp. 3d 93 (E.D.N.Y.

2024), and thus will not be repeated here, but to summarize, defendant is a successful bond

trader who entered into contracts with each of the plaintiffs to travel to New York and engage in

sadomasochistic sexual acts with him. They contended that the acts he inflicted on them

exceeded the limits of their consent and the jury agreed.

Defendant does not seriously dispute that plaintiffs are entitled to recover some amount

of attorney fees and costs as prevailing parties. The TVPA, although a criminal statute, provides

a private right of action in which a prevailing plaintiff may recover "damages and reasonable

attorneys fees." 18 U.S.C. § 1595(a). Furthermore, as the prevailing parties, plaintiffs are

entitled to an award of costs. See Fed. R. Civ. P. 54(d)(1).

SPA-2

This case, delayed by the pandemic, extensive discovery, and endless motion practice, took seven years and culminated in a seven-day trial. Plaintiffs seek $8,793,940.80 in attorneys' fees based on 12,006.9 hours and $2,035,386.10 in costs and expenses. Counsel's fee arrangement with plaintiffs was contingent on recovery.

Having considered what are reasonable fees and costs for this massive case, I grant plaintiffs' motion to the extent of $4,830,148.15.

## I.     The Lodestar

I must first calculate the lodestar – "the product of a reasonable hourly rate and the reasonable number of hours required by the case" – and then adjust it based on case-specific considerations. Millea v. Metro-N. R.R., 658 F.3d 154, 166 (2d Cir. 2011).

Here, the 12,006.9 hours that plaintiffs claim was generated by thirty-six timekeepers. This consisted of five partners, with claimed rates ranging from $1,089/hour to $1,670/hour; one of counsel, at $860/hour; one senior attorney, at $715/hour; seven mid-level attorneys, each at a rate of $650/hour; one chief of staff, at $590/hour; two junior attorneys, at $450/hour and $417/hour; one Operations Manager, at $410/hour; four legal apprentices, at $385/hour; and fourteen non-attorney analysts (paralegals), at $385/hour.

Defendant challenges these rates on a number of grounds.

Relying principally on Paguirigan v. Prompt Nursing Emp. Agency LLC, 17-cv-1302, 2022 WL 6564755 (E.D.N.Y. April 7, 2022), defendant contends that the prevailing rates in this district for TVPA cases are at most $550 for exceptionally qualified partners, $300 to $450 for partners, $200 to $325 for senior associates, $100 to $200 for junior associates, and $70 to $100 for legal support staff.

2

SPA-3

I consider the reasonableness of plaintiff's claimed rates starting with several assumptions.  First, the prevailing rates have to be considered with reference to the Eastern District of New York, not the Southern District of New York or some other district, see Simmons v. New York City Transit Auth., 575 F.3d 170, 175 (2d Cir. 2009), notwithstanding my previously expressed concern that the permeability of the border between the districts makes this distinction unrealistic.  See Gutman v. Klein, No. 03-cv-1570, 2009 WL 3296072, at *2 n.1 (E.D.N.Y. Oct. 13, 2009), aff'd, 515 F. App'x 8 (2d Cir. 2013) (Cogan, J. discussing Simmons).  Second, there are different rates applicable to different kinds of cases because the demand for lawyers is different, the volume of lawyers bringing those cases is different, the size of overhead costs of the firms bringing those cases is different, and the expertise needed for different kinds of cases is different.  See Rubin v. HSBC Bank USA, NA, ___ F. Supp. 4th ___, 2025 WL 248253, at *3 (E.D.N.Y. Jan. 21, 2025).

Beyond these considerations, I am guided by the Second Circuit's decision in Lilly v. City of New York, 934 F.3d 222 (2d Cir. 2019), which reaffirmed the test from its prior decision in Arbor Hill Concerned Citizens Neighborhood Association v. City of Albany, 522 F.3d 182 (2d Cir. 2008).  Arbor Hill, in turn, approved the twelve factor test from Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974).  Although the Supreme Court had some criticism of Johnson in Perdue v. Kenny A., 559 U.S. 542 (2010), observing that it "gave very little actual guidance to district courts [and that s]etting attorney's fees by reference to a series of sometimes subjective factors placed unlimited discretion in trial judges and produced disparate results," id. at 550-51 (quoting Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 563 (1986)), the Second Circuit's decision in Lilly still relies on the Johnson factors in determining the lodestar rate, and so I will as well.  Nevertheless, the fundamental

3

SPA-4

question that <u>Perdue</u> and all of the attorneys' fee cases raise is "the fee that the prevailing

attorney would have received if he or she had been representing a paying client who was billed

by the hour in a comparable case," 559 U.S. at 551.  <u>See also</u> <u>Lilly</u>, 934 F.3d at 232, 234; <u>Arbor</u>

<u>Hill</u>, 522 F.3d at 190.

My colleague Judge Block's recent decision in <u>Rubin</u>, an FCRA case, stressed the

importance of avoiding slavish adherence to historical market rates as defined by decades-old

case law.  He recognized that markets are dynamic and reliance on historical rates does not

account for inflation.  After an extensive and well-documented discussion of the impact of

inflation on the cost of living, he found that the reasonable hourly rates in this district are now

$450 to $650 for partners, $300 to $450 for senior associates, $150 to $300 for junior associates,

and $100 to $150 for paralegals, which are more than one-third higher than many of my other

colleagues, relying on authority going back to 2012 and earlier, still regularly apply.  <u>See</u> <u>Rubin</u>

2025 WL 248253, at *6.  Judge Block reduced the claimed rates in the case before him of $760

to $1,185/hour for partner time and other lower-charging timekeepers to fall within those ranges.

<u>Id.</u> at *7.

I agree with Judge Block as to the reasonable hourly rates that should prevail in this

district overall.  I would fine-tune it for this case, however, because although Judge Block

acknowledged that different areas of law may generate a different supply and demand curve for

legal services, his case did not present the need to work that potential difference into his

inflation-adjusted calculation of the reasonable hourly rate.  Judge Block noted that FCRA cases

might command a higher rate than, for example, FDCPA cases, reasoning that the former are

sometimes more complex, <u>id.</u> at *3, but he did not have occasion to consider if he would have

applied an upwards adjustment in a more complex case.

4

SPA-5

That is an issue I cannot avoid confronting in the instant case because the "market" for TVPA cases is so limited. There are dozens of lawyers in this district whose practice is largely or exclusively focused on, for example, FCRA cases, or FDCPA cases, or Title VII cases, and rarely do their practices overlap. But there are no "TVPA lawyers." Defendant cites only two TVPA cases for its argument that plaintiffs' claimed rates are much too high, one of which is itself a Southern District of New York case. See Paguirigan, 2022 WL 6564755; Hemant Patel, M.D., P.C. v. Bandikatla, 18-cv-10227, 2024 WL 1509238, at *11 (S.D.N.Y. April 5, 2024). Both are readily distinguishable – Paguirigan was the settlement of a class action with no objection to the claimed hourly rates, and Hemant Patel was an action by a physician for her employer's attempt to hold her to an employment contract, resulting in a $45,000 TVPA verdict, where the physician's retainer agreement with some of her lawyers had a fee cap. Neither one of those cases considered the impact of inflation or case-type in fixing the reasonable rate.

There are not many more than that, and it hardly presents an abundance of authority from which to fix a "reasonable rate" for TVPA cases in this district. A few cases here or there are of little value in establishing a reasonable rate for a rarely invoked statutory claim like the TVPA. It is certainly not like FLSA or FDCPA cases, where the Court can draw from its experience in hundreds if not thousands of cases.

Of course, the absence of a market for TVPA cases cuts against Perdue's rationale that one need only consult fees charged in similar cases to determine the lodestar rate and thus the Johnson factors are not all that helpful. Nevertheless, Perdue's primary directive is to determine "a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious" TVPA case, 559 U.S. at 552, on the presumption that such a determination will

subsume most or all of the twelve Johnson factors.  Once that is done, Perdue made it clear that rarely should that lodestar fee be enhanced.  Id.

One way to try to expand the sample would be to brand cases brought under the TVPA as "complex" statutory or common-law tort cases and use other "complex" cases as comparators. But if we broaden the sample, it becomes highly arbitrary because, again, there are largely separate plaintiffs' bars that bring all different kinds of complex cases that require different skill sets and investments of time and resources.

There are two more accurate ways to assess the reasonable hourly rate in a case like this, and both tie into the analyses approved in Perdue and Lilly.  First, we need to focus on what plaintiffs' attorneys charge their paying clients.  Despite protestations from defendant, plaintiffs have established to my satisfaction that the rates they claim are typical of those that they charge paying clients.  Second, the question is whether the reasonable hourly rates that Judge Block has established and I have accepted should be enhanced because of extraordinary circumstances.  In answering this second question, I have to exercise great caution, because the Supreme Court and the Second Circuit could not have been clearer that any such enhancement should be a rarity. See Perdue, 559 U.S. at 552, 553-54; Lilly, 934 F.3d at 231.  The danger is that "rate creep," although purportedly only occurring on a case-by-case basis, will present the opposite problem to rate stagnation that Judge Block identified in Rubin.  Nevertheless, my inquiry ties back to the overarching question of what a lawyer would reasonably charge a paying client to take on a matter of this nature.

Perdue's criticism of the Johnson factors was based on the presumption that the "going rate" for a particular kind of case (there, a civil rights case), was fairly easy to ascertain.  See Perdue, 559 U.S. at 550-52.  When it is not, however, the applicable Johnson factors become

6

SPA-7

more useful. That is the case here. And when I consider those factors in this case, they point to this being one of the rare cases requiring a rate in excess of the usual rate commanded for litigation brought in this district.

The first Johnson factor is the time and labor required. The time commitment here was enormous. This case falls in the top echelon of the most intensively litigated civil cases that I have handled. Although I do not consider either side to be more at fault for that than the other, the fact is that both sides pushed their positions to the outside of whatever envelope the issues presented. That was because both sides' lawyers were creative and aggressive, but it resulted in an extensive time commitment from everyone involved (and the Court), both pretrial and at trial.

The second Johnson factor is the novelty and difficulty of the questions. Defendant argues that this was "obviously not a complex commercial case involving securities law, antitrust issues, or business torts," and if the word "obviously" qualifies only the words "commercial," the three areas of law listed, and the word "business" before "torts," then the statement is true. But the statement is just as "obviously" too narrowly focused. A case does not have fall under securities law, antitrust law, or "business torts" to present complex questions. This case was not only complex because it presented untested legal and factual issues under the TVPA, but because there were so many other pretrial issues that required the exercise of great skill in briefing and arguing that it could in no way be characterized as routine. Including the decision denying defendant's motion for judgment as a matter of law or a new trial (a mammoth undertaking by itself), the Court published sixteen decisions in this case, applying the standard for publication laid down by the Administrative Office of the Courts.[1] In short, defendant simply cannot tell me

---

[1] Pursuant to the E-Government Act of 2002, Pub. L. No. 107-347, § 205(a)(5), this Court must publish online all "written opinions," defined as "any document issued by a judge or judges of the court, sitting in that capacity, that sets forth a reasoned explanation for a court's decision." Memorandum from the Administrative Office of the

7

that this case did not present highly complex questions. If there is a line between this case and the "average" securities fraud case in terms of complexity, it is too hard for me to find.

The third Johnson factor is the level of skill required. Defendant's criticism is that the lead partner did not attend plaintiffs' depositions nor prepare his clients for them. This is thin gruel for a case of this magnitude, and defendant's silence as to the extensive input that plaintiffs' lead counsel had in virtually every other aspect of the case, including the trial, and result obtained at the trial, renders the criticism immaterial. Indeed, the logical inference from defendant's argument is that plaintiffs' counsel should have devoted more resources to the depositions and charged even more.

Johnson also suggests consideration of reputation and experience in the area, and defendant's criticism is, first, that plaintiffs' counsel has never litigated any TVPA cases. But who has? Plaintiffs' lead counsel has experience handling sex crime matters as a prosecutor and sexual harassment civil cases against well-known public figures; substantial experience in handling sexual abuse victims, for reasons I discuss below, had to be a key skill in prosecuting this case. I'd like to see defendant come up with someone who would be better qualified to handle this case based on experience alone and be willing to take it on.

Defendant's more material criticism is that the reputation of plaintiffs' lead counsel is stained. There is something to that. I was compelled to sanction him twice in this case, once for bringing a frivolous discovery dispute, and once for having included a frivolous RICO claim against a tangential party. Defendant points to three other cases criticizing or sanctioning plaintiffs' lead counsel for either bringing frivolous claims, engaging in unethical conduct

_____

United States Courts to all Chief Judges, U.S. Courts re: Compliance with Website Requirements of the E-Government Act (INFORMATION) at 2 (Nov. 10, 2004).

towards a client, or performing legal work of insufficient quality. I must consider all of that conduct under Johnson in determining the reasonable hourly rate.

Finally (as material here), Johnson counsels courts to consider the stakes involved and the actual recovery. Defendant points out that the verdict had to be well below plaintiffs' expectations based on his litigation funding arrangement with a third-party provider, and I suppose that has some relevance, but nearly $4 million seems to me a lot for plaintiffs who put themselves into the vulnerable position that these plaintiffs did. If plaintiffs' counsel overestimated the recovery, it was likely on the punitive damages side, the recovery for which was relatively modest and could have been much higher, but that was always going to be a risk and plaintiffs' counsel decided to take it. I will also consider the fact that although there is no legal prohibition against an award of attorneys' fees exceeding the amount of the plaintiffs' recovery, there comes a point at which an award can be so disproportionate to the recovery that a reasonable client would not want to pay it. See Solnin v. Sun Life & Health Ins. Co., 776 F. App'x 731, 732-33 (2d Cir. 2019) (summary order). Of course, it is also true that a reasonable client may be neutral or all in favor of her attorney getting a fee in excess of her recovery if she is satisfied with her own recovery, and attorneys' fees may not "be reduced merely because the fee would be disproportionate to the financial interest at stake in the litigation." Fisher v. SD Prot. Inc., 948 F.3d 593, 602 (2d Cir. 2020) (quoting Kassim v. City of Schenectady, 415 F.3d 246, 252 (2d Cir. 2005)); see also Millea v. Metro-N. R. Co., 658 F.3d 154, 169 (2d Cir. 2011) ("The whole purpose of fee-shifting statutes is to generate attorneys' fees that are *disproportionate* to the plaintiff's recovery." (emphasis in original)).

Having considered the relevant Johnson factors, I circle back to the overarching question of what it would take to induce a reasonable, qualified lawyer to take on this case. Quite a bit, I

think. It was not a case for the faint-hearted. There were substantial factual, legal, and practical obstacles that would have reduced the desirability of this case for any timid or risk-averse plaintiff's lawyer. For one thing, each plaintiff signed a contract to come to New York and be paid thousands of dollars in exchange for sex. And not just sex, but contractually designated "sadomasochistic (SM) activity" which the contract stated, "can be hazardous and on occasion cause injury to my person." The contracts that each plaintiff signed included a non-disclosure provision and a general release for any injuries sustained in the encounter. Additionally, some of the plaintiffs, despite the brutality of their initial encounter, returned for at least one subsequent encounter, although they contended that the brutality increased in the subsequent encounter. Moreover, even if a jury found in plaintiffs' favor, these same difficulties could well (and may well have) reduced the jury's determination of the appropriate amount of damages. Thus, there was always a substantial risk that a jury (or even one juror) would simply throw up their hands in disgust at what plaintiffs agreed defendant could do to them, not even reaching the issue of whether he went beyond their agreement, and find *in pari delicto*, or a pox on both your houses, and award no or nominal damages.

Based on these facts, the legal issue on how to construe consent under the TVPA also became one of first impression and thus high risk. Plaintiffs had to walk a fine line – they voluntarily came to New York to engage in sadomasochistic activity, but had to show that the abuse to which they consented in writing or on location was less than the involuntary acts proscribed by the TVPA. They also had to show that a reasonable person in defendant's position would have known that the abuse to which he subjected them was more than that to which they had consented. I ultimately ruled that it was a jury question as to whether it could perceive any

distinction, but when plaintiffs' counsel accepted this case, it presented another issue of high risk.

Finally, it became apparent during the case that just accepting these particular plaintiffs as clients for litigation that promised and proved to be protracted presented a high risk. As I noted in my decision denying the motion for judgment as a matter of law or a new trial, these were broken, desperate, and emotionally unstable women who had lived under difficult circumstances which made them particularly vulnerable to being abused by defendant. One withdrew her claims pretrial, and post-judgment, three plaintiffs have discharged their counsel. It is not speculative to conclude that there were continuous client management issues in this case, and it took considerable time, effort, and personal skill to keep the clients on track and not just giving up the case mid-way. This would be another deterrent for many lawyers to have accepted this case.

The problem plaintiffs' attorneys have is that there is no case in this district that has ever approved rates in the range they are seeking. At least they have not cited any and I have found none. Aside from defending their rates as their customary charges, they mostly rely on the fact that defendant's attorneys' rates must have been at least that much or more. That seems a fairly safe assumption – this case had as many defense resources from large firms thrown at it as any case I have ever seen – but the rates that the defense bar is able to command from its client do not seem to me to have much bearing on the rates necessary to induce a plaintiff's lawyer to take on a case like this.

Bearing in mind the most relevant <u>Johnson</u> factors, the usual hourly rates in this district, and the rates typically charged by plaintiffs' law firm, I am reducing the claimed rates pursuant to the following chart but enhancing them substantially beyond the reasonable rates found by

SPA-12

Judge Block.  It will be noted that although I have considered the qualifications of each professional, I am not proceeding timekeeper-by-timekeeper, but rather experience level by experience level, as I think adjustments by individual timekeeper in this situation would be more arbitrary and unnecessarily cumbersome:

| POSITION | CLAIMED RATE | ALLOWED RATE |
|---|---|---|
| PARTNERS (5) | $1089-$1670 | $1000 |
| OF COUNSEL (1) | $860 | $800 |
| SENIOR ATTORNEY (1) | $715 | $500 |
| MID-LEVEL ATTORNEY (7) | $650 | $400 |
| CHIEF OF STAFF (1) | $590 | $0 |
| JUNIOR ATTORNEYS (2) | $417-$450 | $350 |
| OPERATIONS MANAGER (1) | $410 | $0 |
| LEGAL APPRENTICES (4) | $385 | $225 |
| NON-ATTORNEY ANALYSTS (14) | $385 | $150 |

## II.    Number of Hours

Defendant disputes the 12,006.9 hours of time for which plaintiffs seek to recover on a variety of grounds.  The net result of his argument is a request that the amount of time be reduced across the board by 40%.  I agree some reduction is appropriate, but not nearly as large as he suggests.

First, defendant notes that although there were thirty-six timekeepers who recorded time during the seven years this matter lasted, plaintiffs should recover fees only for the "core team" of four timekeepers who worked on the case.  It is an insubstantial argument.  As I have noted, the manner in which a large defense firm litigated this case is not directly relevant to how plaintiffs' lawyers should have litigated, but it takes no guesswork that defendant had a number greatly in excess of the number plaintiffs used – defendant does not dispute that he had thirteen timekeepers defending his deposition, for example.  Over a seven-year period with a seven-day trial and extensive motion practice, I find nothing unreasonable about the number of timekeepers who worked for plaintiffs.

12

SPA-13

Second, defendant complains about "block billing," which is strongly discouraged in the case law because it makes it hard for courts (and defendants) to determine whether time expended on particular tasks was reasonable. See Hines v. City of Albany, 613 F. App'x 52, 55 (2d Cir. 2015). Clearly, any plaintiff's lawyer bringing a case under a fee-shifting statute or contract must be acutely aware of this rule, and my painful review of the time entries here shows quite a lot of block billing.

But defendant's main issue is not that he can't tell how much time a particular timekeeper spent on a particular task. It is that the block billing entries (and some that are not block billing) disclose tasks which defendant believes are not compensable. On some of these I agree with defendant, and some of them I don't:

- **Communications with Counsel's Litigation Funder**. I agree that this is not compensable. How a lawyer finances his practice is irrelevant to a client, whether it is a bank loan, family loan, personal assets, or a litigation funder. That is not time for which defendant should pay; it is overhead.

- **Separate Litigation in Queens County**. Apparently, unbeknownst to this Court until the instant fee application, plaintiffs filed a separate case in state court. Plaintiffs' counsel has not explained to me what this was about.

- **Dismissed Claims, Dismissed Plaintiff, and Dismissed Defendants**. I agree with plaintiffs that although a number of claims and parties were dismissed in pre-trial motion practice, and in one instance a plaintiff who had withdrawn considered re-entering the case, all of these claims and events were so intertwined (except, as noted above, as to the one RICO claim against one defendant for which counsel was sanctioned), that it would be unreasonable to

13

expect counsel to parse them out. See Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1183 (2d Cir. 1996). This entanglement is illustrated in part by the fact that defendant paid for his co-defendants' attorneys' fees. At the very least, the litigation over the dismissed defendants was useful to the Court and the jury in understanding how defendant operated his trafficking scheme with their assistance.

It should be noted that my review of these entries suggests that the time spent on the matters about which defendant complains is not an enormous part of the 12,006.9 hours. Plaintiffs' counsel estimates, for example, that the successful motions to dismiss defendant's three collaborators cost about $63,000, a small portion of the over $8 million in fees that he is seeking. The problem with this, of course, is that with block billing, one cannot know for certain.

Considering defendant's objections, I will apply an overall reduction of the time charges claimed of 15%. Using the hourly rates allowed in the preceding section, this calculates to attorneys' fees of $4,815,033.25.

### III. Costs and Expenses

The $2,035,386.10 in costs, including out-of-pocket expenses, that plaintiffs seek to recover has little basis in law. The bulk of this amount is $1,839,424.00 for the repayment of principal and interest on litigation funding costs from a third-party funder. I am not allowing that for the same reason I am not allowing time charges for plaintiffs' counsel's negotiations with the funder – how counsel finances his practice is not something for which defendant should have to pay. The fact that the primary authority that plaintiffs cite for a contrary result is a decision from the High Court of England and Wales, Essar Oilfield Services Limited v. Norscot Rig Management Pvt. Ltd. [2016] EWHC (Comm) 2361, in which the court confirmed an

14

arbitration award allowing the recovery of such expenses, merely confirms how divorced

plaintiffs' request is from the law of the United States.

      I also reject plaintiffs' theory that "public policy" counsels in favor of this recovery.

First, we have a statute and a Local Rule on this and neither of them even hint at the recovery of

litigation funding costs.  I am not going to insert my own view of what public policy should be.

Second, every fee-shifting statute that Congress passes is obviously intended to promote some

public policy, and nothing suggests that financing costs for litigation are included in the costs

allowable under the statute.

      As to the remaining amount of approximately $200,000 in claimed costs and expenses,

little is recoverable.  Defendant has specifically objected to most of the items and plaintiffs'

reply has not specifically defended any of them, choosing instead to focus solely on the litigation

funding issue.  By not responding to the objections, which are well based in any event,[2] plaintiffs

have waived their argument that they are entitled to recover them.

      Defendant concedes that plaintiffs are entitled to recover costs of $15,114.90, and those

shall be allowed.

---

[2] Plaintiffs have not submitted any supporting documentation such as invoices or receipts for their requested costs,
see Chauca v. Park Mgmt. Sys., LLC, No. 10-cv-5304, 2016 WL 8117953, at *6 (E.D.N.Y. July 18, 2016), many of
plaintiffs' requested costs are not taxable pursuant to 28 U.S.C. § 1920 or Local Civil Rule 54.1, and many of
plaintiffs' requests for costs are so vague as to render their nature unidentifiable by this Court, see Torcivia v.
Suffolk Cnty., 437 F. Supp. 3d 239, 258 (E.D.N.Y. 2020).

15

SPA-16

## CONCLUSION

Plaintiffs' motion for attorneys' fees and costs is granted to the extent of $4,815,033.25 in attorneys' fees and $15,114.90 in costs and expenses.  An amended judgment shall issue that includes those amounts.

**SO ORDERED.**

_Brian M. Cogan_
_____
U.S.D.J.

Dated: Brooklyn, New York
       February 14, 2025

16

SPA-17

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
:
AMY MOORE, MIA LYTELL, NATASHA :
TAGAI, EMMA HOPPER, BRITTANY : **AMENDED JUDGMENT**
HASSEN, and BRITTANY REYES, :
: 17-cv-6404 (BMC)
:
Plaintiffs, :
- against - :
:
HOWARD RUBIN, and JENNIFER :
POWERS, :
:
Defendants. :
:
---------------------------------------------------------- X

**COGAN**, District Judge.

This case having come before the Court for trial by jury, and the jury having rendered its

verdict on April 6, 2022 and April 7, 2022, it is hereby

**ORDERED AND ADJUDGED**, that plaintiffs shall take nothing of defendant Jennifer

Powers; and it is further

**ORDERED AND ADJUDGED**, that plaintiff Amy Moore shall have judgment against

defendant Howard Rubin in the amount of $500,000 in compensatory damages and $250,000 in

punitive damages, for a total of $750,000; and it is further

**ORDERED AND ADJUDGED**, that plaintiff Mia Lytell shall have judgment against

defendant Howard Rubin in the amount of $500,000 in compensatory damages and $120,000 in

punitive damages, for a total of $620,000; and it is further

**ORDERED AND ADJUDGED**, that plaintiff Natasha Tagai shall have judgment

against defendant Howard Rubin in the amount of $500,000 in compensatory damages and

$120,000 in punitive damages, for a total of $620,000; and it is further

SPA-18

**ORDERED AND ADJUDGED**, that plaintiff Emma Hopper shall have judgment against defendant Howard Rubin in the amount of $500,000 in compensatory damages and $120,000 in punitive damages, for a total of $620,000; and it is further'

**ORDERED AND ADJUDGED**, that plaintiff Brittany Hassen shall have judgment against defendant Howard Rubin in the amount of $500,000 in compensatory damages and $120,000 in punitive damages, for a total of $620,000; and it is further

**ORDERED AND ADJUDGED**, that plaintiff Brittany Reyes shall have judgment against defendant Howard Rubin in the amount of $500,000 in compensatory damages and $120,000 in punitive damages, for a total of $620,000; and it is further.

**ORDERED AND ADJUDGED**, that plaintiffs' motion for attorneys' fees and costs is granted to the extent of $4,815,033.25 in attorneys' fees and $15,114.90 in costs and expenses.

**SO ORDERED.**

Dated: Brooklyn, NY
      February 18, 2025

_Brian M. Cogan_
U.S.D.J.

STATE OF NEW YORK    )                     **AFFIDAVIT OF SERVICE**
                              )   ss.:           **BY MAIL**
COUNTY OF NEW YORK  )

      I, Tyrone Heath, 2179 Washington Avenue, Apt. 19, Bronx, New York 10457, being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age and resides at the address shown above or at

      **On June 26, 2025**

deponent served the within: **BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-COUNTER CLAIMANT-APPELLANT**

      **upon:**

**Natasha Tagai**
*Plaintiff-Appellee Pro Se*
**1080 NE 215 Street**
**Apartment #213**
**Miami, FL 33179**

**Brittany Reyes**
*Plaintiff-Appellee Pro Se*
**44 Merrill Avenue**
**East Brunswick, NJ 08816**

**Brittany Hassen**
*Plaintiff-Appellee Pro Se*
**2928 West 5th Street**
**Apartment #7T**
**Brooklyn, NY 11224**

the address(es) designated by said attorney(s) for that purpose by depositing **2** true copy(ies) of same, in a postpaid properly addressed wrapper in a Post Office Mail Depository, under the exclusive custody and care of the United States Postal Service, within the State of New York.

**Sworn to before me on June 26, 2025**

*Mariana Braylovsky*                  *T. Heath*

                                                    _____

**MARIANA BRAYLOVSKIY**
Notary Public State of New York
No. 01BR6004935
Qualified in Richmond County
Commission Expires March 30, 2026         **Job# 381697**