### UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

**Thurgood Marshall U.S. Courthouse  40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

### MOTION INFORMATION STATEMENT

**Docket Number(s):** _____     Caption [use short title] _____

**Motion for:** _____

_____

_____

Set forth below precise, complete statement of relief sought:

_____

_____

_____

_____

_____

_____

**MOVING PARTY:** _____     **OPPOSING PARTY:** _____

☐ Plaintiff          ☐ Defendant

☐ Appellant/Petitioner    ☐ Appellee/Respondent

**MOVING ATTORNEY:** _____     **OPPOSING ATTORNEY:** _____

[name of attorney, with firm, address, phone number and e-mail]

_____     _____

_____     _____

_____     _____

Court- Judge/ Agency appealed from: _____

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☐ Yes  ☐ No (explain): _____

Opposing counsel's position on motion:
☐ Unopposed ☐ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☐ Yes ☐ No ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below?  ☐ Yes ☐ No
Has this relief been previously sought in this court?  ☐ Yes ☐ No

Requested return date and explanation of emergency: _____

_____

_____

_____

Is the oral argument on motion requested?  ☐ Yes  ☐ No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set?  ☐ Yes  ☐ No  If yes, enter date: _____

**Signature of Moving Attorney:**

_____ **Date:** _____     Service : ☐ Electronic  ☐ Other [Attach proof of service]

**Form T-1080 (**rev. 10-23)

Michael J. Weiner
**BALESTRIERE**
225 Broadway, 29th Floor
New York, NY 10007
Tel: 212-540-7362
michael.weiner@balestrierefirm.com
*Attorneys for Non-Party Balestriere Fariello*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

| | |
|---|---|
| **AMY MOORE, MIA LYTELL, NATASHA TAGAI, EMMA HOPPER, BRITTANY HASSEN, and BRITTANY REYES,**<br><br>Appellees-<br>Plaintiffs,<br><br>– against –<br><br>**HOWARD RUBIN**<br><br>Appellant-<br>Defendant. | Case No. 25-613<br><br><br>**NOTICE OF APPEARANCE** |

PLEASE TAKE NOTICE that the undersigned attorney Michael J. Weiner of the firm Balestriere whose address is 225 Broadway, 29th Floor, New York, New York 10007, whose telephone number is (212) 540-7362, and whose email address is michael.weiner@balestrierefirm.com, does hereby appear on behalf of Balestriere Fariello as an interested party with a fee interest in the above captioned matter. Please direct all further notices and copies of pleadings, papers, and other material relevant to this action to Michael J. Weiner.

Dated: New York, New York
August 22, 2025

s/ Michael J. Weiner
_____
Michael J. Weiner
**BALESTRIERE**
225 Broadway, 29th Floor
New York, NY 10007
Tel: 212-540-7362
michael.weiner@balestrierefirm.com
*Attorney for Non-Party Balestriere Fariello*

Michael J. Weiner
**BALESTRIERE**
225 Broadway, 29th Floor
New York, NY 10007
Telephone: (212) 540- 7361
michael.weiner@balestrierefirm.com
*Attorneys for Non-Party Balestriere Fariello*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

| | |
|---|---|
| **AMY MOORE, MIA LYTELL, NATASHA TAGAI, EMMA HOPPER, BRITTANY HASSEN, and BRITTANY REYES,**<br><br>Appellees-Plaintiffs,<br><br> – against –<br><br>**HOWARD RUBIN**<br><br>Appellant Defendant. | Case No. 25-613<br><br>**BALESTRIERE FARIELLO'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE AS A NON-PARTY WITH A FINANCIAL INTEREST** |

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT…………………………………………………………...1

STATEMENT OF FACTS…………………………………………………………………1

ARGUMENT………………………………………………………………………………4

    I.     BALESTRIERE FARIELLO IS FORMER COUNSEL TO THE APPELLEE-PLAINTIFFS IN THIS ACTION AND MAINTAINS A FEE INTEREST

    II.    BRIEFING IS NOT COMPLETE SUCH THAT INTERVENTION WOULD NOT PREJUDICE ANY PARTY

CONCLUSION………………………………………………………………………….6

## **TABLE OF AUTHORITIES**

**Cases**

*Bursey v. United States*, 515 F.2d 1228 (5th Cir. 1975)................................................................3

*Moore v. Rubin,* 766 F. Supp. 3d 423 (E.D.N.Y. 2025) ................................................................3

*McKenna v. Pan Am. Petroleum Corp.*, 303 F.2d 778 (5th Cir. 1962)))). ...................................3

*See Richardson v. Flores*, 979 F.3d 1102 (5th Cir. 2020)................................................................3

*See Schonfeld v. City of N.Y.*, 14 F. App'x 128 (2d Cir. 2001) ......................................................7

*United Auto. Workers, Local 283 v. Scofield,* 382 U.S. 205 (1965)) ...............................................3

*Schnur et al, v. Balestriere et al*, Index No. 160095/2018 (N.Y. Sup. Ct., filed 2018) ..............6

**Statutes**

FRCP 24(a)(2), ................................................................................................................................3

## PRELIMINARY STATEMENT

Balestriere Fariello ("BF" and/or "the Firm"), former counsel to the Plaintiff-Appellees, seeks leave to intervene in this appeal to protect its direct interest in the attorney's fees awarded by the District Court.

Pursuant to engagement letters with the Plaintiff-Appellees, BF has a contractual right to fees, arising from BF's exclusive representation of all Plaintiffs in the trial action for seven years (*Moore et al, v. Rubin*, Case No. 1:17-06404, the "EDNY Sex Trafficking Action"), which resulted in a successful jury verdict and multi-million dollar award for the Plaintiffs and a subsequent award of attorney's fees and costs. Defendant-Appellant Howard Rubin ("Rubin") now challenges that fee award. Although BF is not counsel in this appeal for any of the Plaintiff-Appellees, the appeal directly implicates BF's contractual and earned interest in the judgment proceeds.

If permitted to intervene, BF will argue that the District Court acted well within its discretion in awarding fees in light of the scope, complexity, and results of the litigation. BF would not seek to disturb the District Court's order. BF requests that its briefing be set on the same schedule as the Plaintiff-Appellees, resulting in no change to the existing schedule and causing no prejudice to any party.

## STATEMENT OF FACTS

In August 2016, Balestriere Fariello began investigating Defendant-Appellant Rubin after learning of his involvement in a violent sex trafficking operation in New York. BF's investigation revealed that Rubin operated a criminal scheme involving non-disclosure agreements, coercion, physical abuse, and sexual violence against multiple

women. The investigation was extensive and included sworn statements, deposition testimony, and forensic evidence.

In November 2017, the Firm represented the initial plaintiffs who filed a civil lawsuit in the Eastern District of New York – the EDNY Sex Trafficking Action. These plaintiffs would later be joined by additional victims. The Firm served as sole counsel for all plaintiffs, handling every phase of the litigation through trial and post-verdict briefing.

On April 7, 2022, following a two-week trial, a federal jury found Rubin liable and awarded $3.85 million in compensatory and punitive damages to all six plaintiffs: $750,000 to Amy Moore, and $620,000 each to Mia Lytell, Natasha Tagai, Emma Hopper, Brittany Hassen, and Brittany Reyes. (*See* Verdict Sheet, EDNY Dkt. No. 406, as Exhibit 1 and Judgment, EDNY Dkt. No. 407, as Exhibit 2, attached to the Weiner Declaration[1]).

In early 2024, the District Court denied Rubin's post-verdict motions (*See* Order Denying Rubin Post Verdict Motion, EDNY Dkt. No. 425, dated March 20, 204 as Ex 3). On February 14, 2025, the court granted the Firm's motion for attorneys' fees, awarding $4,815,033.25 in fees and $15,114.90 in costs and expenses, commending the Firm's performance in securing the judgment despite extensive litigation efforts by the defense. The court stated, "This case had as many defense resources from large firms thrown at it as any case I have ever seen" and confirmed that BF counsel was uniquely qualified to try the case. (*See* Decision on Attorney's Fees, EDNY Dkt. No. 466 as Ex 4).

BF is now in dissolution and was not engaged to represent any Plaintiffs on appeal. BF filed motions to withdraw which were granted on November 18, 2024 and March 12,

---

[1] All exhibits are attached to the Weiner Declaration unless otherwise noted. All exhibits are referred to here-in as "Ex X".

2025 (*See* Text Order from Judge Cogan Granting Motion to Withdraw, dated November 18, 2024 as Ex 5 and Text Order from Judge Cogan Terminating Balestriere Fariello as Counsel, dated March 12, 2025 as Ex 6) and, on July 18, 2025, the one client from whom BF did not move to withdraw, Mia Lytell, substituted a former BF lawyer, Matthew Schmidt, as her counsel in the EDNY Sex Trafficking Action. (*See* Motion to Substitute Attorney, EDNY Dkt. No. 506, dated July 17, 2025 as Ex 7). BF had discussions with Defendant-Appellant regarding a resolution of BF's fee interest, but such discussions did not result in an agreement, warranting BF's filing of this Motion at this time, as BF's fee interest remains. (*See* Exemplar Engagement Agreement as Ex 8).

## LEGAL STANDARD

Although intervention is not explicitly governed by the Federal Rules of Appellate Procedure (FRAP), "a court of appeals may, but only in an exceptional case for imperative reasons, permit intervention." (*See Richardson v. Flores*, 979 F.3d 1102, 1105 (5th Cir. 2020) (quoting *Bursey v. United States*, 515 F.2d 1228, 1238 n.24 (5th Cir. 1975) (quoting *McKenna v. Pan Am. Petroleum Corp.*, 303 F.2d 778, 779 (5th Cir. 1962)))). The Supreme Court has also held that "the policies underlying intervention in district courts may be applicable to appellate courts." *Id.* (quoting *United Auto. Workers, Local 283 v. Scofield*, 382 U.S. 205, 217 n.10 (1965)). Pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure (FRCP), intervention must be permitted when there is a direct and protectable interest in the subject matter of the appeal; that interest may be impaired by the outcome; and no existing party adequately represents that interest.

## ARGUMENT

### I.   Balestriere Fariello is Former Counsel to the Appellee-Plaintiffs in This Action and Maintains a Fee Interest.

Intervention is warranted under all criteria of the rules of intervention pursuant to FRCP 24(a)(2). In *United Auto. Workers, Local 283 v. Scofield,* 382 U.S. 205, 217 n.10 (1965), the Supreme Court held that the FRCP was applicable to appellate courts. Intervention is permitted under the FRCP 24(a)(2), when (1) there must be a direct and protectable interest in the subject matter of the appeal, (2) that the interest may be impaired by the outcome, and (3) that no existing party adequately represents that interest. Firstly, BF has a direct and legally protected interest in the attorney's fees award currently at issue in this action. Secondly, BF's interest may be impaired by the outcome of this proceeding – if Rubin wins this appeal, BF will not receive the fees that it has been awarded. Finally, no party to the appeal presently represents BF's interest. Under *Bursey*, it was determined that "exceptional cases" refer to the significance of stake in the matter on appeal and where the interest cannot be adequately represented. That standard is met here; therefore, BF should be allowed to intervene to protect its fee interest.

BF represented the Plaintiff-Appellees in the underlying EDNY Sex Trafficking Action for over six years. BF initiated the litigation, led the pretrial investigation, prosecuted the claims through trial, and secured a $3.85 million jury verdict which the District Court converted to a judgment (EDNY Dkt. Nos. 406, 407). On February 14, 2025, the District Court issued a detailed decision awarding attorney's fees to BF, commending the Firm's work and confirming the value and enforceability of the fee interest (EDNY Dkt. No. 466). While all Plaintiff-Appellees have an interest in BF receiving the full fee

4

award – as doing so will enable such victims of Rubin's sex trafficking to keep perhaps the entire amount of the awards granted to them by the jury without having to pay any fees to BF – several Plaintiff-Appellees have unfortunately maintained an adversarial position with BF. That is, while such Plaintiff-Appellees received many millions of dollars' worth of legal service for years from BF lawyers -- who are the only ones to have stood behind them when there was no law enforcement that took on Rubin -- such Plaintiff-Appellees have recently been adversarial with BF. This may be due to Rubin's continued prosecution of claims against those Plaintiff-Appellees in a New York County Supreme Court action captioned, *Yifat V. Schnur et al, v. John G. Balestriere et al*, Index No. 160095/2018 (where Rubin is paying one of his many lawyers to sue the EDNY Victims as well as BF and several lawyers in an attempt to undermine their work against Rubin), or because a former BF lawyer now represents an appellee here. In any event, there is a risk that other parties will not adequately represent BF's interests, warranting intervention.

That interest is now at stake in this appeal. Rubin, who was found liable for sex trafficking, challenges the fee award which – if reverse or reduced – would directly undermine BF's contractual and earned right to compensation. The risk of adverse impact, combined with the absence of adequate representation, renders intervention necessary to preserve BF's rights.

BF's fee interest is direct and constitutes the subject matter of this appeal. No party to this appeal has an obligation to defend that interest. BF should, therefore, be permitted to intervene for the limited purpose of protecting its financial interest in the attorney's fee award.

## II. Briefing is Not Complete Such That This Intervention Would Not Prejudice Any Party.

No party shall be prejudiced by BF's intervention in this action. Pursuant to FRCP 24(b)(3), the courts must consider whether the intervention will unduly delay or prejudice the original parties. Intervention at this stage would cause neither undue delay nor prejudice. *See Schonfeld v. City of N.Y.*, 14 F. App'x 128, 131 (2d Cir. 2001) where it was noted that "[c]ircumstances considered in this determination [of timeliness] include: (1) how long the applicant had notice of the interest before [he] made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness". Intervention at this procedural stage would not require any changes to the existing schedule: Rubin filed his opening brief on March 17, 2025 and no appellee briefs have yet been filed. Briefs for Plaintiff-Appellees Amy Moore, Emma Hopper, and Mia Lytell are scheduled to be filed on September 25, 2025; Balestriere Fariello could file its brief on such date. Intervention now preserves the proposed intervenor's rights without disrupting the orderly progression of this appeal.

## <u>CONCLUSION</u>

For all the foregoing reasons, BF's motion to intervene to protect its fee interest should be granted.

Dated: New York, New York
      August 22, 2025

    _s/ *Michael J. Weiner*_
Michael J. Weiner
**BALESTRIERE**
225 Broadway, 29th Floor
New York, New York 10007
Telephone: (212) 540-7361
michael.weiner@balestrierefirm.com
*Attorneys for Non-Party Balestriere Fariello*

Michael J. Weiner
BALESTRIERE
225 Broadway, 29th Floor
New York, NY 10007
Tel: 212-540-7362
michael.weiner@balestrierefirm.com
*Attorneys for Non-Party Balestriere Fariello*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

**AMY MOORE, MIA LYTELL, NATASHA
TAGAI, EMMA HOPPER, BRITTANY
HASSEN, and BRITTANY REYES,**

        Appellees-
        Plaintiffs,

    – against –

**HOWARD RUBIN**

        Appellant-
        Defendant.

---

Case No. 25-613

**ATTORNEY DECLARATION
IN SUPPORT OF MOTION
TO INTERVENE AS AN
INTERESTED NON-PARTY
WITH A FINANCIAL
INTEREST**

I, Michael J. Weiner, declare the following under penalty of perjury and pursuant to 28 U.S.C. § 1746:

1.  I am attorney admitted to practice before this Court and serve as Of Counsel to Balestriere, (the "Firm") in the above-referenced action. I am personally familiar with the facts set forth in this declaration.

2.  I submit this declaration in support of the BF's Memorandum of Law in support of the motion to intervene as an interested non-party with a financial interest.

3.  Attached as Exhibit 1, is a true and correct copy of the Verdict Sheet, *Moore et al, v. Rubin*, Case No. 1:17-cv-06404-BMC-CLP, the "EDNY Sex Trafficking Action", Dkt. No. 406, dated April 7, 2022.

4.  Attached as Exhibit 2, is a true and correct copy of the EDNY Judgment, EDNY Dkt. No. 407, dated April 7, 2022.

5.  Attached as Exhibit 3 is a true and correct copy of the Order Denying Rubin Post-Verdict Motion, EDNY Dkt. No. 425, dated March 20, 2024.

6.  Attached as Exhibit 4 is a true and correct copy of the Decision on Attorney's Fees, EDNY Dkt. No. 466, dated February 14, 2025.

7.  Attached as Exhibit 5 is a true and correct copy of Text Order from Judge Cogan Granting Motion to Withdraw, dated November 18, 2024.

8.  Attached as Exhibit 6 is a true and correct copy of the Text Order from Judge Cogan Terminating Balestriere Fariello as Counsel, dated March 12, 2025.

9.  Attached as Exhibit 7 is a true and correct copy of the Motion to Substitute Attorney, EDNY Dkt. No. 506, dated July 17, 2025.

10. Attached as Exhibit 8 is a true and correct copy of an Exemplar Engagement

Agreement with the Plaintiff-Appellees.

I certify this 22th day of August, 2025, under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
      August 22, 2025

*s/ Michael J. Weiner*

Michael J. Weiner
BALESTRIERE
225 Broadway, 29th Floor
New York, NY 10007
Tel: 212-540-7362
michael.weiner@balestrierefirm.com
*Attorneys for Non-Party Balestriere Fariello*

# Exhibit 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

AMY MOORE, MIA LYTELL, NATASHA :
TAGAI, EMMA HOPPER, BRITTANY :  17-cv-6404 (BMC)
HASSEN, and BRITTANY REYES, :
 :  **VERDICT SHEET**
 :
  Plaintiff, :
 :
   - against - :
 :
HOWARD RUBIN, and JENNIFER :
POWERS, :
 :
     Defendant. :
 :

-------------------------------------------------------- X

## PLAINTIFF NATASHA TAGAI

**Claim One – 18 U.S.C. § 1591(a) (Plaintiff Natasha Tagai against both Defendants)**

1. Did the Defendant, in at least one instance engage in sex trafficking by use of force, fraud, or coercion against Plaintiff Tagai in violation of 18 U.S.C. § 1591(a)? (check one for each Defendant)

   Rubin:        ☑ YES                    ☐ NO

   Powers:       ☐ YES                    ☑ NO

If the answer to either part of question 1 is YES move on to question 2.

*If the answer for both Defendants was NO, move on to Claim Two for Plaintiff Tagai.*

2. Is Plaintiff Tagai entitled to compensatory damages for this Claim?

   ☑ YES                    ☐ NO

   COMPENSATORY DAMAGES FOR <u>THIS CLAIM</u> = $ 500,000

Move on to Claim Two for Plaintiff Tagai.

**Claim Two – Assault (Plaintiff Tagai against Defendant Rubin)**

1. Did Defendant Howard Rubin assault Plaintiff Tagai on June 12, 2017? (check one)

   ☐ YES                    ☑ NO

If the answer to question 1 is YES you MUST answer the "Compensatory Damages" question at the end of this section.

Move on to Claim Three for Plaintiff Tagai.

**Claim Three—Battery (Plaintiff Tagai against Defendant Rubin)**

1. Did Defendant Howard Rubin commit a battery against Plaintiff Tagai on June 12, 2017? (check one)

   ☐ YES                    ☑ NO

If the answer to question 1 is YES you MUST answer the "Compensatory Damages" question at the end of this section.

Move on to Claim Four for Plaintiff Tagai.

**Claim Four—False Imprisonment (Plaintiff Tagai against Defendant Rubin)**

1. Did Defendant Howard Rubin falsely imprison Plaintiff Tagai on June 12, 2017? (check one)

   ☐    YES                                    ☑    NO

If the answer to question 1 is YES you MUST answer the "Compensatory Damages" question at the end of this section.

*If the answer to Claims Two through Four was "NO", move on to the Claim for the next Plaintiff.*

**Compensatory Damages**

What are the compensatory damages to which Plaintiff Tagai is entitled for assault, battery, and false imprisonment?

> (Please remember, plaintiff cannot recover twice for the same damage – even if the events that caused that damage might make defendant liable for two, or more, claims.   The goal is to place plaintiff in the position she was in prior to the incident that made defendant liable.)

> COMPENSATORY DAMAGES <u>FOR CLAIMS TWO TO FOUR</u> = $_____

Move on to the Claim for the next Plaintiff.

## PLAINTIFF BRITTANY REYES

**Claim One – 18 U.S.C. § 1591(a) (Plaintiff Brittany Reyes against both Defendants)**

1. Did the Defendant, in at least one instance engage in sex trafficking by use of force, fraud, or coercion against Plaintiff Reyes in violation of 18 U.S.C. § 1591(a)? (check one for each Defendant)

   Rubin:      ☑ YES              ☐ NO

   Powers:     ☐ YES              ☑ NO

If the answer to either part of question 1 is YES move on to question 2.

*If the answer for both Defendants was NO, move on to the Claim for the next Plaintiff.*

2. Is Plaintiff Reyes entitled to compensatory damages for this Claim?

   ☑ YES              ☐ NO

   TOTAL COMPENSATORY DAMAGES = $ 500,000

Move on to the Claim for the next Plaintiff.

4

## PLAINTIFF BRITTANY HASSEN

### Claim One – 18 U.S.C. § 1591(a) (Plaintiff Brittany Hassen against Defendant Rubin)

1. Did the Defendant, in at least one instance engage in sex trafficking by use of force, fraud, or coercion against Plaintiff Hassen in violation of 18 U.S.C. § 1591(a)? (check one)

   Rubin:        ☑ YES                    ☐ NO

If the answer to question 1 is YES move on to question 2.

*If the answer was NO, move on to the Claim for the next Plaintiff.*

2. Is Plaintiff Hassen entitled to compensatory damages for this Claim?

   ☑ YES                    ☐ NO

   TOTAL COMPENSATORY DAMAGES = $ 500,000 ————

Move on to the Claim for the next Plaintiff.

## PLAINTIFF EMMA HOPPER

**Claim One – 18 U.S.C. § 1591(a) (Plaintiff Emma Hopper against both Defendants)**

1. Did the Defendant, in at least one instance engage in sex trafficking by use of force, fraud, or coercion against Plaintiff Hopper in violation of 18 U.S.C. § 1591(a)? (check one for each Defendant)

   Rubin:      ☑  YES                    ☐   NO

   Powers:     ☐  YES                    ☑   NO

If the answer to either part of question 1 is YES move on to question 2.

*If the answer for both Defendants was NO, move on to Claim Two for Plaintiff Hopper.*

2. Is Plaintiff Hopper entitled to compensatory damages for this claim?

   ☑  YES                    ☐   NO

   TOTAL COMPENSATORY DAMAGES = $ 500,000 —————

Move on to the Claim for the next Plaintiff.

6

## PLAINTIFF MIA LYTELL

**Claim One – 18 U.S.C. § 1591(a) (Plaintiff Mia Lytell against both Defendants)**

1. Did the Defendant, in at least one instance engage in sex trafficking by use of force, fraud, or coercion against Plaintiff Lytell in violation of 18 U.S.C. § 1591(a)? (check one for each Defendant)

   Rubin:     ☑ YES          ☐ NO

   Powers:    ☐ YES          ☑ NO

If the answer to either part of question 1 is YES move on to question 2.

*If the answer for both Defendants was NO, move on to the Claim for the next Plaintiff.*

2. Is Plaintiff Lytell entitled to compensatory damages for this claim?

   ☑ YES          ☐ NO

   TOTAL COMPENSATORY DAMAGES = $500,000

Move on to the Claim for the next Plaintiff.

## PLAINTIFF AMY MOORE

**Claim One – 18 U.S.C. § 1591(a) (Plaintiff Amy Moore against both Defendants)**

1. Did the Defendant, in at least one instance engage in sex trafficking by use of force, fraud, or coercion against Plaintiff Moore in violation of 18 U.S.C. § 1591(a)?
(check one for each Defendant)

   Rubin:     ☑ YES          ☐ NO

   Powers:    ☐ YES          ☑ NO

If the answer to either part of question 1 is YES move on to question 2.

*If the answer for both Defendants was NO, move on to Claim Two for Plaintiff Moore.*

2. Is Plaintiff Moore entitled to compensatory damages?

   ☑ YES          ☐ NO

   COMPENSATORY DAMAGES FOR <u>THIS CLAIM</u> = $ 500,000

Move on to Claim Two for Plaintiff Moore.

**Claim Two – Assault (Plaintiff Moore against Defendant Rubin)**

1. Did Defendant Howard Rubin assault Plaintiff Moore in December 2016?
(check one)

   ☐ YES          ☑ NO

If the answer to question 1 is YES you MUST answer the "Compensatory Damages" question at the end of this section.

Move on to Claim Three for Plaintiff Moore.

**Claim Three—Battery (Plaintiff Moore against Defendant Rubin)**

1. Did Defendant Howard Rubin commit a battery against Plaintiff Moore in December 2016?
(check one)

   ☑ YES          ☐ NO

If the answer to question 1 is YES you MUST answer the "Compensatory Damages" question at the end of this section.

Move on to Claim Four for Plaintiff More.

**Claim Four—False Imprisonment (Plaintiff Moore against Defendant Rubin)**

1. Did Defendant Howard Rubin falsely imprison Plaintiff Moore in December 2016? (check one)

   ☐   YES                              ☑   NO

If the answer to question 1 is YES you MUST answer the "Compensatory Damages" question at the end of this section.

Move on to Claim Five for Plaintiff Moore.

**Claim Five—Intentional Infliction of Emotional Distress (Plaintiff Moore against Defendant Rubin)**

1. Did Defendant intentionally inflict emotional distress against Plaintiff Moore in December 2016? (check one)

   ☐   YES                              ☑   NO

If the answer to question 1 is YES you MUST answer the "Compensatory Damages" question at the end of this section.

*If the answer to Claims Two through Five was "NO", do not answer the "Compensatory Damages" question below.*

**Compensatory Damages**

What are the compensatory damages to which Plaintiff Moore is entitled for assault, battery, false imprisonment, and intentional infliction of emotional distress?

(Please remember, plaintiff cannot recover twice for the same damages – even if the events that caused that damages might make defendant liable for two, or more, claims. The goal is to place plaintiff in the position she was in prior to the incident that made defendant liable.)

COMPENSATORY DAMAGES <u>FOR CLAIMS TWO TO FIVE</u> = $ _0_

# Exhibit 2



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
                                                          :
AMY MOORE, MIA LYTELL, NATASHA            :
TAGAI, EMMA HOPPER, BRITTANY             :       **JUDGMENT**
HASSEN, and BRITTANY REYES,              :
                                          :       17-cv-6404 (BMC)
                        Plaintiffs,       :
              - against -                  :
                                          :
HOWARD RUBIN, and JENNIFER               :
POWERS,                                   :
                                          :
                        Defendants.       :
                                          :
--------------------------------------------------------- X

**COGAN**, District Judge.

This case having come before the Court for trial by jury, and the jury having rendered its

verdict on April 6, 2022, and April 7, 2022, it is hereby

**ORDERED AND ADJUDGED**, that plaintiffs shall take nothing of defendant Jennifer

Powers, and the claims against Jennifer Powers are dismissed; and it is further

**ORDERED AND ADJUDGED**, that plaintiff Amy Moore shall have judgment against

defendant Howard Rubin in the amount of $500,000 in compensatory damages and $250,000 in

punitive damages, for a total of $750,000; and it is further

**ORDERED AND ADJUDGED**, that plaintiff Mia Lytell shall have judgment against

defendant Howard Rubin in the amount of $500,000 in compensatory damages and $120,000 in

punitive damages, for a total of $620,000; and it is further

**ORDERED AND ADJUDGED**, that plaintiff Natasha Tagai shall have judgment

against defendant Howard Rubin in the amount of $500,000 in compensatory damages and

$120,000 in punitive damages, for a total of $620,000; and it is further

**ORDERED AND ADJUDGED**, that plaintiff Emma Hopper shall have judgment against defendant Howard Rubin in the amount of $500,000 in compensatory damages and $120,000 in punitive damages, for a total of $620,000; and it is further

**ORDERED AND ADJUDGED**, that plaintiff Brittany Hassen shall have judgment against defendant Howard Rubin in the amount of $500,000 in compensatory damages and $120,000 in punitive damages, for a total of $620,000; and it is further

**ORDERED AND ADJUDGED**, that plaintiff Brittany Reyes shall have judgment against defendant Howard Rubin in the amount of $500,000 in compensatory damages and $120,000 in punitive damages, for a total of $620,000.

**SO ORDERED.**

Dated: Brooklyn, NY
       April 12, 2022

Digitally signed by
Brian M. Cogan

_____
U.S.D.J.

# Exhibit 3

Case 1:17-cv-06404-BMC-CLP   Document 425   Filed 03/20/24   Page 1 of 19 PageID #: 19935

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- X

                               :

AMY MOORE, MIA LYTELL, NATASHA    :
TAGAI, EMMA HOPPER, BRITTANY      :
HASSEN and BRITTANY REYES,         :    **MEMORANDUM DECISION AND**
                               :    **ORDER**

                Plaintiffs,    :

                               :    17-cv-6404 (BMC)

        -against-           :

HOWARD RUBIN,               :

                Defendant.    :

---------------------------------------------------------- X

**COGAN**, District Judge.

      Before the Court is defendant Howard Rubin's [413] motion for judgment as a matter of law or a new trial pursuant to Federal Rules of Civil Procedure 50(b) and 59, respectively. Following a seven-day trial, a jury found Rubin liable for violating the Trafficking Victim Protection Act ("TVPA") by bringing women into New York and sexually brutalizing them. For the following reasons, his motion is denied.

## BACKGROUND

      Rubin is a successful, Harvard-educated bond trader who hired various women, including some of the plaintiffs here, to travel to New York City to engage in conduct involving sadomasochism. He had assistants who would locate and contact these women. He would then pay for their flights to New York, and they would sign contracts in which they acknowledged that in return for payment, they would engage in one-on-one sadomasochism[1] with him. Rubin rented a penthouse in Manhattan specifically for this purpose and equipped it with various sex

---

[1] The parties interchangeably referred to the term "sadomasochism" as "bondage, discipline, domination, and sadomasochism" or "BDSM."

toys and instruments for inflicting sexual pain.  During these encounters, he would also penetrate the women with other objects, like pool cues and electric prods.

Notwithstanding having voluntarily traveled to New York City from out of state and agreeing to engage in sadomasochism with Rubin, the six plaintiffs in this action, Natasha Tagai, Brittany Reyes, Brittany Hassen, Emma Hopper, Mia Lytell, and Amy Moore, believed he went too far, forcing them into acts to which they had not consented.  They therefore brought this action, alleging that he violated the TVPA, 18 U.S.C. § 1591(a), *et seq.*, together with various common law claims.  The case went to the jury on all of the plaintiffs' TVPA claims and some of the common law claims of plaintiffs Tagai and Moore.  After a seven-day trial, a jury found Rubin liable for violating the TVPA as to each plaintiff and, additionally, in favor of plaintiff Moore on her battery claim.   The jury awarded each plaintiff $500,000 in compensatory damages and $120,000 in punitive damages, except for plaintiff Moore, to whom the jury awarded $500,000 in compensatory damages and $250,000 in punitive damages.

Before the Court is Rubin's motion for judgment as a matter of law or, alternatively, for a new trial.  Although he raises a number of points, his main argument is that neither the language nor the purpose of the TVPA fit the facts here.  I think they do, and because his remaining points are also without merit, his motion is denied.

## DISCUSSION

## I.    Legal Standard

A Rule 50 motion for judgment as a matter of law "may be granted only when, considering the evidence in the light most favorable to the non-moving party and drawing all reasonable evidentiary inferences in that party's favor, there was no legally sufficient evidentiary

basis for a reasonable jury to find in favor of the non-moving party." <u>Nimely v. City of New York</u>, 414 F.3d 381, 390 (2d Cir. 2005) (cleaned up).  The court "may not make credibility determinations or weigh the evidence," because those are "jury functions, not those of a judge." <u>Zellner v. Summerlin</u>, 494 F.3d 344, 370 (2d Cir. 2007) (cleaned up).  For the moving party to prevail, there must be "such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture" or the evidence must be "so overwhelming that reasonable and fair minded persons could only have reached the opposite result." <u>Martinez v. City of New York</u>, No. 16-cv-79, 2023 WL 4627739, at *7 (E.D.N.Y. July 19, 2023) (internal citations omitted).

Rule 59 provides that the Court may grant a new trial "on all or some of the issues … for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).  Grounds for granting a new trial include a verdict that is against the weight of the evidence, <u>see</u> <u>Raedle v. Credit Agricole Indosuez</u>, 670 F.3d 411, 417 (2d Cir. 2012), and non-harmless errors in jury instructions, <u>see</u> <u>Velez v. City of New York</u>, 730 F.3d 128, 134 (2d Cir. 2013).  Although the court has more leeway in granting a Rule 59 motion for a new trial than a Rule 50(b) motion for judgment as a matter of law, the trial court should exercise its discretion to order a new trial only if it finds that the jury's verdict was egregious, a seriously erroneous result, or a miscarriage of justice.  <u>See</u> <u>Amorgianos v. Nat'l R.R. Pass. Corp.</u>, 303 F.3d 256, 261 (2d Cir. 2002); <u>DLC Mgmt. Corp. v. Town of Hyde Park</u>, 163 F.3d 124, 133 (2d Cir. 1998).

## II.      The TVPA

The TVPA provides, in relevant part, that

> Whoever knowingly … in or affecting interstate or foreign commerce ... recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person … knowing, or ... in reckless disregard of the fact, that means of force, threats of force, fraud, coercion ... or any combination of such means will be used to cause the person to engage in a commercial sex act, shall be punished[.]

18 U.S.C. § 1591(a)(1).  Although this section is part of the Criminal Code, the same chapter also provides for a private right of action in favor of any victim of a violation of this statute.  18 U.S.C. § 1595.

Rubin argues the Court should grant judgment as a matter of law because: (1) plaintiffs were not forced to engage in commercial sex; rather, they were willing sex workers; (2) the evidence cannot support the jury's verdict that Rubin had the requisite *mens rea* required under the TVPA; and (3) to the extent Rubin exceeded consent during the course of the initially-consensual sex acts, those non-consensual acts were not "commercial sex."  On the record here, however, each of these arguments presented a jury question that the jury was entitled to resolve against Rubin.

## III.      Voluntary Agreement

Rubin's first argument is essentially the same one that he made on his motion for summary judgment, which the Court denied, and the evidence at trial was not materially different than the summary judgment record.  The argument is that plaintiffs were just prostitutes doing their jobs.  They were not "forced," he argues.  What they did, they did voluntarily and in exchange for money.  And the TVPA does not cover unforced, voluntary, commercial sex.

Rubin principally relies on the contract that each plaintiff signed and their voluntary appearance in New York to engage in sex for money. The contract that each plaintiff signed disclosed that she was going to be participating in what are sometimes referred to as "rough" sex acts. The contracts stated: "In return for the payment of an agreed upon fee, I have voluntarily agreed to engage in sexual activity with [Rubin] including Sadomasochistic (SM) activity that can be hazardous and on occasion cause injury to my person," together with a release for such injuries. The agreement also included a non-disclosure provision, and a $500,000 penalty provision if the non-disclosure provision was violated.

However, Rubin only acknowledges in passing what was the central issue in this case – did plaintiffs "consent" to extreme acts of violence as part of their contracts for sexual services? Coming to New York to participate in consensual sex, even something falling under the general rubric of "sadomasochism," was not tantamount to declaring open season on them once they got here. As I stated in denying Rubin's summary judgment motion:

> The problem with Rubin's argument is its false assumption that there was a meeting of the minds on the notion of what constitutes "BDSM." All parties must agree that whatever consent plaintiffs gave did not extend to killing them, dismembering them, causing third degree burns, prying off fingernails, or disfiguring them (this is just by way of example; it is not alleged that Rubin did these things). It was obviously something less than these acts. But how much less is a fact issue. The brutality Rubin had in mind may well have been less than plaintiffs intended to receive; there is certainly evidence to that effect. If there is such a thing as a BDSM consent that the law will enforce, and there may not be, it's going to have to be a lot more specific about what the perpetrator and the victim have in mind.

The examples I gave above did not include what the evidence actually showed – penetration with an electric prod and a pool cue, for example – but the point is the same. If Rubin wanted to assert consent as a matter of law for conduct like this – if it is legally possible – then he probably had to spell out *verbatim* what he had in mind. A reference to "sadomasochism" or "injury"

5

might well have meant something different to plaintiffs than it did to him, and a finding that it did would be fully consistent with the jury's verdict.

In other words, Rubin certainly adduced evidence to show that plaintiffs were on notice that he was going to engage in some kind of BDSM with them, but a reasonable jury could well have concluded that the degree of BDSM plaintiffs experienced was more severe than any kind of BDSM in which plaintiffs, or any reasonable person, consented to participate. "[T]he physical attack must not exceed the consent." <u>Van Vooren v. Cook</u>, 273 A.D. 88, 92, 75 N.Y.S.2d 362, 366 (4th Dep't 1947). That was an issue for the jury to decide, and it did.

## IV. Rubin's State of Mind

Rubin's next argument as to why the TVPA does not apply to his conduct is that he didn't know, *at the time he solicited* plaintiffs to come to New York, that he would exceed their consent. If he exceeded their consent, he urges, he did so only once the particular encounter was underway in the New York apartment and he decided to take it further. Because he only formed his intent to exceed consent during the encounter (or, theoretically, after they arrived in New York), then the language of the statute doesn't cover his conduct.

Assuming for the moment that Rubin has correctly stated the standard (and, as discussed at the end of this subpoint, he is ignoring part of the statute), there are multiple failings within his argument. One arises from the language of the statute itself, which allows recovery not only for threatening to use force to compel sexual conduct knowingly, but recklessly.[2] How many women have to tell Rubin to stop before he gets the message that when he's bringing them to

---

[2] Rubin does not omit the term "recklessly" in his motion, but each time he refers to it, the reference is contained only in a parenthetical, as if to suggest that it is a mere congressional afterthought. In fact, reckless disregard is just as actionable as knowing disregard.

New York to do the things he's doing, they felt forced into doing those things? Certainly the jury could find that reasonably that all of these plaintiffs told him to stop. If Rubin didn't know that he was bringing women in to inflict upon them a level of force beyond their consent, the jury could reasonably find that he was kidding himself, *i.e.*, that he was certainly reckless in disregarding that likelihood.

The second failing is that, again, his argument presented a factual issue for the jury. Rubin must have known that he had brought or was going to bring electric prods and pool cues into the apartment at the time he solicited these plaintiffs to visit the apartment, and that he intended to use them. It is fully consistent with the jury's verdict to conclude that Rubin wanted to spring the more extreme behavior on them once they were bound and gagged (as if that wasn't extreme enough), and that he so intended at the time he tricked plaintiffs to come to New York for what they thought would be less extreme behavior. Each of the plaintiffs testified to conduct that the jury could find Rubin knew he was going to undertake when he brought them to New York but plaintiffs did not. Those acts included vaginal penetration with a pool cue; clamping clothes pins to breasts; insertion of electric artificial phalli; penetration while gagged; intercourse while tied up; penetration with a "cattle prod"; and repeated punching, slapping, whipping, and dragging while bound. Viewing the facts most favorably to plaintiffs, the results of this activity to which plaintiffs testified included vaginal tearing, heavy and permanent bruising, a "capsulated breast,"[3] and a bruised or broken rib, to say nothing of the psychological impacts from the encounters. Rubin may well have thought that all falls within BDSM, but the jury

---

[3] Plaintiff Moore was not entirely clear what she meant by this. She may have been referring to damage to a breast implant.

could reasonably find that this level of force was not that for which these women signed up, and that if he didn't know that, he recklessly disregarded it.

Moreover, in his post-trial motion, Rubin has focused on his state of mind at the time of recruitment of the women.  But the TVPA is not so narrow.  It also applies if the trafficker "harbor[ed]; "obtain[ed]; or "patronize[d]" a victim with knowledge or reckless disregard of the fact that the force would be used to commit sexual acts.  18 U.S.C. § 1591(a)(1).  Thus, the temporal component that forms the basis of Rubin's argument is absent when it comes to "harboring," "obtaining," or "patronizing" a victim.  The evidence was more than sufficient for the jury to find that here.

## V.    Commercial Sex

In the alternative, Rubin asserts that if, in fact, he coerced plaintiffs to engage in sex acts that went beyond their consent, those sex acts lost their character as "commercial sex" and thus fell outside the TVPA because they were not part of the parties' contract.  But I see nothing in the TVPA that requires a contract.  All that is required is that the plaintiff has to be promised some value in exchange for a sex act.  Plaintiffs received money, which was of value to them and covered both consensual and nonconsensual sex acts, regardless of whether they fell under the contract.  Rubin received, well, whatever it was he needed to receive through his conduct.  Rubin admitted in his testimony that he enjoyed abusing women and delivering physical pain.[4]  Value received through a sex act by either party to the transaction is enough to bring it under the TVPA.  See United States v. Maneri, 353 F.3d 165, 168 (2d Cir. 2003); Ardolf v. Weber, 332

---

[4] Rubin actually testified that "I personally derive sexual pleasure from inflicting – you know, getting off, but inflicting physical pain and verbal abuse."  More than a couple of jurors' mouths dropped open.

F.R.D. 467, 478 (S.D.N.Y. 2019); Noble v. Weinstein, 335 F. Supp. 3d 504, 520 (S.D.N.Y. 2018). Here, the jury had ample evidence that both sides received value.

A sexual assault claim would be the more natural fit for the facts of this case, but that does not preclude recovery under 18 U.S.C. § 1591, pursuant to which a "commercial sex act need not [even] occur for a [d]efendant to be liable." Ardolf, 332 F.R.D. at 476 (citing United States v. Alvarez, 601 F. App'x 16, 18 (2d Cir. 2015)) (finding that because 18 U.S.C. § 1591 employs "the future tense," "the [sex act] itself is not an element of the offense"); United States v. Maynes, 880 F.3d 110, 114 (4th Cir. 2018) ("[T]he crime is complete when the defendant recruits, entices, harbors, etc. the victim with knowledge that the prohibited means will be used in the future to cause them to engage in commercial sex acts.")).

## VI.    Plaintiff Reyes: Travel in Interstate Commerce

Rubin concedes that as to five of the six plaintiffs, the jury had sufficient evidence to support the interstate commerce requirement under the TVPA because he arranged for them to fly from outside of New York to the Eastern District. As to plaintiff Reyes, however, Rubin contends that he had nothing to do with her travel to New York. He points to evidence showing that Reyes arrived here at the solicitation of her "friend" Taren Cassidy.

However, the record was far from one-sided as to who Cassidy was acting for in presenting Reyes with the "opportunity" to have encounters with Rubin. In fact, it is hard to believe that Cassidy was acting solely on her own account. As necessary background, substantial evidence showed that Rubin's *modus operandi* was not usually to make first contact with his victims himself, but to utilize other women as intermediaries to locate and entice women to come to New York for his adventures. The use of female intermediaries, the jury could find, was a method by which Rubin could build trust with his victims.

9

In Reyes's case, Cassidy told her "I have job for you, big job."  She told Reyes that if she would meet Rubin, Rubin would pay for her flight to New York and give her $5,000 for the encounter.  There was also evidence before the jury that Cassidy was working with Rubin's main "procurer," co-defendant Jennifer Powers.[5]  Cassidy relayed to Reyes that she had sent pictures of Reyes to Rubin, and he would arrange her flight if he liked what he saw.  There was also a writing from Cassidy showing she had been in the building where Rubin maintained the apartment.

In light of the evidence, the jury could conclude that either Cassidy on behalf of Rubin or Rubin himself had enticed Reyes to come to New York.  There is no basis for drawing an inference favorable to Rubin on this score.

### VII.    Jury Instruction on "Consent"

Part of the Court's instruction on consent under the TVPA to the jury was as follows:

> If you find that plaintiff consented to a commercial sex act, then the defendant doesn't have the requisite knowledge for liability under the sex trafficking law.  In other words, if the plaintiff you're considering consented to engage in a commercial sex act about which you've heard evidence, then her claim under this cause of action fails.  That is, consent is a complete defense to this cause of action. … Consent isn't permanent; if a person willingly agrees to engage in a commercial sex act, but later changes her mind, and then is forced to continue to engage in a commercial sex act against her will by force, threat of force, fraud or coercion, then a commercial act becomes involuntary, not with consent.

Rubin objected to this instruction on the ground that it did not advise the jury that to be liable, Rubin had to know, or recklessly disregard the fact, that a plaintiff had withdrawn her consent.

First, Rubin's argument disregards the standard instruction given to all juries, including this one, that they should not isolate on any one jury instruction but must view the charge as a

---

[5] Plaintiffs had sued Powers as well and their claims against her were submitted to the jury; Powers was found not liable.

whole.  Second, his argument ignores that the need for a defendant to know of the withdrawal

was even more explicitly addressed in response to a note from the jury, in which I stated:

> Where consent has been given and then a person is not present when the consent
> is withdrawn, the person who is not present must know, or recklessly disregard,
> the withdrawal of the consent during the commercial sex act to be liable for that
> act of sex trafficking.

These instructions dovetailed with the instruction that plaintiffs had the burden of proving that

Rubin knew or recklessly disregarded that prohibited conduct would be used to obtain sex.

Because the jury had already been told that was an element of plaintiff's case, it did not have to

be repeated multiple times.

In addition, Rubin's point is largely immaterial because he concedes that "the fair

inference from the jury's verdict is that it found that each Plaintiff withdrew her consent at some

point during her encounter with Rubin[.]"  He only argues that the jury needed to know that

Rubin needed to know that they had withdrawn their consent.  But that is how the jury was

instructed.  Indeed, considering the reckless disregard standard, I almost could have directed a

verdict on that issue in plaintiffs' favor as a matter of law.  Plaintiff Reyes testified that even

when she used the safe word, Rubin didn't stop.  And Plaintiffs Tagai, Reyes, Lytell, Hopper,

and Hassen testified that they asked Rubin to stop, but he would not.  As rhetorically suggested

above, with all of these women telling him to stop and, crediting their testimony as the jury did,

at what point is Rubin recklessly disregarding the fact that maybe he shouldn't even start or, at

least, listen a lot harder for indications that they want him to stop?  And the fact that the jury

heard from different women saying the same thing (while denying that they knew each other or

had discussed their testimony with one another) further supported the jury's inference that Rubin

didn't care much about safe words or any other means of withdrawing consent.

Rubin is correct that the Court *could* have instructed the jury that Rubin needed to know, or that he recklessly disregarded, each plaintiff's withdrawal of their consent. But considering Rubin's extreme conduct described above and plaintiffs' testimony that he would not stop the brutality even when they told him to, the lack of such an instruction was, at most, harmless. The instruction did not cause him any prejudice: either the jury was going to believe that plaintiffs told him to stop and he wouldn't, or it was going to believe Rubin that plaintiffs didn't tell him to stop. If the jury believed plaintiffs – and, as Rubin concedes, the unavoidable inference from the verdict is that it did – it followed *a fortiori* that Rubin was at least reckless in disregarding their entreaties.

### VIII.   "Overwhelming Evidence" or "Seriously Erroneous Result"

Rubin's motion contains a perfunctory argument that five of the six plaintiffs (excluding Reyes) gave such contradictory testimony that he is entitled to judgment as a matter of law. He cites unspecified "blatantly false" and "contradictory" testimony in their depositions and at trial; the fact that plaintiffs signed the consent agreements; prior "sessions" with Rubin involving BDSM; and Rubin's "consistent and largely unimpeached testimony." He asks in the alternative for a new trial to avoid a "seriously erroneous result," citing United States v. Landau, 155 F.3d 93, 104-05 (2d Cir. 1998).

The record does not come close to meeting the Rule 50(b) standard. Sure, there were contradictions in plaintiffs' testimony, perhaps more than in Rubin's. But these were pure issues of fact that turned on the jury's evaluation of the witnesses' credibility. The standard on a Rule 50(b) motion is essentially the same as on a motion for summary judgment under Rule 56, see This Is Me, Inc. v. Taylor, 157 F.3d 139, 142 (2d Cir. 1998), and I could no more grant such a motion on the trial record than I could when I denied summary judgment.

Nor did I disbelieve these women such that I could find a new trial is warranted under Rule 59.  The jury likely saw plaintiffs the same way I did – and probably the same way Rubin did – as vulnerable and desperate people with limited ability to see much beyond the moment. They were ripe for the taking, which was why Rubin was able to exploit them the way he did.

On the other hand, Rubin also likely struck the jury the same way he struck me – someone so wrapped up in his own wealth, power, and base desires that he had little regard for the consequences of his actions or his victims' reactions to them.  When he testified – virtually boasted – that "I personally derive sexual pleasure from inflicting – you know, getting off, but inflicting physical pain and verbal abuse" on women, without apology or explanation, it was not egregious, a miscarriage of justice, or a seriously erroneous result for the jury to conclude that Rubin wasn't the kind of person who would have much regard for his victims' wellbeing, even if his testimony was more erudite than theirs.  The jury could reasonably believe that, at least when it came to encounters with his procured women, he was more divorced from reality and societal norms than plaintiffs were, such that the jury did not want to credit his perspective over theirs.

I am not offended by the balance the jury struck and thus see no basis for a new trial.

### IX.    Compensatory Damages

Rubin seeks a new trial or remittitur as to the jury's compensatory damage award.  His argument is principally based on three grounds: (1) each of the plaintiffs received an identical award of $500,000, even though they had separate encounters and injuries from Rubin, suggesting that the jury did not have a rational basis for the awards; (2) the damage testimony from each was uncorroborated, medically or otherwise; and (3) the awards are out of line with other sexual assault cases in New York.

To find the awards excessive, I would have to hold that they "shock[] the judicial conscience and constitute[] a denial of justice." Kirsch v. Fleet St., Ltd., 148 F.3d 149, 165 (2d Cir. 1998) (internal citations omitted). Although the jury's award has to be based on evidence – here, the plaintiffs' testimony – the Second Circuit has recognized that "[a]wards for mental and emotional distress are inherently speculative. There is no objective way to assign any particular dollar value to distress." Stampf v. Long Island R. Co., 761 F.3d 192, 205 (2d Cir. 2014). At the same time, because courts are more familiar with jury awards across different cases than any individual jury and there is a danger of raising the "floor" based on too lightly scrutinized awards, the Second Circuit has also recognized that "[e]xcessive awards for psychological and emotional distress not only disproportionally inflict harm on the tortfeasor and his or her [defendants], they also impose burdensome costs on society." Id.

There were two components to the jury's compensatory damages awards here: first, the pain and suffering resulting from the actual physical abuse to which Rubin subjected plaintiffs (vaginal tearing, bleeding, and soreness; bruising of breasts and eyes; "capsulated breast"; bruised or broken rib; swollen face; bruised arm; welts; inability to sit or stand; loss of taste; lopsided buttocks), and, second, emotional and psychological injuries (anxiety, PTSD; difficulty sleeping; therapy; suicide attempt; loss of intimacy and sexual desire; difficulty bonding with children; distrust of family; relapse into drug use).

As to Rubin's first point – that $500,000 to each plaintiff bespeaks a lack of individual analysis by the jury – it was not an easy undertaking for the jury to value either of these components as to any one plaintiff, let alone to compare them as between each plaintiff. Any differentiation between the amounts awarded per plaintiff would have been no less arbitrary than deciding that each plaintiff had been grievously injured in the same amount. Rather than

14

undertaking an artificial valuation of how much each injury on each plaintiff was worth, the jury's award of $500,000 was a fair approximation as to each for similar injuries. I do not take issue with the jury's approach.

Rubin's second point about the lack of corroboration is not without some merit. Certainly, each plaintiff's damage claim would have been stronger had friends or family corroborated the psychological effects of the trauma that plaintiffs said Rubin inflicted on them, or had treating physicians or medical experts testify about those effects. But I see no such requirement under New York law, and perhaps if plaintiffs had offered such testimony, the jury would have awarded even more damages than it did. But even without such evidence, most or all of these plaintiffs presented as highly traumatized individuals during their testimony, and the jury was able to determine firsthand whether their descriptions of the effects of the abuse to which they testified were genuine. I do not think the lack of corroboration requires a new trial on damages.

Finally, Rubin attempts to portray the $500,000 awards as outliers among New York sexual assault awards. He starts by characterizing the emotional injury component as "garden variety" because no medical testimony was presented, and compares the awards here to other garden variety emotional injury claims that yielded much smaller awards. See Sooroojballie v. Port Auth. of New York & New Jersey, 816 F. App'x 536, 545-46 (2d Cir. 2020) (reducing $2.16 million award for emotional distress damages for employment discrimination claim). However, in virtually all of the cases plaintiff cites, the emotional injury component was the only component – like a wrongful detention or an employment discrimination case with little or no physical contact. See, e.g., Ravina v. Columbia Univ., No. 16-cv-2137, 2019 WL 1450449, at *11 (S.D.N.Y. March 31, 2019); Duarte v. St. Barnabas Hosp., 341 F. Supp. 3d 306, 319-20

15

(S.D.N.Y. 2018); <u>Emamian v. Rockefeller Univ.</u>, No. 07-cv-3919, 2018 WL 2849700, at *16 (S.D.N.Y. June 8, 2018).  They have little to do with the traumatic sexual acts inflicted on plaintiffs here.

When Rubin turns to sexual assault cases as comparators, he merely cherry-picks them. Some of them are more than 30 years old, and thus have diminished probative value as to what the "going rate" for sexual assault is today.  <u>See</u>, <u>e.g.</u>, <u>Laurie Marie M. v. Jeffrey T.M.</u>, 159 A.D.2d 52, 56-57, 559 N.Y.S.2d 336, 338-39 (2d Dep't 1990), <u>aff'd</u>, 77 N.Y.2d 981, 571 N.Y.S.2d 907 (1991); <u>Deborah S. v. Diorio</u>, 153 Misc. 2d 708, 715-16, 583 N.Y.S.2d 872, 878 (N.Y. C. Civ. Ct. 1992), <u>aff'd</u>, 160 Misc. 2d 210, 612 N.Y.S.2d 542 (1st Dep't 1994).  Others are not in the context of reviewing jury verdicts in post-trial proceedings, but rather are findings of fact by trial courts sitting without a jury, where there is less constraint on the court in determining the appropriate amount of damages.  <u>See</u>, <u>e.g.</u>, <u>Ortiz v. Lasker, Jr.</u>, No. 08-cv-6001L, 2010 WL 3476017 (W.D.N.Y. Aug. 20, 2018); <u>Estevez-Yalcin v. The Children's Village</u>, No. 01-cv-8784, 2007 WL 2746807 (S.D.N.Y. Sept. 20, 2007); <u>Anna O. v. State of New York</u>, 37 Misc. 2d 1209(A), 961 N.Y.S.2d 356 (N.Y. Ct. Cl. 2012).

My own review of the case law shows nothing untoward about a $500,000 compensatory damage award, especially when one considers not just emotional damages, but the pain and suffering resulting from the cruelty of the sex acts involved here.  <u>See</u>, <u>e.g.</u>, <u>Carroll v. Trump</u>, No. 20-cv-7311, 2024 WL 339782 (S.D.N.Y. Jan. 26, 2024) ($7.3 million compensatory damages for rape victim); <u>Jane Doe 1 v. JP Morgan Chase Bank, N.A.</u>, No. 22-cv-10019 (S.D.N.Y. 2023) (settling claims of about 200 women against JPMC as facilitator for Jeffrey Epstein under the TVPA for $290 million); <u>H.B. v. Haggis</u>, No. 0161137/2017, 2022 WL 18935710 (N.Y. Co. Sup. Ct. Nov. 14, 2022) (award-winning director invited plaintiff for a drink

at his home, which she accepted for career purposes; he raped her; jury awarded $7.5 million);

Mitrione ex rel. Brittany v. Monroe, No. 02-cv-526, 2010 WL 1539719 (N.D.N.Y. April 19,

2010) (upholding $11 medical malpractice verdict against doctor who failed to report rape of

child) (citing Johnson v. NYCHA, 19 Jury Verdict Review Publications, Issue 6 (Kings County

Sup. Ct. 2002) ($5.1 million against building owner for premises liability; intruder beat and

sexually abused plaintiff) and L.A. v. Port Jervis Housing Auth., 15 Jury Verdict Review

Publications, Issue 5 (Orange Cnty. Sup. Ct. 1998) (similar facts; $3 million awarded to 81-year

old plaintiff)); Venus v. Sohn, No. 28194/92, 1997 WL 372866 (N.Y. Co. Sup. Ct. May, 1997)

($950,000 settlement for premises liability arising from rape).

Many of these cases, no doubt, had some of the corroborating personal or medical

testimony that Rubin complains was missing here.  But, then again, the awards in these cases

were much higher, and sometimes against those who, unlike Rubin, did not themselves

perpetrate the acts.  And there are other verdicts and settlements that I could have cited.

Of course, all of these cases, like the ones Rubin cites, have disparate circumstances and

turn on their own facts.  But they all have in common that women had sexual acts performed on

them by force to which they did not consent, and in the cases cited above, the compensatory

damages were much higher than those awarded here.  Read against the backdrop of all of the

cases, the jury's verdict does not warrant a new trial or remittitur.

## X.    Punitive Damages under the TVPA

Rubin's final argument is that the TVPA does not provide for punitive damages. Every

Court of Appeals to address this issue (as well as a district court within this district) has held

otherwise.  See Warfaa v. Ali, 1 F.4th 289, 293-96 (4th Cir. 2021); Adhikari v. Kellogg Brown &

Root, Inc., 845 F.3d 184, 206 (5th Cir. 2017); Francisco v. Susano, 525 Fed. Appx. 828, 834

(10th Cir. 2013); <u>Ditullio v. Boehm</u>, 662 F.3d 1091, 1096-1102 (9th Cir. 2011); <u>Paguirigan v. Prompt Nursing Emp. Agency LLC</u>, No. 17-cv-1302, 2019 WL 4647648, at *18 (E.D.N.Y. Sept. 24, 2019).  Rubin reads the legislative history as requiring a contrary finding, but as the Ninth Circuit found in <u>Ditullio</u>, the legislative history does not definitively eliminate the possibility that Congress intended to provide for punitive damages under the statute, and Congress "may have intentionally left this question to the [c]ourts."  <u>Ditullio</u>, 662 F.3d at 1098 n.5.  I agree with the Ninth Circuit and the other courts to have addressed this issue and thus decline to set aside the punitive damage award.

## CONCLUSION

The essence of Rubin's arguments is that the TVPA should not apply to him because what happened in this case is not the archetypical TVPA case.  But in many respects, it was. Rubin was not that all that much different than the sex traffickers we regularly see in this Court who trick young women into coming into New York for what they think is money or affection and then find themselves victims of sexual abuse.  If anything, Rubin's enormous wealth and sophistication created an even greater power disparity than in the more usual case, and he took full advantage of it to feed his peculiar sexual needs.  The jury's verdict reflects that it recognized the power dynamics involved between these vulnerable women and Rubin, and the

results are fully in line with those which the TVPA's civil remedy was designed to address.

Rubin's motion is therefore denied.


**SO ORDERED.**

*Brian M. Cogan*
_____
U.S.D.J.

Dated: Brooklyn, New York
        March 19, 2024

# Exhibit 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------- X

AMY MOORE, MIA LYTELL, NATASHA :
TAGAI, EMMA HOPPER, BRITTANY :
HASSEN and BRITTANY REYES, :

        :  **MEMORANDUM DECISION AND**
     Plaintiffs, :  **ORDER**

         :

  -against-    :  17-cv-6404 (BMC)

         :

HOWARD RUBIN,    :

         :

     Defendant. :

--------------------------------------------------------- X

**COGAN**, District Judge.

  Presently before the Court is the motion by plaintiffs for an award of attorneys' fees and costs, the result of plaintiffs having obtained a jury verdict pursuant to the Trafficking Victims Protection Act, 18 U.S.C. § 1591, in the aggregate amount of $3,850,000. The facts surrounding this action are discussed at length in the Court's decision denying defendant's motion for judgment as a matter of law or for a new trial, see Moore v. Rubin, 724 F. Supp. 3d 93 (E.D.N.Y. 2024), and thus will not be repeated here, but to summarize, defendant is a successful bond trader who entered into contracts with each of the plaintiffs to travel to New York and engage in sadomasochistic sexual acts with him. They contended that the acts he inflicted on them exceeded the limits of their consent and the jury agreed.

  Defendant does not seriously dispute that plaintiffs are entitled to recover some amount of attorney fees and costs as prevailing parties. The TVPA, although a criminal statute, provides a private right of action in which a prevailing plaintiff may recover "damages and reasonable attorneys fees." 18 U.S.C. § 1595(a). Furthermore, as the prevailing parties, plaintiffs are entitled to an award of costs. See Fed. R. Civ. P. 54(d)(1).

This case, delayed by the pandemic, extensive discovery, and endless motion practice, took seven years and culminated in a seven-day trial.  Plaintiffs seek $8,793,940.80 in attorneys' fees based on 12,006.9 hours and $2,035,386.10 in costs and expenses.  Counsel's fee arrangement with plaintiffs was contingent on recovery.

Having considered what are reasonable fees and costs for this massive case, I grant plaintiffs' motion to the extent of $4,830,148.15.

## I.    The Lodestar

I must first calculate the lodestar – "the product of a reasonable hourly rate and the reasonable number of hours required by the case" – and then adjust it based on case-specific considerations.  Millea v. Metro-N. R.R., 658 F.3d 154, 166 (2d Cir. 2011).

Here, the 12,006.9 hours that plaintiffs claim was generated by thirty-six timekeepers. This consisted of five partners, with claimed rates ranging from $1,089/hour to $1,670/hour; one of counsel, at $860/hour; one senior attorney, at $715/hour; seven mid-level attorneys, each at a rate of $650/hour; one chief of staff, at $590/hour; two junior attorneys, at $450/hour and $417/hour; one Operations Manager, at $410/hour; four legal apprentices, at $385/hour; and fourteen non-attorney analysts (paralegals), at $385/hour.

Defendant challenges these rates on a number of grounds.

Relying principally on Paguirigan v. Prompt Nursing Emp. Agency LLC, 17-cv-1302, 2022 WL 6564755 (E.D.N.Y. April 7, 2022), defendant contends that the prevailing rates in this district for TVPA cases are at most $550 for exceptionally qualified partners, $300 to $450 for partners, $200 to $325 for senior associates, $100 to $200 for junior associates, and $70 to $100 for legal support staff.

I consider the reasonableness of plaintiff's claimed rates starting with several assumptions. First, the prevailing rates have to be considered with reference to the Eastern District of New York, not the Southern District of New York or some other district, see Simmons v. New York City Transit Auth., 575 F.3d 170, 175 (2d Cir. 2009), notwithstanding my previously expressed concern that the permeability of the border between the districts makes this distinction unrealistic. See Gutman v. Klein, No. 03-cv-1570, 2009 WL 3296072, at *2 n.1 (E.D.N.Y. Oct. 13, 2009), aff'd, 515 F. App'x 8 (2d Cir. 2013) (Cogan, J. discussing Simmons). Second, there are different rates applicable to different kinds of cases because the demand for lawyers is different, the volume of lawyers bringing those cases is different, the size of overhead costs of the firms bringing those cases is different, and the expertise needed for different kinds of cases is different. See Rubin v. HSBC Bank USA, NA, ___ F. Supp. 4th ___, 2025 WL 248253, at *3 (E.D.N.Y. Jan. 21, 2025).

Beyond these considerations, I am guided by the Second Circuit's decision in Lilly v. City of New York, 934 F.3d 222 (2d Cir. 2019), which reaffirmed the test from its prior decision in Arbor Hill Concerned Citizens Neighborhood Association v. City of Albany, 522 F.3d 182 (2d Cir. 2008). Arbor Hill, in turn, approved the twelve factor test from Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974). Although the Supreme Court had some criticism of Johnson in Perdue v. Kenny A., 559 U.S. 542 (2010), observing that it "gave very little actual guidance to district courts [and that s]etting attorney's fees by reference to a series of sometimes subjective factors placed unlimited discretion in trial judges and produced disparate results," id. at 550-51 (quoting Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 563 (1986)), the Second Circuit's decision in Lilly still relies on the Johnson factors in determining the lodestar rate, and so I will as well. Nevertheless, the fundamental

3

question that <u>Perdue</u> and all of the attorneys' fee cases raise is "the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case," 559 U.S. at 551.  <u>See also</u> <u>Lilly</u>, 934 F.3d at 232, 234; <u>Arbor Hill</u>, 522 F.3d at 190.

My colleague Judge Block's recent decision in <u>Rubin</u>, an FCRA case, stressed the importance of avoiding slavish adherence to historical market rates as defined by decades-old case law.  He recognized that markets are dynamic and reliance on historical rates does not account for inflation.  After an extensive and well-documented discussion of the impact of inflation on the cost of living, he found that the reasonable hourly rates in this district are now $450 to $650 for partners, $300 to $450 for senior associates, $150 to $300 for junior associates, and $100 to $150 for paralegals, which are more than one-third higher than many of my other colleagues, relying on authority going back to 2012 and earlier, still regularly apply.  <u>See</u> <u>Rubin</u> 2025 WL 248253, at *6.  Judge Block reduced the claimed rates in the case before him of $760 to $1,185/hour for partner time and other lower-charging timekeepers to fall within those ranges. <u>Id.</u> at *7.

I agree with Judge Block as to the reasonable hourly rates that should prevail in this district overall.  I would fine-tune it for this case, however, because although Judge Block acknowledged that different areas of law may generate a different supply and demand curve for legal services, his case did not present the need to work that potential difference into his inflation-adjusted calculation of the reasonable hourly rate.  Judge Block noted that FCRA cases might command a higher rate than, for example, FDCPA cases, reasoning that the former are sometimes more complex, <u>id.</u> at *3, but he did not have occasion to consider if he would have applied an upwards adjustment in a more complex case.

That is an issue I cannot avoid confronting in the instant case because the "market" for TVPA cases is so limited. There are dozens of lawyers in this district whose practice is largely or exclusively focused on, for example, FCRA cases, or FDCPA cases, or Title VII cases, and rarely do their practices overlap. But there are no "TVPA lawyers." Defendant cites only two TVPA cases for its argument that plaintiffs' claimed rates are much too high, one of which is itself a Southern District of New York case. See Paguirigan, 2022 WL 6564755; Hemant Patel, M.D., P.C. v. Bandikatla, 18-cv-10227, 2024 WL 1509238, at *11 (S.D.N.Y. April 5, 2024). Both are readily distinguishable – Paguirigan was the settlement of a class action with no objection to the claimed hourly rates, and Hemant Patel was an action by a physician for her employer's attempt to hold her to an employment contract, resulting in a $45,000 TVPA verdict, where the physician's retainer agreement with some of her lawyers had a fee cap. Neither one of those cases considered the impact of inflation or case-type in fixing the reasonable rate.

There are not many more than that, and it hardly presents an abundance of authority from which to fix a "reasonable rate" for TVPA cases in this district. A few cases here or there are of little value in establishing a reasonable rate for a rarely invoked statutory claim like the TVPA. It is certainly not like FLSA or FDCPA cases, where the Court can draw from its experience in hundreds if not thousands of cases.

Of course, the absence of a market for TVPA cases cuts against Perdue's rationale that one need only consult fees charged in similar cases to determine the lodestar rate and thus the Johnson factors are not all that helpful. Nevertheless, Perdue's primary directive is to determine "a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious" TVPA case, 559 U.S. at 552, on the presumption that such a determination will

subsume most or all of the twelve <u>Johnson</u> factors.  Once that is done, <u>Perdue</u> made it clear that rarely should that lodestar fee be enhanced.  <u>Id.</u>

One way to try to expand the sample would be to brand cases brought under the TVPA as "complex" statutory or common-law tort cases and use other "complex" cases as comparators. But if we broaden the sample, it becomes highly arbitrary because, again, there are largely separate plaintiffs' bars that bring all different kinds of complex cases that require different skill sets and investments of time and resources.

There are two more accurate ways to assess the reasonable hourly rate in a case like this, and both tie into the analyses approved in <u>Perdue</u> and <u>Lilly</u>.  First, we need to focus on what plaintiffs' attorneys charge their paying clients.  Despite protestations from defendant, plaintiffs have established to my satisfaction that the rates they claim are typical of those that they charge paying clients.  Second, the question is whether the reasonable hourly rates that Judge Block has established and I have accepted should be enhanced because of extraordinary circumstances.  In answering this second question, I have to exercise great caution, because the Supreme Court and the Second Circuit could not have been clearer that any such enhancement should be a rarity. <u>See</u> <u>Perdue</u>, 559 U.S. at 552, 553-54; <u>Lilly</u>, 934 F.3d at 231.  The danger is that "rate creep," although purportedly only occurring on a case-by-case basis, will present the opposite problem to rate stagnation that Judge Block identified in <u>Rubin</u>.  Nevertheless, my inquiry ties back to the overarching question of what a lawyer would reasonably charge a paying client to take on a matter of this nature.

<u>Perdue</u>'s criticism of the <u>Johnson</u> factors was based on the presumption that the "going rate" for a particular kind of case (there, a civil rights case), was fairly easy to ascertain.  <u>See</u> <u>Perdue</u>, 559 U.S. at 550-52.  When it is not, however, the applicable <u>Johnson</u> factors become

more useful.  That is the case here.  And when I consider those factors in this case, they point to this being one of the rare cases requiring a rate in excess of the usual rate commanded for litigation brought in this district.

The first <u>Johnson</u> factor is the time and labor required.  The time commitment here was enormous.  This case falls in the top echelon of the most intensively litigated civil cases that I have handled.  Although I do not consider either side to be more at fault for that than the other, the fact is that both sides pushed their positions to the outside of whatever envelope the issues presented.  That was because both sides' lawyers were creative and aggressive, but it resulted in an extensive time commitment from everyone involved (and the Court), both pretrial and at trial.

The second <u>Johnson</u> factor is the novelty and difficulty of the questions.  Defendant argues that this was "obviously not a complex commercial case involving securities law, antitrust issues, or business torts," and if the word "obviously" qualifies only the words "commercial," the three areas of law listed, and the word "business" before "torts," then the statement is true.  But the statement is just as "obviously" too narrowly focused.  A case does not have fall under securities law, antitrust law, or "business torts" to present complex questions.  This case was not only complex because it presented untested legal and factual issues under the TVPA, but because there were so many other pretrial issues that required the exercise of great skill in briefing and arguing that it could in no way be characterized as routine.  Including the decision denying defendant's motion for judgment as a matter of law or a new trial (a mammoth undertaking by itself), the Court published sixteen decisions in this case, applying the standard for publication laid down by the Administrative Office of the Courts.[1]  In short, defendant simply cannot tell me

---

[1] Pursuant to the E-Government Act of 2002, Pub. L. No. 107-347, § 205(a)(5), this Court must publish online all "written opinions," defined as "any document issued by a judge or judges of the court, sitting in that capacity, that sets forth a reasoned explanation for a court's decision."  Memorandum from the Administrative Office of the

that this case did not present highly complex questions.  If there is a line between this case and the "average" securities fraud case in terms of complexity, it is too hard for me to find.

The third <u>Johnson</u> factor is the level of skill required.  Defendant's criticism is that the lead partner did not attend plaintiffs' depositions nor prepare his clients for them.  This is thin gruel for a case of this magnitude, and defendant's silence as to the extensive input that plaintiffs' lead counsel had in virtually every other aspect of the case, including the trial, and result obtained at the trial, renders the criticism immaterial. Indeed, the logical inference from defendant's argument is that plaintiffs' counsel should have devoted more resources to the depositions and charged even more.

<u>Johnson</u> also suggests consideration of reputation and experience in the area, and defendant's criticism is, first, that plaintiffs' counsel has never litigated any TVPA cases.  But who has?  Plaintiffs' lead counsel has experience handling sex crime matters as a prosecutor and sexual harassment civil cases against well-known public figures; substantial experience in handling sexual abuse victims, for reasons I discuss below, had to be a key skill in prosecuting this case.  I'd like to see defendant come up with someone who would be better qualified to handle this case based on experience alone and be willing to take it on.

Defendant's more material criticism is that the reputation of plaintiffs' lead counsel is stained.  There is something to that.  I was compelled to sanction him twice in this case, once for bringing a frivolous discovery dispute, and once for having included a frivolous RICO claim against a tangential party.  Defendant points to three other cases criticizing or sanctioning plaintiffs' lead counsel for either bringing frivolous claims, engaging in unethical conduct

---

United States Courts to all Chief Judges, U.S. Courts re: Compliance with Website Requirements of the E-Government Act (INFORMATION) at 2 (Nov. 10, 2004).

towards a client, or performing legal work of insufficient quality.  I must consider all of that

conduct under <u>Johnson</u> in determining the reasonable hourly rate.

Finally (as material here), <u>Johnson</u> counsels courts to consider the stakes involved and the

actual recovery.  Defendant points out that the verdict had to be well below plaintiffs'

expectations based on his litigation funding arrangement with a third-party provider, and I

suppose that has some relevance, but nearly $4 million seems to me a lot for plaintiffs who put

themselves into the vulnerable position that these plaintiffs did.  If plaintiffs' counsel

overestimated the recovery, it was likely on the punitive damages side, the recovery for which

was relatively modest and could have been much higher, but that was always going to be a risk

and plaintiffs' counsel decided to take it.  I will also consider the fact that although there is no

legal prohibition against an award of attorneys' fees exceeding the amount of the plaintiffs'

recovery, there comes a point at which an award can be so disproportionate to the recovery that a

reasonable client would not want to pay it.  <u>See</u> <u>Solnin v. Sun Life & Health Ins. Co.</u>, 776 F.

App'x 731, 732-33 (2d Cir. 2019) (summary order).  Of course, it is also true that a reasonable

client may be neutral or all in favor of her attorney getting a fee in excess of her recovery if she

is satisfied with her own recovery, and attorneys' fees may not "be reduced merely because the

fee would be disproportionate to the financial interest at stake in the litigation."  <u>Fisher v. SD</u>

<u>Prot. Inc.</u>, 948 F.3d 593, 602 (2d Cir. 2020) (quoting <u>Kassim v. City of Schenectady</u>, 415 F.3d

246, 252 (2d Cir. 2005)); <u>see also</u> <u>Millea v. Metro-N. R. Co.</u>, 658 F.3d 154, 169 (2d Cir. 2011)

("The whole purpose of fee-shifting statutes is to generate attorneys' fees that are

*disproportionate* to the plaintiff's recovery." (emphasis in original)).

Having considered the relevant <u>Johnson</u> factors, I circle back to the overarching question

of what it would take to induce a reasonable, qualified lawyer to take on this case.  Quite a bit, I

think.  It was not a case for the faint-hearted.  There were substantial factual, legal, and practical obstacles that would have reduced the desirability of this case for any timid or risk-averse plaintiff's lawyer.  For one thing, each plaintiff signed a contract to come to New York and be paid thousands of dollars in exchange for sex.  And not just sex, but contractually designated "sadomasochistic (SM) activity" which the contract stated, "can be hazardous and on occasion cause injury to my person."  The contracts that each plaintiff signed included a non-disclosure provision and a general release for any injuries sustained in the encounter.  Additionally, some of the plaintiffs, despite the brutality of their initial encounter, returned for at least one subsequent encounter, although they contended that the brutality increased in the subsequent encounter. Moreover, even if a jury found in plaintiffs' favor, these same difficulties could well (and may well have) reduced the jury's determination of the appropriate amount of damages.  Thus, there was always a substantial risk that a jury (or even one juror) would simply throw up their hands in disgust at what plaintiffs agreed defendant could do to them, not even reaching the issue of whether he went beyond their agreement, and find *in pari delicto*, or a pox on both your houses, and award no or nominal damages.

Based on these facts, the legal issue on how to construe consent under the TVPA also became one of first impression and thus high risk.  Plaintiffs had to walk a fine line – they voluntarily came to New York to engage in sadomasochistic activity, but had to show that the abuse to which they consented in writing or on location was less than the involuntary acts proscribed by the TVPA.  They also had to show that a reasonable person in defendant's position would have known that the abuse to which he subjected them was more than that to which they had consented.  I ultimately ruled that it was a jury question as to whether it could perceive any

distinction, but when plaintiffs' counsel accepted this case, it presented another issue of high risk.

Finally, it became apparent during the case that just accepting these particular plaintiffs as clients for litigation that promised and proved to be protracted presented a high risk. As I noted in my decision denying the motion for judgment as a matter of law or a new trial, these were broken, desperate, and emotionally unstable women who had lived under difficult circumstances which made them particularly vulnerable to being abused by defendant. One withdrew her claims pretrial, and post-judgment, three plaintiffs have discharged their counsel. It is not speculative to conclude that there were continuous client management issues in this case, and it took considerable time, effort, and personal skill to keep the clients on track and not just giving up the case mid-way. This would be another deterrent for many lawyers to have accepted this case.

The problem plaintiffs' attorneys have is that there is no case in this district that has ever approved rates in the range they are seeking. At least they have not cited any and I have found none. Aside from defending their rates as their customary charges, they mostly rely on the fact that defendant's attorneys' rates must have been at least that much or more. That seems a fairly safe assumption – this case had as many defense resources from large firms thrown at it as any case I have ever seen – but the rates that the defense bar is able to command from its client do not seem to me to have much bearing on the rates necessary to induce a plaintiff's lawyer to take on a case like this.

Bearing in mind the most relevant Johnson factors, the usual hourly rates in this district, and the rates typically charged by plaintiffs' law firm, I am reducing the claimed rates pursuant to the following chart but enhancing them substantially beyond the reasonable rates found by

Judge Block. It will be noted that although I have considered the qualifications of each

professional, I am not proceeding timekeeper-by-timekeeper, but rather experience level by

experience level, as I think adjustments by individual timekeeper in this situation would be more

arbitrary and unnecessarily cumbersome:

| POSITION | CLAIMED RATE | ALLOWED RATE |
|---|---|---|
| PARTNERS (5) | $1089-$1670 | $1000 |
| OF COUNSEL (1) | $860 | $800 |
| SENIOR ATTORNEY (1) | $715 | $500 |
| MID-LEVEL ATTORNEY (7) | $650 | $400 |
| CHIEF OF STAFF (1) | $590 | $0 |
| JUNIOR ATTORNEYS (2) | $417-$450 | $350 |
| OPERATIONS MANAGER (1) | $410 | $0 |
| LEGAL APPRENTICES (4) | $385 | $225 |
| NON-ATTORNEY ANALYSTS (14) | $385 | $150 |

## II.    Number of Hours

Defendant disputes the 12,006.9 hours of time for which plaintiffs seek to recover on a

variety of grounds. The net result of his argument is a request that the amount of time be

reduced across the board by 40%. I agree some reduction is appropriate, but not nearly as large

as he suggests.

First, defendant notes that although there were thirty-six timekeepers who recorded time

during the seven years this matter lasted, plaintiffs should recover fees only for the "core team"

of four timekeepers who worked on the case. It is an insubstantial argument. As I have noted,

the manner in which a large defense firm litigated this case is not directly relevant to how

plaintiffs' lawyers should have litigated, but it takes no guesswork that defendant had a number

greatly in excess of the number plaintiffs used – defendant does not dispute that he had thirteen

timekeepers defending his deposition, for example. Over a seven-year period with a seven-day

trial and extensive motion practice, I find nothing unreasonable about the number of timekeepers

who worked for plaintiffs.

12

Second, defendant complains about "block billing," which is strongly discouraged in the case law because it makes it hard for courts (and defendants) to determine whether time expended on particular tasks was reasonable.  See Hines v. City of Albany, 613 F. App'x 52, 55 (2d Cir. 2015).  Clearly, any plaintiff's lawyer bringing a case under a fee-shifting statute or contract must be acutely aware of this rule, and my painful review of the time entries here shows quite a lot of block billing.

But defendant's main issue is not that he can't tell how much time a particular timekeeper spent on a particular task.  It is that the block billing entries (and some that are not block billing) disclose tasks which defendant believes are not compensable.  On some of these I agree with defendant, and some of them I don't:

- **Communications with Counsel's Litigation Funder**.  I agree that this is not compensable.  How a lawyer finances his practice is irrelevant to a client, whether it is a bank loan, family loan, personal assets, or a litigation funder.  That is not time for which defendant should pay; it is overhead.

- **Separate Litigation in Queens County**.  Apparently, unbeknownst to this Court until the instant fee application, plaintiffs filed a separate case in state court.  Plaintiffs' counsel has not explained to me what this was about.

- **Dismissed Claims, Dismissed Plaintiff, and Dismissed Defendants**.  I agree with plaintiffs that although a number of claims and parties were dismissed in pre-trial motion practice, and in one instance a plaintiff who had withdrawn considered re-entering the case, all of these claims and events were so intertwined (except, as noted above, as to the one RICO claim against one defendant for which counsel was sanctioned), that it would be unreasonable to

13

> expect counsel to parse them out.  See Reed v. A.W. Lawrence & Co., 95 F.3d
> 1170, 1183 (2d Cir. 1996).  This entanglement is illustrated in part by the fact
> that defendant paid for his co-defendants' attorneys' fees.  At the very least, the
> litigation over the dismissed defendants was useful to the Court and the jury in
> understanding how defendant operated his trafficking scheme with their
> assistance.

It should be noted that my review of these entries suggests that the time spent on the matters about which defendant complains is not an enormous part of the 12,006.9 hours.  Plaintiffs' counsel estimates, for example, that the successful motions to dismiss defendant's three collaborators cost about $63,000, a small portion of the over $8 million in fees that he is seeking. The problem with this, of course, is that with block billing, one cannot know for certain.

Considering defendant's objections, I will apply an overall reduction of the time charges claimed of 15%.  Using the hourly rates allowed in the preceding section, this calculates to attorneys' fees of $4,815,033.25.

### III.   Costs and Expenses

The $2,035.38610 in costs, including out-of-pocket expenses, that plaintiffs seek to recover has little basis in law.  The bulk of this amount is $1,839,424.00 for the repayment of principal and interest on litigation funding costs from a third-party funder.  I am not allowing that for the same reason I am not allowing time charges for plaintiffs' counsel's negotiations with the funder – how counsel finances his practice is not something for which defendant should have to pay.  The fact that the primary authority that plaintiffs cite for a contrary result is a decision from the High Court of England and Wales, Essar Oilfield Services Limited v. Norscot Rig Management Pvt. Ltd. [2016] EWHC (Comm) 2361, in which the court confirmed an

arbitration award allowing the recovery of such expenses, merely confirms how divorced plaintiffs' request is from the law of the United States.

I also reject plaintiffs' theory that "public policy" counsels in favor of this recovery. First, we have a statute and a Local Rule on this and neither of them even hint at the recovery of litigation funding costs. I am not going to insert my own view of what public policy should be. Second, every fee-shifting statute that Congress passes is obviously intended to promote some public policy, and nothing suggests that financing costs for litigation are included in the costs allowable under the statute.

As to the remaining amount of approximately $200,000 in claimed costs and expenses, little is recoverable. Defendant has specifically objected to most of the items and plaintiffs' reply has not specifically defended any of them, choosing instead to focus solely on the litigation funding issue. By not responding to the objections, which are well based in any event,[2] plaintiffs have waived their argument that they are entitled to recover them.

Defendant concedes that plaintiffs are entitled to recover costs of $15,114.90, and those shall be allowed.

---

[2] Plaintiffs have not submitted any supporting documentation such as invoices or receipts for their requested costs, see Chauca v. Park Mgmt. Sys., LLC, No. 10-cv-5304, 2016 WL 8117953, at *6 (E.D.N.Y. July 18, 2016), many of plaintiffs' requested costs are not taxable pursuant to 28 U.S.C. § 1920 or Local Civil Rule 54.1, and many of plaintiffs' requests for costs are so vague as to render their nature unidentifiable by this Court, see Torcivia v. Suffolk Cnty., 437 F. Supp. 3d 239, 258 (E.D.N.Y. 2020).

## CONCLUSION

Plaintiffs' motion for attorneys' fees and costs is granted to the extent of $4,815,033.25 in attorneys' fees and $15,114.90 in costs and expenses.  An amended judgment shall issue that includes those amounts.

**SO ORDERED.**

_Brian M. Cogan_
_____
U.S.D.J.

Dated: Brooklyn, New York
       February 14, 2025

Exhibit 5

 Outlook

---

Activity in Case 1:17-cv-06404-BMC-CLP Lawson et al v. Rubin et al Order on Motion to Withdraw as Attorney

---

**From** ecf_bounces@nyed.uscourts.gov <ecf_bounces@nyed.uscourts.gov>

**Date** Tue 11/19/2024 12:04 PM

**To** nobody@nyed.uscourts.gov <nobody@nyed.uscourts.gov>

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### Eastern District of New York

### Notice of Electronic Filing

The following transaction was entered on 11/19/2024 at 12:03 PM EST and filed on 11/19/2024

**Case Name:** Lawson et al v. Rubin et al

**Case Number:** 1:17-cv-06404-BMC-CLP

**Filer:**

**WARNING: CASE CLOSED on 04/13/2022**

**Document Number:** No document attached

**Docket Text:**
ORDER granting [459] John G. Balestriere's Motion to Withdraw as Counsel for Plaintiffs Brittany Reyes, Emma Hopper, and Brittany Hassen. After review of Balestriere's *ex parte* submissions, the Court is satisfied that plaintiff Brittany Reyes has terminated Balestriere as counsel and the circumstances of the withdrawal are not sufficiently compelling to deny the motion to withdraw. See Callaway Golf Co. v. Corp. Trade Inc., No. 10-cv-1676, 2011 WL 2899192, at *2 (S.D.N.Y. July 6, 2011) ("[A]n attorney is required to withdraw from the representation of a client if, among other circumstances, the lawyer is discharged... except under the most compelling circumstances." (internal quotation marks and quotations omitted)). Despite the fact that withdrawal at this stage of the case may hinder plaintiffs' ability to obtain counsel to defend the appeal, Balestriere has demonstrated that Reyes, as well as three other plaintiffs, did retain counsel to defend the appeal. Although appellate counsel has since withdrawn representation as to Reyes, it is clear that Balestriere's withdrawal will not directly result in Reyes' inability to retain

counsel to defend the appeal. Furthermore, the case before this Court is closed, so withdrawal will not impact upcoming deadlines.

Balestriere has also sufficiently shown a breakdown of the attorney-client relationship such that Balestriere can no longer represent plaintiffs Emma Hopper and Brittany Hassen. Communications between Balestriere, Hopper, and Hassen demonstrate that it would be "unreasonably difficult for an attorney to effectively carry out representation," warranting withdrawal. Hampton v. McDonough, No. 17-cv-5711, 2023 WL 3126525, at *3 (E.D.N.Y. Apr. 27, 2023) (citations omitted). It is clear that the attorney-client relationship has "deteriorated to such an extent that continued representation would be inappropriate." Id. (quotation omitted). Thus, Balestriere's motion to withdraw is granted.

It is further ORDERED that John G. Balestriere print a copy of this text Order and serve it on each of his clients in this action at all known addresses. Balestriere shall then file on the docket proof of such service, including in his affidavit the addresses used for service, by 11/27/2024. Ordered by Judge Brian M. Cogan on 11/19/2024. (PW)

**1:17-cv-06404-BMC-CLP Notice has been electronically mailed to:**

Richard Henry Dolan     rhd@schlamstone.com

Peter Bradley Foster     pfoster@foster-wolkind.com, bryanwolkind@gmail.com, bwolkind@foster-wolkind.com

Benjamin Edward Rosenberg     benjamin.rosenberg@dechert.com, 7356881420@filings.docketbird.com, AutoDocket@dechert.com, Christine.Isaacs@dechert.com, nycmanagingclerks@dechert.com

John J.D. McFerrin-Clancy     jmc@mcferrin-clancy.com

Jeffrey M. Eilender     jme@schlamstone.com

Mark Arthur Berman     mberman@bsk.com, courtmail@bsk.com, jbaptiste@bsk.com

Jonathan Mazer     jmazer@mazerpllc.com

Edward A. Mc Donald     edward.mcdonald@dechert.com

Marc Steven Gottlieb     beilttog@yahoo.com

John G. Balestriere     matters@balestrierefirm.com, 8839033420@filings.docketbird.com, alexis.pudvan@balestrierefirm.com, john.balestriere@balestrierefirm.com, michael.weiner@balestrierefirm.com, rebecca.gonzalez@balestrierefirm.com

Douglas E. Grover     dgrover@schlamstone.com

Eric R Breslin     erbreslin@duanemorris.com, AutoDocketNWK@duanemorris.com

Melissa S. Geller      msgeller@duanemorris.com, AutoDocketNWK@duanemorris.com

Michael J. Gilbert      MGilbert@sheppardmullin.com, 2630451420@filings.docketbird.com

May K Chiang      may.chiang@dechert.com, AutoDocket@dechert.com, nycmanagingclerks@dechert.com

Yifat V. Schnur      yvlslaw@gmail.com

Jolene F. Lavigne-Albert      jlavignealbert@schlamstone.com

Dawn Marie Wilson      dwilson@bsk.com, dawnw2@verizon.net

Christine Isaacs      cisaacs@fordobrien.com, Docketing@KelleyDrye.com

Angela Li      ali@schlamstone.com

Katherine Anne Boy Skipsey      kboyskipsey@sheppardmullin.com

**1:17-cv-06404-BMC-CLP Notice will not be electronically mailed to:**

Amy Moore


Brittany Hassen


Brittany Reyes


Emma Hopper


Hillary Lawson


Kristina Hallman


Lauren Fuller


Macey Speight


Marjorie Berman
Krantz & Berman LLP
747 Third Avenue, 32nd Floor
New York, NY 10017

Mia Lytell

Moira Hathaway

Natasha Tagai

Robert Aloi
15480 Annapolis Road
#202
Bowie, MD 20715

Rosemarie Peterson

Exhibit 6

3/12/25, 1:20 PM                                                Mail - Alexis Pudvan - Outlook

 **Outlook**

---

**New filing in Lawson et al v. Rubin et al: ORDER re [471] and [472]. (nyed-1:2017-cv-06404)**

---

**From** DocketBird <do-not-reply@docketbird.com>

**Date** Wed 3/12/2025 11:27 AM

**To**   Alexis Pudvan <alexis.pudvan@balestrierefirm.com>



## Hello,

The following text notice was just entered in ***Lawson et al v. Rubin et al***. DocketBird has updated the docket sheet for this case accordingly.

Case:   ***Lawson et al v. Rubin et al* (nyed-1:2017-cv-06404)**

Court:   Eastern District of New York

> ORDER re [471] and [472]. John G. Balestriere is terminated as counsel for Natasha Amber Tagai and Amy Nicole Moore. Mr. Balestriere is directed to print this Order, mail one copy to Ms. Moore and one copy to Ms. Tagai, and file proof that he has done so. Ordered by Judge Brian M. Cogan on 3/12/2025.

This notification was sent to the following email addresses associated with your company: alexis.pudvan@balestrierefirm.com, chezliah.osman@balestrierefirm.com, john.balestriere@balestrierefirm.com, matters@balestrierefirm.com, alexis.pudvan@balestrierefariello.com, rebecca.gonzalez@balestrierefariello.com

You can view the docket sheet in this case by clicking the link above.

If you need any help, don't hesitate to let us know.

Thanks,

Team DocketBird

---

DocketBird ID:

2025/03/12/[$LATEST]72a55ebfaf53407080f8e21af77aedce|6gpg8juvvq023a9luunptqj1u48bjf424n94
2vo1

You are receiving this notification because Balestriere Fariello added you to the
DocketBird distribution list for this case.

Made by **Mink LLC**

Las Vegas, NV

Exhibit 7

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**AMY MOORE, MIA LYTELL, NATASHA TAGAI, EMMA HOPPER, BRITTANY HASSEN, and BRITTANY REYES,**

Plaintiffs,

-against-

**HOWARD RUBIN and JENNIFER POWERS,**

Defendants.

---

Case No.: 1:17-CV-06404-BMC

**STIPULATION OF SUBSTITUTION OF COUNSEL FOR MIA LYTELL**

 

**IT IS HEREBY STIPULATED AND AGREED** that Matthew W. Schmidt, of the firm Schmidt Law Corporation, located at 116A Main Street, Tiburon, California 94920, with telephone number (415) 390-6075, and email address matt@schmidtlc.com is hereby substituted as attorney of record for Plaintiff Mia Lytell, in place of John G. Balestriere.

//

//

//

//

By:  /s/ Matthew W. Schmidt

Matthew W. Schmidt

**SCHMIDT LAW CORPORATION**

116A Main Street

Tiburon, California 94920

Telephone: (415) 390-6075

matt@schmidtlc.com

*Incoming Attorney for Mia Lytell*

By:  /s/ John G. Balestriere

John G. Balestriere

**BALESTRIERE FARIELLO**

225 Broadway, 29th Floor

New York, New York 10007

Telephone: (212) 374-5401

john.balestriere@balestrierefirm.com

*Outgoing Attorney for Mia Lytell*

SO ORDERED

_____

Brian M. Cogan

United States District Judge

DATED:  _____

Brooklyn, New York

# Exhibit 8

# Exhibit 1

**BALESTRIERE
FARIELLO**

BALESTRIERE FARIELLO
225 Broadway, 29th Floor
New York, NY 10007
T: +1.212.374.5400
F: +1.212.208.2613
info@balestrierefariello.com
www.balestrierefariello.com

August 21, 2017

**VIA E-MAIL (Mialytell@hotmail.com)**
Mia Raquel Lytell
Fort Lauderdale, Florida

**VIA E-MAIL (Amy2mo@gmail.com)**
Amy Moore
Daytona Beach, Florida

**VIA E-MAIL (Katrinavanessarico@gmail.com)**
Katrina Rico
Fort Lauderdale, Florida

> Re:  Engagement of services of Balestriere Fariello (the "Firm") for
> your matter regarding any civil claims you may have against
> Howard Rubin and his associates. (the "matter").

Dear Mia, Amy and Katrina:

This letter ("Agreement") confirms the discussions we have had regarding the Firm's representation of you ("you," "your," "yours," "his," "her," "its," or similar pronoun means the party or parties who seeks representation) in your matter, pending further investigation, and your obligations to the Firm once you engage the Firm. We thank you for your trust in choosing us as your counselor and to fight for you.

You agree that, consistent with any applicable ethical rules, the Firm has the exclusive right to represent you in connection with this matter to pursue any claims asserted or to be asserted by you in or related to this matter. The Firm's services in this matter will end, unless otherwise agreed upon in a written document signed by us, when there is a final agreement, settlement, decision, or a judgment.

Please take care in reviewing this letter and ask us any questions of any kind you have. By signing this letter, you agree to be bound by its terms.

As we can discuss at any time, <u>we cannot and do not guarantee or represent that we can obtain any particular result, or that the amount of fees or costs or the length of the matter shall be a certain amount</u>.

**BALESTRIERE FARIELLO**

## FEES, EXPENSES, BILLING, AND PAYMENT

The representation of you by this Firm or any other lawyer with which we choose to coordinate our efforts in this matter is on the basis described below, including the payment of a contingency fee (the "Success Fee"). While you may pay us on an exclusively hourly rate basis, we both agree that you wish to proceed on a largely Success Fee basis.

### Success Fee

_Success or Share of the Recovery Fee_. The Firm will receive a Success Fee based on the gross value we obtain for you (the "Recovery"), as defined below. The Success Fee shall not be limited by any taxes, liens, assessments, charges, or fees due by you, or any fees or expenses you owe to anyone else. The Success Fee is based on the entire Recovery.

The Recovery is defined as inclusively as possible to encompass anything of value whatsoever you obtain from the engagement of the Firm whether from actual litigation, negotiation, arbitration, advocacy, consultation, or otherwise, including, but not limited to, by way of court order, judgment, award, or any agreement. It specifically includes a cash recovery as well as any other service or thing of value of any kind, from any source, including, but not limited to, the following:

a) any transfer, purchase, or purchase rights of any assets, licensing agreements, any intellectual property, or any business transactions or goodwill of any kind;

b) restitution from any source, including a government source, if our Firm has, prior to the payment of restitution, had any contact of any kind with the source or government body including, but not limited to, any communications or negotiations with the source; and

c) reduction of any amount of any debt, taxes, liens, or any financing obligations of any kind.

You agree that the Firm is choosing to share the risk with you in this litigation based not merely on our due diligence, but on your representations regarding the merits of your claims and the ability to obtain a Recovery if we are successful in prosecution of any claims you have. Such representations are a condition precedent to the Firm sharing the risk with you in this engagement.

_You may have a tax liability as a result of the Recovery and should immediately discuss how to address such liability, if any, with your accountant or other tax adviser._ We do not have the requisite qualifications to provide you with advice regarding any tax liability which may arise as a result of the Recovery, but shall assist you however you reasonably request in finding such a tax adviser. IRS Circular 230 Disclosure: As required by federal law and to ensure compliance with requirements imposed by the Internal Revenue Service, please be advised that any U.S. federal tax advice is not intended to be used or relied upon, and cannot be used or relied upon, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

BALESTRIERE
FARIELLO

Obligations by You Do Not Reduce Success Fee.  If, in any action, you are ordered or agree to pay any money, or provide any other service or thing of value of any kind, from any source, as a party, this shall not reduce the Success Fee.  As a simple example, if we obtain a recovery for you of $1,000.00, but you also, as part of the matter, either agree to or are ordered as part of a judgment, award or any other order, to pay $250.00 to another party, our Success Fee shall still be based on the recovery of $1,000.00, which we obtain for you, and not reduced by the amount ($250.00) you are ordered to pay.

The Firm shall, at the Firm's sole discretion, receive either the Success Fee of the following amount or attorney's fees awarded by the Court, or provided by agreement, if there is an order or agreement regarding attorney's fees.  You agree to provide any necessary assistance to the Firm to seek attorney's fees from the Court, if relevant.

The Success Fee shall be determined on the following schedule:

- 35% of the entire Recovery (however and whenever recovered) if the case is resolved before the filing of any documents of any kind with a court or other dispute resolution body

- 37.5% of the entire Recovery (however and whenever recovered) if the case is resolved after the filing of any documents of any kind with a court or other dispute resolution body, but before the trial stage

- 40% of the entire Recovery (however and whenever recovered) if the case is resolved before the trial stage.  The "trial stage" is defined as the time after we have taken any steps of any kind actually preparing for trial or arbitration and either (1) upon the completion of discovery, including, but not limited to, once a settlement conference has been scheduled at or near the end of discovery, or (2) after litigation and resolution of motions for summary judgment, if any.

## Expenses

Additional Charges for Expenses.  You are completely and solely responsible for any out-of-pocket costs of any kind and any expenses actually incurred on your matter, however small.

These include, by way of non-exhaustive example, expenses for travel (including reasonable client-related flights, trains, cars, lodging, reasonable meals, Internet access, and other expenses), off-site photocopying or document production, discovery or other litigation or investigations support services (which may require engagement of outside vendors, for which the Firm will provide you invoices including an up to 35% mark up for Firm administration and relationship management of the vendor), courier and messenger services, private investigators, shipping and postage, online legal research (billed proportionally to the amount of research done on your matter), proportional allocation of document-review and production programs allocated for your matter, expert witnesses and/or professional vendor services of any kind, transcription services, meals for staff who must spend time during the meal working on the case, non-exempt employee overtime for work on your matter, late night car or cab service (when staff work on your matter past 8:30pm or on weekends or holidays), electronic funds transfer or bank

transaction charges, and other items and services related to your matter. The Firm charges a minimum of $25 for any conference call, regardless of length or number of participants. It is the Firm's standard policy to travel via business class for any flights exceeding four hours.

Please note that there may be instances where you will incur travel or other case-related expenses for scheduled court appearances or other scheduled appearances which may be cancelled or postponed, either by the Firm or any other party to the matter. The Firm is not responsible for issuing a credit or refund for any expenses actually incurred in connection with any cancelled or postponed events when the cancellation or postponement was unavoidable. During intensely litigated times in the case, such as during a stretch of depositions, an evidentiary hearing, or at trial, please note that we may be more likely to bill meals or take car service. During evidentiary hearings or trials firm staff generally will stay in hotel rooms close to the court or hearing forum and will employ the hotel's provision of room service and other concierge services in order to save the time of staff assigned to the matter. Also, you may continue to incur expenses even after the litigation or arbitration has concluded since the Firm will continue to do work on the matter until all issues have been completely resolved by all parties and the matter closed by the Firm. Any expenses incurred on the matter will be distinguished in the invoice you receive.

Payment. The Firm shall receive the actual payment for any Recovery or portion of the Recovery into the Firm's trust account. The Success Fee based on the entire eventual Recovery, regardless of whether the entire amount of the Recovery is received at initial payment time, shall then be paid to the Firm in full. Then, expenses advanced by the Firm, if any, will be deducted from the remainder of the Recovery and paid to the Firm. Then, any expenses owed to any vendors which the Firm engaged on your behalf or which you directly engaged shall be paid to satisfy any of your debts to such vendors. Finally, the amount of Recovery that remains will remain in the Firm's trust account until the undersigned has agreed to the distribution of the balance of the Recovery. If multiple clients are engaged, and unless otherwise directed, we shall distribute the remaining Recovery in equal portions to each client. All payments which constitute the Recovery, whenever made, shall be received first by the Firm and then distributed consistent with this paragraph.

Award of Costs and Fees. The prevailing party in this litigation may be entitled to recover all attorneys' fees (including, in the event you are the prevailing party, the reasonable value of the time of all professionals in our Firm who perform legal services in any such arbitration or litigation, as determined by the arbitrator or judge), all experts' fees and expenses and all costs (whether or not such costs are recoverable that may be incurred in connection with either obtaining or collecting any judgment and/or arbitration award, in addition to any other relief to which that party may be entitled.)

If a court or any other body should award fees or costs against you and in favor of an opposing party, you will be solely responsible for payment of that amount separately from any amounts due to us, and without regard to the outcome of the litigation or arbitration.

Fees and Expenses: Distinction. The different terms "fees" and "expenses" have the ordinary meaning as those terms are used regarding legal services.

**BALESTRIERE FARIELLO**

- Fees are payments to a lawyer for services and value provided by the lawyer.
- Expenses are moneys actually spent out of pocket on goods or services separate and apart from the actual services or value provided by the lawyer.

<u>Obligation to Pay the Firm</u>. Should you seek the assistance of any other attorney, law firm, or other party to aid in the litigation of this matter, you shall remain solely responsible for any fees owed to the Firm, as well as to any other outside party, whether or not affiliated with the Firm. Any fees or expenses owed to any outside party will not diminish the amount of fees owed to the Firm. You agree to fulfill your outstanding fee obligations to the Firm prior to the fulfilling of any obligations to any new attorney, affiliated or not, with our Firm. You agree that the Firm reserves all rights we have to fees, whether in quantum meruit, contract, or any other form. You also agree to notify us in writing if you engage or obtain the services of any other lawyer at any time to represent you in the matter.

<u>Estimates</u>. All dispute resolution is by definition inherently risky and unpredictable. Consequently, although we may offer an opinion about the possible or probable course or results of our engagement, including fees and costs needed to complete the matter, **<u>we cannot and do not guarantee or represent that we can obtain any particular result, or that the amount of fees or expenses shall be a certain amount or less</u>**. Any projections we make regarding costs shall be made in good faith, but are not guaranteed regarding what the actual cost will be. The cost of dispute resolution may change dramatically based on factors we do not control, including, for example, actions taken by our adversary, rulings by the court or other dispute resolution body, changes in the law, or other developments in the dispute resolution. The actual fees and costs for which you will be liable will be based on this Agreement. Past results do not guarantee future outcomes.

<u>Lien</u>. You agree that the Firm will have a lien for its fees and costs (including expenses) advanced on all claims and causes of action subject to its representation of you under this Agreement and on all proceeds of any Recovery obtained (whether by settlement, arbitration award, court judgment, or any other means, regardless of whether the Firm is counsel of record, and regardless of whether the relationship between you and the Firm is terminated).

<u>LEAD REPRESENTATION, MAJOR DECISION MAKING, AND AUTHORITY</u>

As long as the Firm represents you in any way in this matter, the Firm shall remain lead counsel. This means that the Firm shall have primary authority in the matter compared to any other lawyers or advisors, and any other attorney, law firm, or other party that may aid in the litigation of this matter shall not make any tactical, strategic, and litigation decisions without the Firm's prior written consent.

The Firm shall make all tactical, strategic, and litigation decisions in the matter we are ethically permitted to, **including any public relations decisions (including dealing with any media and issuance of any public statements of any kind, including press releases)**. However, we shall discuss all major decisions in the case with you. You acknowledge that we have that right to publicize or otherwise distribute public information regarding the matter.

**BALESTRIERE FARIELLO**

<u>Coordination</u>. In addition, Crotty Saland, LLP (Crotty Saland"), shall work with the Firm on your matter pursuant to the following terms. You hereby consent to the terms of the following fee-sharing arrangement between the Firm and the Crotty Saland Firm prior to the time of the proposed association between attorneys. These terms shall not increase any fees due by you under this Agreement.

- The Firm and Crotty Saland shall split the Success Fee recovered by the matter. Crotty Saland shall receive 50% of the Success Fee, if the matter is resolved prior to filing any complaint with any court or dispute resolution body, and 30% if the matter is resolved after the filing of any complaint with any court or dispute resolution body.

- The Firm and Crotty Saland assume joint responsibility for the representation for as long as this fee-sharing agreement is in effect, and the division of the Success Fee is based upon this joint responsibility. In accepting joint responsibility, Crotty Saland will make reasonable efforts to assure adequacy of representation, provide adequate client communication, respond to client questions, and assist the Firm when necessary.

- You acknowledge and understand that Crotty Saland and the Firm are not in or a part of the same firm. You further acknowledge that the total fee to be charged is reasonable, not excessive and not unconscionable considering, among other things, the nature of the fee agreement (contingency fee), the legal expertise involved in the representation, the legal issues involved in the representation, and the amount of work and investment of resources necessary to prosecute your case.

<u>Settlement</u>. The Firm will notify you promptly of the terms of any settlement offer received by the Firm. If, however, you instruct the Firm to settle contrary to the advice of the Firm, reject a settlement offer the Firm recommends, or do not settle at all when the Firm recommends to do so, the Firm will be entitled, at its sole option, to the greater of (i) a fee calculated in accordance with the percentages set forth in the Success or Share of the Recovery Fee paragraph above, applied to the amount of the proposed settlement we recommend, or (ii) its attorneys' fees, (including its fees for the services of any employees or affiliates of the Firm calculated at the Firm's non-discounted hourly rates, as well as reimbursement for all costs (including expenses) advanced before the settlement offer).

The Firm will not settle your claim without your approval, but we ask you to understand at the beginning of this engagement that we should be compensated for time we continue to devote to a matter if we have obtained a settlement amount which we recommend and which you reject. Subject to the foregoing, you shall have the absolute right to accept or reject any settlement.

You, in turn, agree that you shall not settle or make any offers of compromise without the Firm's participation and that, if you do, you shall immediately owe the Firm, at our sole discretion, either the Success Fee as define by this agreement or our attorney's fees charged at our standard, undiscounted hourly rates for all time we devote to the matter.

**BALESTRIERE FARIELLO**

<u>Compensation for Other Matters</u>.  The engagement of the Firm pursuant to this Agreement encompasses only our representation in the matter.  As noted above, until we come to another agreement, **if we perform legal services for you on any other matter, you agree to pay the Firm based on our standard hourly rates** and to reimburse us for our costs as set forth in a separate invoice or invoices to you, which are payable on receipt.

<u>Direct Engagement of Third Party Professional Services</u>.  You agree that you may execute any necessary contracts, agreements, or statements of work with any third-party vendors or experts.

<u>Borrowed Firm Funds</u>.  In accordance with the New York State Bar Association's Ethics Opinion 754-2/25/02, as well as the applicable ethics opinions of other states, it is ethical for an attorney to borrow funds from a third-party lender to cover litigation expenses, or to fund his law practice, and the interest charged by the lender to a lawyer on the funds borrowed by the lawyer to fund litigation expenses may be passed on to you as a legitimate litigation expense if certain conditions are met:

- You must remain ultimately liable for expenses paid under Rule 1.8(e) of the New York Rules of Professional Conduct,
- the lawyer cannot have any interest in the lender,
- client confidentiality cannot be compromised,
- the terms of the borrowing are disclosed with adequate advance notice to you,
- the time after which interest is charged to you, and the loan interest rate, are both reasonable,
- you have consented to the loan in advance of the closing thereof,
- you are permitted to avoid paying the interest charges by paying the funded disbursements before the loan is taken, and
- the disbursements themselves must be fair and appropriate to the case.

See also, Association of the Bar of the City of New York, Formal Op. 1997-1.  Please note that if all conditions are met, and the Firm uses a portion of said loan to fund the matter, an interest expense will be passed on to you.

<u>LIMITATION OF SCOPE OF SERVICES</u>

The litigation or arbitration of any related claims or defenses, or any claims against any other parties shall be subject to separate engagement.  We welcome the opportunity to serve you further, so please do not hesitate to ask us about this.

Not included within the scope of our representation is any work of any kind involving any party other than those names above, as well as any appeals, addressing counter-claims or claims of any kind against you in this or any other matter, or enforcement of judgments.  Such other services are subject to separate discussions and negotiation between our Firm and you.  Any such services the Firm provides shall be billed to you at an hourly rate basis unless and until we do come to a separate engagement regarding such services.

Also, not included in the scope of this engagement are services you may request in connection with any other matter, action, or proceeding, including any general counselling to you or your company.

WAIVER

Waiver of Future Conflicts with Any Adverse Party. We may currently or in the future represent one or more other clients in matters that may in some way relate to your current matter. We are undertaking this engagement on condition that we may represent other clients in matters in which we do not represent you, even if the interests of the other clients are adverse to yours, including the appearance on behalf of another client adverse to you in litigation or arbitration, provided that the other matter is not substantially related to our representation of you, and that in the course of representing you we do not obtain confidential information from you material to the representation of the other clients. If our Firm does not continue an engagement or is required to withdraw from a matter due to a conflict of interest, you may incur delay, prejudice, or additional cost associated with acquainting new counsel with the matter.

Your express consent to this arrangement is required, however, because of the arrangement's possible adverse effects on the performance of our duties as attorneys to remain loyal to each client, to maintain client confidences, and to render legal services with vigor and competence.

By your signature below, you hereby waive any right you may have now or in the future to object to, or to disqualify the Firm from, representation of any third party in any future litigation. You further acknowledge that you make this express waiver voluntarily, knowingly, and intentionally, in consideration of the Firm's Agreement to represent you in this matter.

Nothing in this letter permits us to represent in any fashion in this matter a party which is actually adverse to you in this matter. Such action is unethical and something the Firm would never do. Upon engagement by you in this matter, we cannot represent any party whose interests are adverse to yours in this matter.

POTENTIAL TERMINATION OF RELATIONSHIP

Initial Termination of Services. If, after our initial investigation and before we file any complaint or notice of any kind, we decide not to continue to represent you in this matter, we shall notify you of that decision and our services will be terminated. After that point there will no longer be an attorney-client relationship between us, and we will not represent you further in this matter.

Moreover, at any time after the execution of this Agreement or any future engagement Agreement or amendment, you agree that we have the right to stop representing you in this matter, consistent with our ethical obligations, and you have the right to terminate our services without cause. If we decide to stop representing you, we shall notify you of that decision, and all of our services in this matter will be terminated.

Withdrawal. The Firm may withdraw from engagement at any time permitted by law. The circumstances under which it may be permissible to withdraw include, but are not limited to, the following: (a) upon your consent, or (b) if we determine that you have made a material

**BALESTRIERE FARIELLO**

misrepresentation to the Firm or omitted to disclose a material fact to the Firm, or (c) if, in the Firm's opinion, your conduct renders it unreasonably difficult for the Firm to carry out its retention effectively.

In the unlikely event that circumstances make it necessary to do so, we may withdraw with good cause from this engagement for nonpayment of fees or expenses or for any other reason authorized or required by the applicable rules of professional conduct. Notwithstanding the Firm's withdrawal, you will be obligated to pay the Firm its fees set forth in this Agreement, including, at our sole discretion, either the Success Fee (as defined above in percentages according to stage when the Recovery was achieved or what the end Recovery was, regardless of whether we were providing you services at the time of any Recovery or other successful result of any kind), or our attorneys' fees, (including its fees for the services of any employees or affiliates of the Firm calculated at the Firm's non-discounted hourly rates, as well as reimbursement for all costs (including expenses) advanced before the settlement.)

We hope that this relationship continues for the life of this matter, and we would only terminate our services consistent with our ethical obligations.

Client's Termination of Services.  You are entitled to terminate this engagement for any reason, subject to the Firm's right to be paid for services already rendered and expenses already incurred on your matter or any other service the Firm has provided for you.

If you decide to terminate the Firm without good cause shown, and without such specific cause or causes made explicit to us in writing, we shall still be due, regardless of whether we were providing you services at the time of any successful result of any kind (settlement or otherwise), our attorneys' fees.  Our attorneys' fees shall be, at the Firm's sole discretion, either the fees as provided for in this engagement letter, or our fees on an hourly rate basis for the services of any employees or affiliates of the Firm calculated at the Firm's non-discounted hourly rates.  The Firm shall also be due full reimbursement for all costs expended in any way on your behalf.

The Firm reserves all rights, including the right to litigate to seek any unpaid fees, should we so choose.

We hope that neither you nor we will seek to terminate the relationship prior to the resolution of the matter.  While the fee arrangement described in this Agreement otherwise controls, if either of us does decide to terminate the relationship, we agree to discuss the best way to resolve any fee arrangement.

ARBITRATION REGARDING A FEE DISPUTE

In the event that a dispute arises between us relating to our fees, you may have the right to arbitration of the dispute pursuant to Part 137 of the Rules of the Chief Administrator of the Courts, a copy of which is attached to this Agreement.

**BALESTRIERE
FARIELLO**

## COOPERATION AND TRUST

You agree to cooperate and fully participate in the conduct of any matter in which we provide services to you, including providing us with information we need in order to adequately represent you and provide the services you wish.

Such cooperation also includes, but is not limited to:

- reasonably being available for meetings in our office and for phone calls;
- promptly responding to any correspondence we send to you, including e-mails;
- timely paying invoices, and raising any concerns you have with any invoices with us immediately;
- raising issues of concern with us, of any kind, promptly, respectfully, and without delay;
- devoting your own time necessary to work with us to achieve as successful a resolution as possible in your matter;
- being available to review drafts of documents, should we request, **which you acknowledge are sent to you in draft form.**
- promptly providing truthful and complete responses to any requests for information, and not failing to disclose information or omitting information of any kind whatsoever which is material to the matter or to our attorney-client relationship; **you promise to provide this information even if you believe you have previously disclosed the requested information** (please understand that such repeated requests are commonplace and necessary, particularly at the beginning of a matter, so that we fully understand the facts and can be the best advocates we can be for your position);
- trusting that we will always endeavor to have our Firm take whatever steps we believe necessary, and spend whatever time is warranted, in order to provide you with superior legal representation and counseling (we are organized to be efficient, and shall always strive to be, but will not be so at the expense of quality work product or our ethical obligations);
- being prepared to push this case to trial or arbitration if necessary (unless we agree in writing that the engagement is for a limited purpose, you should NOT engage us unless you are prepared to go the distance in this matter and push the case to arbitration or trial);
- committing to engage only in legal and ethical conduct, and conduct which comports with any applicable laws, rules, and regulations.

## INDEMNIFICATION

You agree to indemnify and hold harmless the Firm from any and all actions, suits, proceedings, and investigations brought by third parties for damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and/or disbursements directly or indirectly caused by, relating to, based upon, arising out of, and/or in connection with your engagement of services by the Firm. Your obligations to indemnify the firm shall not apply under those circumstances where there has been a finding of ethical or legal misconduct by the Firm.

**BALESTRIERE FARIELLO**

This provision shall in no way limit your right to bring a legal malpractice claim against the Firm to the extent permitted by law.

<u>DISPOSITION OF FILES</u>

After the conclusion of your matter, you have the option to take possession of your file, at your expense. It will be your obligation to maintain current contact information with the Firm.

<u>ENTIRE AGREEMENT AND SEVERABILITY</u>

This Agreement contains the entire understanding of you and the Firm with regard to our provision of services to you. If any provision of this Agreement is held in whole or in part to be unenforceable for any reason, the remainder of that provision and of the entire Agreement will be severable and remain in effect.

<u>JOINT REPRESENTATION AND INSURANCE</u>

<u>Joint Representation</u>. As you know, the Firm has been engaged to represent Mia Lytell, Amy Moore, and Katrina Rico in the above-referenced litigation. Please see Appendix A, incorporated here by reference, to understand the benefits and consequences of joint representation.

<u>INDEPENDENT COUNSEL</u>

You acknowledge that you had sufficient time to review this Agreement and consult with other attorneys or advisors concerning this Agreement if you so desire, and that you have freely determined to execute this Agreement without duress.

<u>COMMUNICATION</u>

It is important to us that our clients be aware of the progress of their matters, and that they have the full opportunity to ask us any questions that may arise. Accordingly, we hope you will feel free to contact us—either in our office, on our mobile phones, or via e-mails—with any questions, whether relating to the case, your invoices, the fees, or anything else regarding our relationship.

<u>SCOPE AND ENFORCEMENT OF THIS AGREEMENT</u>

This Agreement may not be amended, waived, or modified without the mutual written consent of all of the parties hereto. This Agreement shall be governed and construed in accordance with the laws of the State of New York without regard to any applicable principles of conflicts of law.

In the event that Part 137 of the Rules of the Chief Administrator of the Courts (a copy of which is attached hereto) does not apply, or if you otherwise elect not to proceed under Part 137 of the Rules of the Chief Administrator of the Courts, any dispute, claim or controversy arising out of or relating to this Agreement, including without limitation the Firm's representation of you, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in New York, New York before one arbitrator.



The arbitration shall be administered by JAMS pursuant to the expedited procedures set forth in JAMS's Comprehensive Arbitration Rules and Procedures as those Rules exist on the effective date of this Agreement, including Rules 16.1 and 16.2 of those Rules, unless the parties otherwise agree in writing to other rules which shall apply. Judgment on the Award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

In any arbitration arising out of or related to this Agreement, the arbitrator shall award to the prevailing party, if any, costs and attorneys' fees of any kind reasonably incurred by the prevailing party in connection with the arbitration, including any costs reasonably incurred prior to initiation of the arbitration but related in any way to a breach of this Agreement. If the arbitrator determines a party to be the prevailing party under circumstances where the prevailing party won on some but not all of the claims and counterclaims, the arbitrator may award the prevailing party an appropriate percentage of the costs and attorneys' fees reasonably incurred by the prevailing party in connection with the arbitration.

You agree that this Agreement may be executed in identical counterparts and may be transmitted by facsimile or e-mail, each of which shall be deemed an original for all purposes.

Besides signing below, please write your initials and the date on every page of this agreement.

If you have any questions about anything at all, please do not hesitate to contact us.

We look forward to fighting for you and being your advisor.

Sincerely,

/s/ John G. Balestriere                               August 21, 2017
John G. Balestriere                                   Date
Balestriere Fariello

The above is understood and agreed to:

_____          08/21/17
Mia Raquel Lytell                                     Date

_____          8/21/17
Amy Moore                                             Date

_____          8/21/17
Katrina Rico                                          Date

cc:   Jeremy Saland, Esq. (via email: jsaland@crottysaland.com)



## APPENDIX A: Joint Representation

An undertaking by a lawyer or law firm to represent multiple clients in the same matter is called a "joint representation." Such an arrangement permits certain savings of costs that otherwise would be incurred if each client retained separate counsel. In this particular case, you have agreed to share costs with the other parties represented by this Firm, including Mia Lytell, Amy Moore, and Katrina Rico.

Joint representation is not mandatory in this matter, however, and you hereby acknowledge that you have the right to retain your own independent counsel. You should also feel free to consult with separate counsel about the substance of this Agreement, and you remain free to seek the advice of separate counsel at any time even if you agree to this joint representation.

The applicable rules of professional responsibility permit the representation of clients in the same matter provided that the lawyer or Firm can adequately represent each client's interests and each client knowingly consents to the joint representation. Because you share with the other parties represented by the Firm a common interest in this matter, there does not appear to be an actual conflict between you in the pursuit of that common interest.

There exists, however, the potential for conflict. Also, as in any case involving multiple defendants/plaintiffs, the interests of the co-defendants/plaintiffs may diverge during the course of the litigation, even though they do not actually conflict. For example, one defendant/plaintiff may prefer a quick settlement of the matter while another desires a vigorous defense/prosecution. Although we are not currently aware of any actual or reasonably foreseeable adverse effects of joint representation, it is possible that issues may arise in which our representation of one of you may be materially limited by our representation of another. If such circumstances arise, we must together evaluate whether continued joint representation is appropriate, as discussed below.

It is our understanding that you do not seek to assert claims against any of the other parties we are representing in the action. We could not assert any such claims on your behalf as we would have a conflict of interest. We thus are not advising you, and have not advised you, whether you would or would not have claims against any other parties we are representing in the action. If you believe that you might have such claims, you should engage other counsel to advise you with respect to such claims, and if you want to assert such claims in this action, you should advise us immediately, as we would not be the proper counsel to represent you in this action.

We understand that you do not object in any way to the Firm representing you in this matter and that, **to the extent that any potential conflict may exist or appear to exist, you waive any such conflict.** Based on the information provided to us, and your expressed desire for joint representation, we have concluded that we may appropriately represent you in this matter.

If at any time you have any concerns about the appropriateness of continued joint representation, you should let us know immediately so that we can reevaluate our continuing representation of each of the parties in this action. If we become aware of any such circumstances, we will do the same.

**BALESTRIERE FARIELLO**

In the event that joint representation is no longer appropriate, by virtue of any adversity, dispute, or conflict that may arise between any of the clients we represent, we will determine which of you we will continue to represent and will offer to assist the others to find appropriate substitute counsel. You agree that, in such circumstances, you will consent to our continued and future representation of those whom we elect to continue to represent and will not seek to disqualify the Firm from such representation, and will assent to the Firm's withdrawal as attorney of record for you. In the event that the Firm withdraws from representing you, we will take reasonable steps to avoid any reasonably foreseeable prejudice.

In addition, if you proceed to accept the benefit of our services in this matter, that will indicate and confirm your Agreement: (i) that the Firm's representation of you hereunder is not a conflict or to the extent a conflict exists, you waive such conflict; (ii) such representation shall not disqualify the Firm from representing any other member of the group in an <u>unrelated</u> matter when that member may have interests that are or may be adverse to you or your company; and (iii) that you will not seek to disqualify the Firm from any such representation.

In the ordinary one lawyer/one client relationship, confidential communications between the lawyer and the client are privileged from disclosure to any third party without the client's consent. This privilege also exists in a joint representation with an important qualification: a confidential communication between the lawyer and client may not be disclosed to third parties, but may be shared with other jointly-represented clients. In other words, any communication between you and the Firm relating to this action may be disclosed to the other clients who agree to this joint representation.

We will continue to keep you informed about any material developments in the case. We will also notify you and consult as appropriate regarding any settlement proposals. In the event a joint settlement proposal is made, we will seek written consent from each represented party before entering into a settlement relating to the claims in this matter (unless you are only a defendant with no claims against any party and the settlement results is a dismissal of all claims against you without committing you to do or pay anything). As there are a number of different claims or potential claims here, it is possible that a settlement may be proposed involving only certain claims. Before entering into such a proposed settlement, we will only seek written approval from those of you who have or are named as a defendant in the specific claims being settled.



### Attorney-Client Fee Dispute Resolution Program

The New York State court system has established a Statewide Fee Dispute Resolution Program (FDRP) to resolve attorney-client disputes over legal fees through arbitration (and in some cases mediation).  See the full program description here http://www.nycourts.gov/admin/feedispute/pdfs/FD_brochure.pdf).

The FDRP is made up of a network of State-approved and monitored local programs that resolve attorney-client fee disputes outside of court through arbitration.  Arbitration is a hearing conducted by one or more neutral persons who have special training and experience.  One arbitrator or a panel of three arbitrators (at least one of whom must be a non-lawyer) listen to the arguments on both sides and decide the outcome of the dispute.  Fee arbitration is fair, inexpensive and usually faster than going to court.

In addition to arbitration, some local programs may offer mediation.  This is a process by which both sides meet with the assistance of a trained mediator to clarify issues and explore options for a mutually acceptable resolution.  Mediation provides the opportunity for you and your attorney to discuss your concerns and reach a satisfactory result without going to court.  Unlike an arbitrator, the mediator does not issue a decision.  Participation in mediation is voluntary for your attorney and you, and it does not waive your right to arbitration.  If you are interested in resolving your dispute through mediation, you may indicate this on the Request for Arbitration form.  However, not every local program offers mediation.

The FDRP's Board of Governors has approved a number of local programs which administer the FDRP on a region by region basis.  These local programs are run by bar associations or by the court system's regional Administrative Judges.  All local programs have been carefully reviewed to ensure that they will resolve fee disputes in a fair, impartial and efficient manner.

In general, your lawyer may not sue you in court over a fee dispute unless he or she first provided you with notice of your right to utilize the FDRP.  Once you have received this notice you have 30 days to decide whether to use the FDRP.  If you don't choose to participate in the FDRP within 30 days, your lawyer is free to pursue the matter in court.

Fee dispute resolution services are provided by local programs throughout New York. The local program is determined by where the majority of legal services were performed. Find your local program (http://www.courts.state.ny.us/admin/feedispute/local_programs.shtml) and download the local program's rules and forms.

Please note that the FDRP's jurisdiction is limited to resolving attorney-client disputes over legal fees.

- The FDRP cannot address claims of lawyer misconduct.
- The FDRP cannot address claims of lawyer malpractice.
- The FDRP applies when:
  - Your attorney practices in New York and your case involved a civil matter.

www.balestrierefariello.com          225 Broadway, 29th Floor          New York, New York 10007

**BALESTRIERE FARIELLO**

- o The amount in dispute is between $1,000 and $50,000 (fee disputes can involve fees that you have already paid your attorney and for which you seek a refund, or fees that your attorney claims are owed by you).
- o The legal representation began on or after January 1, 2002.
- o Your attorney has rendered services to you within two years prior to the filing of the request for fee arbitration.

If you believe that your attorney committed malpractice in your case, you should not utilize the FDRP because it is possible that an arbitration decision against you with regard to the fee dispute could adversely affect your ability to pursue malpractice in court at a later date.

If you believe attorney misconduct or malpractice is present in your case, please find contact information for the appropriate Grievance Committee (http://www.courts.state.ny.us/ip/attorneygrievance/complaints.shtml).